VACA DAFFAN LLP
MONICA VACA (*pro hac vice* forthcoming)
KATI DAFFAN (*pro hac vice* forthcoming)
1717 Pennsylvania Ave. NW, Suite 1025
Washington, DC 20006
Telephone: (202) 240-7021
monica@vacadaffanlaw.com
kati@vacadaffanlaw.com

CONN LAW, PC
ELLIOT CONN, Cal. Bar No. 279920
COLIN HECTOR, Cal. Bar No. 281795
KIRA PATTERSON, Cal. Bar No. 354953
100 Bush Street, Suite 1580
San Francisco, CA 94104
Telephone: (415) 417-2780
Facsimile: (415) 358-4941
elliot@connlawpc.com
colin@connlawpc.com
kira@connlawpc.com
eservice@connlawpc.com
*Attorneys for Plaintiff Karl Kahn and
the Proposed Class*

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| KARL KAHN, individually, on behalf of all others similarly situated, and on behalf of the general public,<br><br>Plaintiff,<br><br>v.<br><br>ANTHROPIC, PBC dba ANTHROPIC, INC.<br><br>Defendant. | Case No.: 3:26-cv-5763<br><br>CLASS ACTION<br><br>**COMPLAINT FOR DAMAGES, RESTITUTION, AND EQUITABLE RELIEF; DEMAND FOR JURY TRIAL; DECLARATION REGARDING VENUE** |

Class Action Complaint – 1

Plaintiff, Karl Kahn, individually and on behalf of all others similarly situated ("the Class" and "Class Members"), hereby complains against Defendant ANTHROPIC, PBC dba ANTHROPIC, INC. ("Defendant" or "Anthropic") and on information and belief, unless otherwise expressly stated as based upon personal knowledge, alleges as follows:

**INTRODUCTION**

1. Plaintiff brings this action for Anthropic's misleading and deceptive marketing of its Claude Max subscription plans.

2. Defendant markets and sells subscription plans to Claude, a generative AI agentic coding product. Subscribers can prompt Claude to answer research questions, draft or edit text, and write code, among other things. Consumers shopping for access to a Large Language Model (LLM) like Claude typically look for the best quality services, the ability to access a high level of usage or "compute," and the best price point.

3. Defendant offers commercial plans (Team and Enterprise) and individual plans (Free, Pro, and Max).

4. Defendant's individual subscription plans cost $17-$20 per month at the Pro tier, $100 per month for the Max 5x plan, and $200 per month for the Max 20x plan.

5. In its offer of monthly subscriptions to Claude, Defendant misleads prospective customers into believing that its higher priced tier for individual subscriptions, Max 20x, delivers expanded usage of twenty times greater than the amount of usage delivered by Defendant's lower tier Pro package.

6. In fact, Defendant's Max 20x plan delivers far less than twenty times the usage of the Pro tier, delivering just six to eight times the usage of Pro.

7. Similarly, Defendant's Max 5x plan delivers far less than five times the usage of the Pro tier, delivering just three-and-a-half times the usage of Pro.

8. To make matters worse, Defendant entices consumers to pay the $200 monthly Max 20x subscription by falsely claiming it offers a 50% savings.

9. Many subscribers have reported their frustration and complained that Defendant has engaged in a bait and switch. And while Defendant has made clear, specific claims about the increased usage consumers will receive with the Max 5x and Max 20x subscription plans, Defendant's website is a black box, without any meaningful description of how usage is calculated. When customers have complained to Defendant, Defendant has failed to deliver the usage advertised.

10. To the extent that Anthropic has made representations to consumers about the specific usage tiers, these representations have conflicted with their advertisements and marketing, further demonstrating the falsity of Defendant's claims.

11. Plaintiff and putative Class Members are Claude subscribers who have experienced monetary losses from Defendant's false and misleading claims. Based on Defendant's unlawful conduct, Plaintiff seeks, on behalf of the Class, damages, restitution, injunctive relief, declaratory relief, and reasonable attorneys' fees and costs.

**JURISDICTION AND VENUE**

12. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds the sum of $5,000,000 exclusive of costs, there are more than one hundred putative Class Members, and minimal diversity exists because many putative Class Members, including Plaintiff, are citizens of a different state than Defendant. Furthermore, Defendant and each class member have agreed by contract to submit to the personal and exclusive jurisdiction of the state and federal courts in San Francisco, California.

13. Venue is proper in this District under 28 U.S.C. §§ 1391 (b)(1) and (b)(2), as Anthropic's principal place of business is in this District, and a substantial part of the events or omissions giving rise to Plaintiff's claims emanate from activities within this District.

**DIVISIONAL ASSIGNMENT**

14. Assignment to the San Francisco Division is proper under L.R. 3-2(d) and (e), since a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in San Francisco County.

**PARTIES**

15.    Plaintiff KARL KAHN is an individual, over 18 years of age. Since on or around June 23, 2025, he has been a subscriber to Claude at the following tiers: Pro, Max 5x (upgraded on January 5, 2026) and Max 20x (upgraded on April 21, 2026). At all relevant times, Plaintiff was a resident of Washington, District of Columbia.

16.    Defendant ANTHROPIC PBC is a Public Benefit Corporation incorporated in Delaware that maintains its headquarters at 500 Howard Street, San Francisco, California 94105.

**OPERATIVE FACTS**

***Defendant Markets the Max 5x and Max 20x Plans as Offering Five and Twenty Times More Usage than a Pro Account***

17.    Defendant launched its generative artificial intelligence product, Claude, in March 2023. In September 2023, Defendant began selling individual subscriptions to Claude at the Pro tier, and in April 2025, it announced the launch of individual subscriptions at the Max tier.

18.    Defendant offers subscriptions to its Claude product at different levels, including a free version, individual, team, and enterprise subscriptions. The free version does not include Claude Code or Claude Cowork. In order to access Claude Code, Claude Cowork, and higher usage limits than the free version, customers must buy a subscription.

19.    Defendant offers subscriptions to Claude on its website at Claude.com and on its desktop app.

20.    When consumers arrive at the landing page of Claude.com, Defendant's website shows them how to "Get started with Claude Code."



**GRAPHIC A**

21.     At issue in this case are the individual subscriptions, which are sold in three tiers that have increasing usage allowances: Pro, Max 5x, and Max 20x. A monthly subscription to Pro costs $17 to $20 per month, while Max 5x and Max 20x cost $100 and $200 per month respectively.

22.     Defendant prompts consumers interested in subscribing to create an account. But first, they must check a box that states: "I agree to Anthropic's Consumer Terms and Acceptable Use Policy and confirm that I am at least 18 years of age."

23. Once consumers click "Create Account," Defendant's site takes consumers to a page titled "Plans that grow with you."

**GRAPHIC B**

24. For the Max plan, the primary feature Defendant highlights is "more usage." The copy urges: "Choose 5x or 20x more usage than Pro."

25. When consumers click on "Get Max plan," Defendant's website takes them to a screen that again differentiates the Max plan by comparison with the Pro plan. Once again, this screen explicitly represents that the Max 5x plan provides five times more usage than Pro, and the Max 20x plan provides 20x more usage than Pro:

## Max plan

| ● | ○ | Save 50% |
|---|---|---|
| 5x more usage than Pro $100.00/month + tax | 20x more usage than Pro $200.00/month + tax | |

### Order details

| Max plan 5x more usage than Pro | $100 |
|---|---|
| Subtotal | $100 |
| Total due today | $100 |

ⓘ Your subscription will auto renew on 7/2/2026. You will be charged $100.00/month + tax.

**GRAPHIC C**

26.    Defendant's interface, at Graphic C, also identifies the prices of the two Max plans, specifically calling out a savings of "50%" with the 20x plan.

27.    Defendant's interface provides updated price information to consumers who click on the round button next to the words "Save 50%" for the Max 20x plan:

**Max plan**

○                            ●            **Save 50%**

**5x more usage than Pro**              **20x more usage than Pro**
$100.00/month + tax                $200.00/month + tax

**Order details**

| | |
|---|---|
| Max plan<br>20x more usage than Pro | $200 |
| Subtotal | $200 |
| Total due today | $200 |

ⓘ Your subscription will auto renew on 7/2/2026. You will be charged $200.00/month + tax.

**GRAPHIC D**

28.     Defendant's interface at Graphics C and D permits users to scroll down to a request for payment information, and includes a checkbox next to this statement: "You agree that Anthropic will charge your card in the amount above now and on a recurring monthly basis until you cancel in accordance with our <u>terms</u>. You can cancel at any time in your account settings."

29.     The "terms" link to Defendant's Consumer Terms of Service, as they did at the beginning of the sign-up flow.

30.     Once the consumer provides payment information and checks the box identified in paragraph 22, the consumer can "Subscribe."

31.     Some users upgrade through their desktop Claude application by accessing their billing page and clicking on "adjust plan."

**GRAPHIC E**

32.    Users who click on "adjust plan" are taken to a "Plans that grow with you" page. The page is parallel to Graphic B except that it presents only two options, Pro and Max, excluding the free version.

33.    Clicking on the Max plan takes the user to a plan change page similar to Graphic D but incorporating information about the user's current plan:



**GRAPHIC F**

34.    Defendant's enrollment interface leads reasonable consumers to understand that the Max 5x plan provides 5 times more usage per month than the Pro plan.

35.    Defendant's enrollment interface leads reasonable consumers to understand that the Max 20x plan provides 20 times more usage per month than the Pro plan.

36.    Defendant's enrollment interface leads reasonable consumers to understand that the Max 20x plan is offered at a savings of 50%.

*Defendant Obscures How It Measures Usage*

37.    Despite Defendant's clear and specific representations about the relative amount of additional usage available under the 5x and 20x plans, and the purported 50% savings obtained by subscribing to the 20x plan, Defendant does not provide any explanation that usage means anything other than what it would ordinarily be understood as—that is, the computational resource usage available over each subscription period.

38.    But subscribers have expressed frustration that they have not received what they paid for.  For example, consumers have complained publicly:

- "Last weekend I upgraded my 5x Max plan to 20x Max. After noticing the credits dropping much faster than I would expect I dug into the data. The jump from 5x Max to 20x Max is absolutely not 4x the weekly credits compared to 5x Max, which is what the plan implies. Based on my actual usage data from ccusage it comes out to roughly 1.4 to 2.5x."

- "wtf is this, anthropic? i've been on x5 for almost a year and decided to try 20x. Now i'm already at 50% of the weekly limit and not even 36 hours in. wtf. the weekly limit feels basically the same as x5, but it just makes the 5-hour sessions longer, which means you burn through the weekly limit even faster. what the hell is this? i feel cheated. my $200 is not worth it."

- "How is the "Max 20x" only an additional 5-9 hours of Opus 4, and not 4x that of "Max 5x"? At least I'd expect a doubling, since I'm paying twice as much."

- "I am only on my third day of the week and I have already used 50% of my weekly allowance on the 20x Max plan. I am only running a single instance, with no MCPs or anything else. Last week when using Claude Code just as heavily on the 5x Max plan I only hit 100% on Saturday. Now, with the 20x Max plan it looks like I will not even make it through the week even though I am definitely not using Claude Code four times as much. To me this feels like false advertising. Anthropic support did not provide any useful assistance. The bot repeatedly gaslighted me and cut me off at the end."

39.    The mismatch between marketing and delivery has been reported to Defendant, but Defendant has not made changes to its representations.

40.    Confused subscribers searching Defendant's website for more concrete information about the usage limits on the Max 5x and Max 20x plan will not find a clear answer.

41.    The disclaimer at the bottom of Graphics A and B states simply that: "<u>Usage limits</u> apply. Prices don't include applicable tax. Price and plans are subject to change at Anthropic's discretion."

42.    Clicking on the hyperlink to "usage limits" takes users to a "Usage limit best practices" page, which at the very top, refers users to other pages:

# Usage limit best practices

Updated over a week ago

The number of messages you can send will vary based on your Claude plan. For more information on your plan's usage, refer to the following resources.

- **Free Claude**
- **Pro plan**
- **Max plan**
- **Team plan**
- **Enterprise plan**

**GRAPHIC G**

43.    Consumers who click on the hyperlink for "Max plan" will be taken to an article touting the much higher usage availability for Max plans and explaining that weekly usage limits reset after seven days:

### Does the Max plan have any usage limits?

Yes. The Max plan offers substantially higher usage compared to our Pro plan and is available in two tiers:

**Max 5x** provides 5 times more usage per session than the Pro plan. This tier is ideal for frequent users who work with Claude on a variety of tasks.

**Max 20x** provides 20 times more usage per session than the Pro plan. This tier is ideal for daily users who collaborate often with Claude for most tasks.

Max plans also have two weekly usage limits: one that applies across all models and another for Sonnet models only. Both limits reset seven days after your session starts.

In addition, to manage capacity and ensure fair access to all users, we may limit your usage in other ways, such as weekly and monthly caps or model and feature usage, at our discretion.

**GRAPHIC H**

44.    The page at Graphic H leaves undefined the term "session" and, aside from the comparison to the Pro version, does not further define the usage limits.

45.    A reasonable consumer who encounters Graphic H would understand that the usage limits reset after 7 days, that the Max 5x subscription plan provides 5 times more usage than Pro on a monthly (or at least weekly) basis, and that the Max 20x subscription plan provides 20 times more usage than Pro on a monthly (or at least weekly) basis.

46.    The article commencing at Graphic H directs consumers to another link, "Understanding usage and length limits." Clicking on that link takes consumers to an article titled: "How do usage and length limits work?" It begins with a subsection titled "What are usage limits?":

> ## What are usage limits?
>
> Usage limits control how much you can interact with Claude over a specific time period. Think of this as your "conversation budget" that determines how many messages you can send to Claude, or how long you can work with Claude Code, before needing to wait for your limit to reset.
>
> Your usage is affected by several factors, including the length and complexity of your conversations, the features you use, and which Claude model you're chatting with. Different subscription plans (Pro, Max, Team, etc.) have different usage allowances, with paid plans offering higher limits.
>
> Note that your usage of all different Claude product surfaces (claude.ai, Claude Code, Claude Desktop) counts towards the same usage limit.

**GRAPHIC I**

47.    After explaining that there are usage limits and the factors that affect those limits, the article beginning at Graphic I moves on to address topics such as: "How can I get unlimited usage?", "What are length limits?", "Automatic context management", and "How can I increase the size of Claude's context window?" It concludes by advising customers how they can purchase additional usage.

48. The usage tracking page and Graphics G, H, and I are outside the sales funnel, and consumers do not need to interact with them in order to subscribe to a Max plan.

49. Defendant's website fails to directly answer the question of how much usage Max plan subscribers will receive, except by reference to the Pro subscription.

50. Defendant's site permits subscribers to view what percentage of their "weekly limits" they have used. But it does not quantify the usage by reference to tokens used, hours spent, or queries made.

51. Defendant's site is not even clear about how it measures usage. The clearest statement appears on Graphic I in response to the question, "What are usage limits?" Defendant answers: "Think of this as your 'conversation budget' that determines how many messages you can send to Claude, or *how long you can work with Claude Code*, before needing to wait for your limit to reset." (Emphasis added.)

### The Actual Usage Provided by the Max 5x and Max 20x Plans is
### Far Below the Advertised Amount of Usage

52. For subscribers using Claude Code, the relevant metric, therefore, appears to be "how long you can work with Claude Code."

53. Defendant offers several different AI models as part of Claude Code. The models include Haiku, Sonnet, and Opus, and are designed for different coding tasks.

54. In communications with then-current subscribers, Anthropic confirmed that Max 5x and Max 20x subscriptions have not been receiving the advertised amount of usage.

55. Specifically, in emails to subscribers on or around July 28, 2025, Defendant announced the launch of weekly limits that reset every seven days. Defendant sent separate emails to Pro, Max 5x, and Max 20x subscribers that provided usage information for the particular subscriber base that the email was sent to.

56. Defendant's email to Pro users is titled: "Important updates to your Pro account usage limits." In that email, Defendant states: "Most Pro users can expect 40-80 hours of Sonnet 4 within their weekly rate limits. This will vary based on factors such as codebase size and user

settings like auto-accept mode. Users running multiple Claude Code instances in parallel will hit their limits sooner."

57.     Although Defendant made Opus available to Pro users, Defendant did not include a range of Opus hours in its email to Pro users.

58.     In contrast, Defendant's email to Max 5x users states: "Most Max 5x users can expect 140-280 hours of Sonnet 4 and 15-35 hours of Opus 4 within their weekly rate limits. Heavy Opus users with large codebases or those running multiple Claude Code instances in parallel will hit their limits sooner."

59.     And Defendant's email to Max 20x users states: "Most Max 20x users can expect 240-480 hours of Sonnet 4 and 24-40 hours of Opus 4 within their weekly rate limits. Heavy Opus users with large codebases or those running multiple Claude Code instances in parallel will hit their limits sooner. If you do reach a weekly usage limit, you'll have the option to purchase more usage at standard API rates to continue working without interruption."

60.     Because subscribers to each plan received only the email related to their own plan, each individual user was unable to make calculations to verify Defendant's claims. But a simple analysis based on Defendant's own statements, in the aggregate, shows that its "5x more usage than Pro" and "20x more usage than Pro" claims are false.

| Plan | Model | Hours per week[1] according to Anthropic emails | Hours per week expected if 5x and 20x multiplier claims are true | Actual usage multiplier |
|------|-------|------|------|------|
| Pro | Sonnet 4 | 40-80 | 40-80 | 1x Pro |
| Max 5x | Sonnet 4 | 140-280 | 200-400 | 3.5x more usage than Pro |
| Max 20x | Sonnet 4 | 240-480 | 800-1600 | 6x more usage than Pro; 1.7x more usage than Max 5x |

**TABLE 1**

61.     The hours of usage expected from Max 20x is four times that delivered by Max 5x. But the expected usage limits articulated by Defendant do not align with a multiple of four – they are not even a multiple of two.

62.     For example, Defendant's own statements about the actual range of hours it delivers for Opus 4 on a weekly basis demonstrate that Defendant delivers only 1.1 to 1.6 times the usage of Max 5x with the Max 20x subscription plan.

63.     Defendant's own statements demonstrate that Max 20x delivers only six times the weekly usage available in Pro for Sonnet 4.  For Opus 4, Defendant does not state what number of hours Pro delivers, but assuming it actually delivers one-fifth of Max 5x (i.e. 15 to 35 hours / 5 =  3 to 7 hours), then Max 20x delivers just six to eight times the usage of Pro.

64.     Furthermore, based on Defendant's own statements about the number of hours it delivers with Max 20x weekly, the per hour price of the Max 20x subscription is *more* than the per hour price of either the Max 5x subscription or Pro subscription for Opus 4 and Sonnet 4, not 50% less than the per hour price of Max 5x.

---

[1] There are only 168 hours in a calendar week. As Defendant's email points out, subscribers can initiate "multiple Claude Code instances in parallel," presumably accounting for the number of hours in the weekly limit exceeding 168.

| Subscription | Model | Hours delivered per week | Monthly cost | Estimated price per hour[2] |
|---|---|---|---|---|
| Pro | Sonnet 4 | 40-80 hours | $17-$20 | $0.05-$0.11 |
| Max 5x | Sonnet 4 | 140-280 hours | $100 | $0.08-$0.16 |
| Max 20x | Sonnet 4 | 240-480 hours | $200 | $0.09-$0.19 |
| Max 5x | Opus 4 | 15-35 hours | $100 | $0.66-$1.55 |
| Max 20x | Opus 4 | 24-40 hours | $200 | $1.16-$1.93 |

**TABLE 2**

*Plaintiff's Experience of Receiving Less Usage Under the Max 5x and Max 20x Plans than*

*Advertised*

65.     Plaintiff has paid between $100 and $200 per month for his Max 5x and Max 20x subscriptions since January 5, 2026. In that time, he experienced a discrepancy between the usage that is advertised for the Max 20x subscription on Defendant's enrollment website and the usage he received after subscribing to it. Plaintiff suffered injury in the following ways:

a.   He overpaid for his subscription to Max 5x;

b.   He overpaid for his subscription to Max 20x;

c.   He received less usage than Defendant represented it would provide;

d.   He may not have purchased the subscription to Max 20x if he had known the truth;

e.   He had to budget and restrict his usage of Claude, in part or in whole because of the lower limits actually provided under the Max 5x plan;

f.   He had to budget and restrict his usage of Claude, in part or in whole because of the lower limits actually provided under the Max 20x plan; and

g.   At times, he paid to purchase additional usage when the Max subscription fell short of Defendant's promises.

66.     Plaintiff acquired his individual subscriptions to Claude by purchasing them from Defendant through its enrollment website or desktop application, and he saw and relied on Defendant's usage and savings claims in the purchase funnel.

---

[2] The calculation is: monthly price / (hours per week x 4.3 weeks per month).

67.    Plaintiff used the Claude subscription plans for personal, family or household purposes.

68.    On or around June 23, 2025, Plaintiff subscribed to Claude Pro. Among other things, Plaintiff was interested in using Claude Code to accomplish computer programming tasks.

69.    Plaintiff increasingly used Claude, and decided to upgrade to the Max 5x subscription on or around January 5, 2026.

70.    Plaintiff's decision to upgrade to the Max 5x subscription was based on Defendant's representations that he would receive five times the usage of the Pro plan.

71.    Plaintiff began to use Claude Code extensively. As a subscriber to Max 5x, Plaintiff budgeted and monitored his usage of Claude Code. Soon, Plaintiff found himself needing additional usage to manage his projects.

72.    On or around April 21, 2026, Plaintiff upgraded from the Max 5x plan to the Max 20x plan.

73.    Plaintiff's decision to upgrade was based on Defendant's representations about the expanded usage limits under the Max 20x plan and the savings of 50% relative to the Max 5x plan.

74.    In upgrading from Pro to Max 5x, and from Max 5x to Max 20x, Plaintiff viewed an upgrade page that looked similar to Graphics D and F.

75.    Within weeks of subscribing to Max 20x, Plaintiff found himself encountering weekly usage limits imposed by Defendant.

76.    For example, Plaintiff discovered that using Claude in a single 5-hour window to the fullest extent permitted could burn a whopping 15% of the weekly usage allotment that Defendant set.

77.    Once again, Plaintiff found himself needing either to halt his work, ration his usage, or purchase additional usage to ensure that he could complete his work.

78.     Plaintiff's experience is typical of subscribers to the Max 5x and Max 20x plans, who similarly were induced to purchase the plan because of Defendant's claims about expanded usage and 50% savings.

79.     Having relied on Defendant's claims, Plaintiff and all consumers who purchased the Max 5x and 20x subscription plans have received less than they paid for, and Max 20x subscribers have not realized a savings of 50%.

## CLASS ACTION ALLEGATIONS

80.     Pursuant to Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, Plaintiff brings this class action on behalf of himself and all other persons similarly situated and the general public.

81.     The proposed class (the "Class") is defined as follows:

All natural persons in the United States who acquired a subscription to a Max 5x or Max 20x plan by purchasing the plan, either through an initial purchase or upgrade of an existing plan, on Claude.com or through the Claude desktop application, at any point from April 9, 2025 to the present.

82.     The class excludes the Court and its staff, and Defendant, its officers and directors, members of their immediate families, their co-conspirators, aiders and abettors, and the heirs, successors or assigns of any of the foregoing.

83.     The Class definition is subject to such further definition, limitations and exclusions as may be ordered by the Court.

**Numerosity and Ascertainability**

84.    Plaintiff is unable to state the precise number of members of the class because such information is in the exclusive control of Anthropic. Due to the nature of the trade and commerce involved, however, Plaintiff believes that the total number of Class Members is in the thousands, with approximately 18% of the Class Members being California residents, and members of the Class are so numerous that joinder of all Class Members is impracticable. The exact size of the proposed Class, and the identity of the members thereof, will be readily ascertainable from the business records of Anthropic.

85.    The disposition of the claims of these Class Members in a single action will provide substantial benefits to all parties and to the Court. Class Members are readily identifiable from information and records in Anthropic's possession, custody, or control.

**Commonality**

86.    There are common questions of law and fact affecting the rights of each Class Member and common relief by way of damages and restitution. The harm that Anthropic has caused or could cause is substantially uniform with respect to Class Members. Common questions of law and fact that affect the Class Members include, but are not limited to:

    a.    Whether Anthropic promised to deliver specific usage amounts to Max 5x and 20x subscribers, relative to Pro subscribers;

    b.    Whether Anthropic has made false and/or misleading statements of fact or has omitted, and will continue to make false and/or misleading statements or omit material facts, to members of the Class and the public concerning the usage amounts under the Max 5x and 20x plans;

    c.    If so, whether Anthropic's false and/or misleading statements of fact or concealment of material facts concerning the usage amounts of Max subscription plans were likely to deceive the public;

    d.    Whether, by the misconduct alleged in this action, Anthropic has violated the CLRA;

e.  Whether, by the misconduct alleged in this action, Anthropic has violated the FAL;

f.  Whether, by the misconduct alleged in this action, Anthropic has negligently made misrepresentations;

g.  Whether, by the misconduct alleged in this action, Anthropic has violated the UCL; and

h.  Whether, as a result of Anthropic's misconduct as alleged herein, members of the Class are entitled to damages, restitution, injunctive relief, declaratory relief, and other remedies, and, if so, the amount and nature of such relief.

**Typicality**

87.    Plaintiff's claims are typical of the claims of the other members of the Class. Anthropic's conduct has caused Plaintiff and members of the Class to sustain the same or substantially similar injuries and damages. The representative Plaintiff, like all Class Members, has been damaged by Defendant's misconduct. Furthermore, the factual bases of Defendant's misconduct are common to all Class Members and represent a common thread of misconduct resulting in injury to all Class Members.

**Adequate Representation**

88.    Plaintiff will fairly and adequately represent and protect the interests of the members of the Class. Plaintiff is a member of the Class and does not have any conflict of interest with other Class Members. Plaintiff has retained and is represented by competent counsel who are experienced in complex consumer protection and class action litigation.

89.    Plaintiff and his counsel are committed to vigorously prosecuting the action on behalf of the Class and have the financial resources to do so. Neither Plaintiff nor his counsel have interests adverse to those of the Class.

**Predominance and Superiority**

90.     The common questions of law and fact set forth herein predominate over any questions affecting only individual Class Members. A class action provides a fair and efficient

method for the adjudication of this controversy, which, for the following reasons, is superior to the alternative methods involved in individual litigation:

    a.  Prosecution of separate actions by individual members of the Class would create a risk of inconsistent and varying adjudications against Defendant when confronted with incompatible standards of conduct;

    b.  Adjudications with respect to individual members of the Class could, as a practical matter, be dispositive of any interest of other members not parties to such adjudications, or substantially impair their ability to protect their interests;

    c.  Absent a class action, most Class Members would likely find the cost of litigating their claims prohibitively high and would therefore have no effective remedy at law. Because of the relatively small size of the individual Class Members' claims, it is likely that relatively few Class Members could afford to seek legal redress for Defendant's misconduct;

    d.  Anthropic has acted or refused to act on grounds generally applicable to the Class, making injunctive relief appropriate with respect to the class as a whole; and

    e.  Class treatment of common questions of law and fact would also be a superior method to multiple individual actions or piecemeal litigation in that class treatment will conserve the resources of the courts and the litigants, and will promote consistency and efficiency of adjudication.

## CALIFORNIA CHOICE OF LAW

91.    Defendant is headquartered at 500 Howard Street, San Francisco, California. This is where Defendant's high-level employees and officers direct, control, and coordinate the corporation's activities, including its marketing, product and service development, and major policy, financial, and legal decisions.

92.    Defendant's product and service development and marketing work, including on the individual subscription plans, emanates from Defendant's headquarters in San Francisco, California.

93.     Defendant elected to have California law govern all claims and disputes arising out of its sale of individual Claude subscriptions that are the subject of this lawsuit.

94.     Specifically, Defendant's Consumer Terms of Service govern individual subscriptions, and state:

> Terms will be governed by, and construed and interpreted in accordance with, the laws of the State of California without giving effect to conflict of law principles. You and Anthropic agree that any disputes arising out of or relating to these Terms will be resolved exclusively in the state or federal courts located in San Francisco, California, and you and Anthropic submit to the personal and exclusive jurisdiction of those courts. By accessing our Services, you waive any claims that may arise under the laws of other jurisdictions.

95.     Defendant drafted its Consumer Terms of Service and requires consumers to agree to them before it will permit consumers to subscribe to the Pro and Max subscription plans.

96.     California has a significant interest in regulating the conduct of businesses operating within its borders. California has a particular interest in protecting the rights of Californians and of residents and citizens across the nation from harmful and fraudulent conduct emanating from a company headquartered and doing business in California.

97.     For all these reasons, the application of California law to all of the Class Members' claims is fair and appropriate.

98.     Under California's choice of law principles, which are applicable to this action, the common law of California applies to the common law claims of all Class Members. Additionally, given California's significant interest in regulating the conduct of businesses operating within its borders, California's consumer protection laws may generally be applied to nonresident Class Members.

**FIRST CAUSE OF ACTION**
**(Violations of the Consumers Legal Remedies Act, Cal. Civil Code § 1750, *et seq.*)**

99.     Plaintiff realleges and incorporates herein by reference the allegations in each and every paragraph above.

100.     The Consumers Legal Remedies Act ("CLRA") was enacted to protect consumers from unfair and deceptive business practices. Cal. Civil Code § 1760.

101.    At all relevant times:

a.    The Max subscription plans are services—as reflected by the nature of the activities offered by the plans and the repeated characterization of the plans as "services" by Anthropic in its Consumer Terms of Service and other materials—that were offered and purchased by Plaintiff and Class Members for other than commercial or business uses, and, as such, are "services" as defined by Cal. Civil Code § 1761(b);

b.    Alternatively, the Max subscription plans are tangible chattel that result in a physical change to computer hardware, possess corporeal form, are sought or used primarily for personal, family, or household purposes, and are therefore "goods" as defined by Cal. Civil Code § 1761(a);

c.    Plaintiff and Class Members purchased the Max subscription plans for personal, family or household purposes and, as such, are "consumers" as defined in Cal. Civil Code § 1761(d);

d.    Anthropic's sale of the Max subscription plans constitutes "transactions" as that term is defined in Cal. Civil Code § 1761(e); and

e.    Anthropic is a company, and as such, is a "person" as that term is defined in Cal. Civil Code § 1761(c).

102.    Defendant has violated the CLRA by:

a.    misrepresenting that goods or services have characteristics, uses, benefits, or quantities that they do not have, by misrepresenting the amount of usage under the Max subscription plans relative to the Pro plan, in violation of Cal. Civil Code § 1770(a)(5);

b.    advertising goods or services with an intent not to sell them as advertised, by misrepresenting the amount of usage under the Max subscription plans relative to the Pro plan, while providing confusing or inconsistent information to consumers, in violation of Cal. Civil Code § 1770(a)(9);

Class Action Complaint – 24

c.   advertising goods or services with an intent not to supply reasonably expectable demand, unless the advertisement discloses a limitation of quantity, by misrepresenting the amount of usage under the Max subscription plans relative to the Pro plan, without disclosing that the offered usage was incorrect under normal conditions, in violation of Cal. Civil Code § 1770(a)(10); and

d.   representing that the subject of a transaction has been supplied in accordance with a previous representation when it has not, by misrepresenting the amount of usage under the Max subscription plans relative to the Pro plan, without disclosing that the offered usage was incorrect under normal conditions, in violation of Cal. Civil Code § 1770(a)(16).

103.   Defendant's violations of the CLRA present a continuing threat to Plaintiff, the Class, and the general public, in that Defendant continues to engage in the above-referenced acts and practices, and unless enjoined from doing so by this Court, will continue to do so.

104.   As a proximate result of the misleading conduct and deceptive practices of Defendant and its agents and employees, Plaintiff and the Class Members have suffered actual damages. These damages include all amounts paid for the deceptively-advertised Max subscription plans, prejudgment interest, and statutory attorneys' fees incurred in bringing this action.

105.   Plaintiff has not yet complied with the notice provisions of Cal. Civil Code § 1782, and therefore does not seek damages on this claim at the time this Complaint is filed.

106.   Plaintiff will notify Defendant of the particular alleged violations of Cal. Civil Code § 1770 and demand that they correct, repair, replace, or otherwise rectify the goods or services alleged to be in violation of § 1770. The notice will be given in writing and will be sent by certified mail, return receipt requested, to the place where the transaction occurred or to Defendant's principal places of business within California. This Complaint will be amended to state a claim for damages pursuant to Cal. Civil Code § 1782(d) upon the expiration of thirty days after the notice is given.

107.    Plaintiff is entitled to an award of attorneys' fees and costs pursuant to Cal. Civil Code § 1780(a)(4).

108.    Accordingly, at this time, Plaintiff seeks equitable relief, including injunctive relief to enjoin Defendant's practices, as well as an award of attorneys' fees and costs pursuant to Cal. Civil Code § 1780, subdivisions (a) and (e).

WHEREFORE, Plaintiff prays for relief as set forth herein and below.

**SECOND CAUSE OF ACTION**
**(Violations of the False Advertising Law, Cal. Bus. & Prof. Code, § 17500, *et seq.*)**

109.    Plaintiff realleges and incorporates herein by reference the allegations in each and every paragraph above.

110.    The False Advertising Law, Cal. Bus. & Prof. Code, § 17500, *et seq.*, makes it "unlawful for any person, firm, corporation, or association, or any employee thereof with intent directly or indirectly to dispose of real or personal property or to perform services . . . or to induce the public to enter into any obligation relating thereto, to make or disseminate . . . before the public in this state . . . in any newspaper or other publication . . . or in any other manner or means whatever . . . any statement, concerning that real or personal property or those services . . . which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading . . . " Cal. Bus. & Prof. Code § 17500.

111.    Defendant disseminated claims over the internet that:

    a.    The Max 5x subscription plan provides consumers with five times more usage per month (or in the alternative, per week) than the Pro subscription plan provides;

    b.    The Max 20x subscription plan provides consumers with twenty times more usage per month (or in the alternative, per week) than the Pro subscription plan provides; and

    c.    The Max 20x subscription plan provides a 50% savings, relative to the Max 5x plan, for usage.

112.   Defendant knew or by the exercise of reasonable care should have known the claims to be untrue or misleading because:

    a.   Defendant does not deliver five times the usage of Pro with its Max 5x plan per month or per week;

    b.   Defendant does not deliver twenty times the usage of Pro with its Max 20x plan per month or per week;

    c.   Defendant does not provide usage under the Max 20x plan at a price that reflects a 50% savings from the Max 5x plan; and

    d.   Defendant's own communications with subscribers exposed the falsity of its promises.

113.   Defendant's misrepresentations therefore constitute violations of the False Advertising Law, Cal. Bus. & Prof. Code § 17500.

114.   Plaintiff seeks, on behalf of himself and the Class, to enjoin Defendant's false, misleading, and deceptive statements. Cal. Bus. & Prof. Code § 17535.

115.   Plaintiff further seeks, on behalf of himself and the Class, appropriate and reasonable ancillary equitable relief, including restitution. Cal. Bus. & Prof. Code § 17535.

116.   In addition, pursuant to Cal. Code of Civil Procedure § 1021.5, Plaintiff seeks recovery of attorneys' fees and costs incurred in the filing and prosecution of this action.

WHEREFORE, Plaintiff prays for relief as set forth herein and below.

### THIRD CAUSE OF ACTION
**(Negligent Misrepresentation)**

117.   Plaintiff realleges and incorporates herein by reference the allegations in each and every paragraph above.

118.   Under California's Civil Code, "[o]ne who willfully deceives another with intent to induce him to alter his position to his injury or risk, is liable for any damage which he thereby suffers." Cal. Civil Code § 1709.

119.   Deceit includes "the assertion, as a fact, of that which is not true, by one who has no reasonable ground for believing it to be true." Cal. Civil Code § 1710(2).

Class Action Complaint – 27

120.    Defendant:

    a.  Misrepresented the amount of usage subscribers would receive under the Max 5x subscription plan;

    b.  Misrepresented the amount of usage subscribers would receive under the Max 20x subscription plan; and

    c.  Misrepresented that the Max 20x subscription plan provided a 50% savings.

121.    Defendant did not have reasonable grounds for believing these claims to be true. In fact, Defendant's own communications with subscribers exposed the falsity of its promises.

122.    Defendant's misrepresentations about the usage amount and cost savings of the Max 5x and 20x plans were made with the intent to induce Plaintiff and Class Members to rely upon them, as they were a core feature of Defendant's marketing and promotion of the plans.

123.    Plaintiff and Class Members justifiably relied on the misrepresentation. Due to massive information asymmetries, consumers cannot reasonably verify Defendant's claims, and therefore must rely on what Defendant represents about usage availability and savings with each subscription.

124.    Plaintiff and the Class Members have suffered and continue to suffer damages as a direct result of relying on the misrepresentations.

125.    Pursuant to Cal. Civil Code § 1709, Plaintiff seeks an award of all actual damages sustained by Plaintiff and the Class Members as a result of Defendant's negligent misrepresentations.

126.    In addition, pursuant to Cal. Code of Civil Procedure § 1021.5, Plaintiff seeks recovery of attorneys' fees, costs, and expenses incurred in the filing and prosecution of this action.

WHEREFORE, Plaintiff prays for relief as set forth below.

**FOURTH CAUSE OF ACTION**
**(Breach of Contract)**

127.    Plaintiff realleges and incorporates herein by reference the allegations in each and every paragraph above.

128.    Defendant and Class Members have valid contracts for the acquisition of Claude via monthly subscriptions to the Max 5x and 20x plans.

129.    Plaintiff and Class Members have complied with the terms of the contract by paying $100 or $200 per month in exchange for access to Claude via the Max 5x and Max 20x plans.

130.    Defendant has breached its contract with consumers by failing to provide Max subscribers with five and twenty times more usage than it provides to its Pro subscribers per month (or per week, in the alternative), as advertised.

131.    Plaintiff and Class Members have suffered damages as a direct and proximate cause of Defendant's breach by overpaying for Max 5x and Max 20x, and Defendant is liable for all the detriment proximately caused by the breach, or which, in the ordinary course of things, would be likely to result therefrom. Cal. Civil Code § 3300.

WHEREFORE, Plaintiff prays for relief as set forth herein and below.

**FIFTH CAUSE OF ACTION**
**(Violations of the Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, *et seq*.)**

132.    Plaintiff realleges and incorporates herein by reference the allegations in each and every paragraph above.

133.    Plaintiff files this cause of action as a representative of the Class, and on behalf of the general public, to challenge and to remedy Defendant's business practices. California Business and Professions Code § 17200, *et seq*., often referred to as the "Unfair Competition Law," (hereinafter "the UCL") defines unfair competition to include any unlawful, unfair, or fraudulent business act or practice. The UCL provides that a Court may order injunctive relief and restitution to affected individuals as remedies for any violations of the UCL.

134. Beginning on an exact date unknown to Plaintiff, but at all times relevant herein and during the four years preceding the filing of this Action, Defendant has committed acts of unfair competition proscribed by the UCL, in connection with its marketing, advertising, offering, and provision of the Max subscription plans.

135. The business acts and practices of Defendant as hereinabove alleged constitute unlawful business practices in that, for the reasons set forth above, said acts and practices violate the Consumers Legal Remedies Act and False Advertising Law, and constitute negligent misrepresentation and breach of contract.

136. The business acts and practices of Defendant, as hereinabove alleged, constitute unfair business practices in that said acts and practices offend public policy and are substantially injurious to consumers, because Anthropic induces consumers into paying for Max plans with deceptive usage claims. Said acts and practices have no utility that outweighs the substantial harm to consumers.

137. The business acts and practices of Defendant, as hereinabove alleged, constitute fraudulent business practices in that said acts and practices are likely to deceive consumers as to the nature and true cost of the Max subscription plans, and by use of such deception, may preclude such individuals from exercising legal rights to which they are entitled.

138. The unlawful and unfair business acts and practices of Defendant described herein present a continuing threat to Plaintiff and the general public in that Defendant is currently engaging in such acts and practices, and will persist and continue to do so unless and until an injunction is issued by this Court.

139. As a direct and proximate result of the acts and practices described herein, Defendant has received and collected substantial monies or property from Plaintiff and the Class, including, but not limited to, unlawful subscription payments that were obtained in a deceptive manner. Plaintiff and Class Members have suffered injury in fact and have lost money or property as a result of the unlawful, unfair, and fraudulent acts and practices of Defendant challenged herein.

140.　Plaintiff has no adequate remedy at law and pursuant to California Business and Professions Code § 17203, Plaintiff seeks an order enjoining Defendant from engaging in such acts and practices as hereinabove alleged as directed at the general public, and an order providing appropriate restitution to Plaintiff and the members of the class.

141.　In addition, pursuant to Cal. Code of Civil Procedure § 1021.5, Plaintiff seeks recovery of attorneys' fees and costs incurred in the filing and prosecution of this action. Plaintiff is entitled to such fees and costs under § 1021.5 because:

    a.　A successful outcome in this action will result in the enforcement of important rights affecting the public interest by protecting the general public from unfair, unlawful, and deceptive practices in the offering and marketing of subscription plans, especially in the AI consumer goods and services marketplace.

    b.　This action will result in a significant public benefit by causing the disgorgement of revenues improperly collected and retained by Defendant, together with interest on that money and through the issuance of an injunction against unlawful and deceptive sales practices.

    c.　Unless this complaint is prosecuted, Defendant's activities will go unremedied and will continue, and consumers will not recover money properly belonging to them.

WHEREFORE, Plaintiff prays for relief as set forth herein and below.

**<u>PRAYER FOR RELIEF</u>**

WHEREFORE, on behalf of the Class, Plaintiff prays for judgment against Defendant as follows:

    a.　That the Court determine that this action may be litigated as a class action and that Plaintiff and his counsel be appointed class representative and class counsel, respectively;

    b.　That the Court enter judgment against Anthropic and in favor of Plaintiff and the Class on all counts;

c. That the Court find and declare that Anthropic's acts and practices, as challenged herein, are unlawful, unfair, and fraudulent;

d. That Anthropic be required to bear the cost of notice to the absent Class Members, as well as the administration of any common fund;

e. That actual damages, and/or restitution or disgorgement be awarded to each Class Member according to proof;

f. That the Court award injunctive and declaratory relief as pled or as the Court may deem proper;

g. That the Court award interest as allowable by law;

h. That the Court award reasonable attorneys' fees as provided by applicable law, including under the CLRA and/or Cal. Code of Civil Procedure § 1021.5;

i. That the Court award all costs of suit; and

j. That the Court award such other and further relief as the Court deems just and proper.

Dated:  June 14, 2026

Respectfully submitted,

/s/ *Elliot Conn*
Monica Vaca, IL Bar #6244040
(pro hac vice forthcoming)
Kati Daffan, DC Bar #991729
(pro hac vice forthcoming)
VACA DAFFAN LLP
1717 Pennsylvania Ave. NW, Suite 1025
Washington, DC 20006
Telephone: (202) 240-7021
monica@vacadaffanlaw.com
kati@vacadaffanlaw.com

Elliot Conn, Cal. Bar No. 279920
Colin Hector, Cal. Bar No. 281795
Kira Patterson, Cal. Bar No. 354953
CONN LAW, PC
100 Bush Street, Suite 1580
San Francisco, CA 94104
Telephone: (415) 417-2780
Facsimile: (415) 358-4941
elliot@connlawpc.com
colin@connlawpc.com
kira@connlawpc.com
eservice@connlawpc.com

*Attorneys for Plaintiff Karl Kahn and
the Proposed Class*

## **DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a trial by jury of each and every cause of action so triable.


Dated:  June 14, 2026                          Respectfully submitted,


                                               /s/ *Elliot Conn*
                                               Monica Vaca, IL Bar #6244040
                                               (pro hac vice forthcoming)
                                               Kati Daffan, DC Bar #991729
                                               (pro hac vice forthcoming)
                                               VACA DAFFAN LLP
                                               1717 Pennsylvania Ave. NW, Suite 1025
                                               Washington, DC 20006
                                               Telephone: (202) 240-7021
                                               monica@vacadaffanlaw.com
                                               kati@vacadaffanlaw.com

                                               Elliot Conn, Cal. Bar No. 279920
                                               Colin Hector, Cal. Bar No. 281795
                                               Kira Patterson, Cal. Bar No. 354953
                                               CONN LAW, PC
                                               100 Bush Street, Suite 1580
                                               San Francisco, CA 94104
                                               Telephone: (415) 417-2780
                                               Facsimile: (415) 358-4941
                                               elliot@connlawpc.com
                                               colin@connlawpc.com
                                               kira@connlawpc.com
                                               eservice@connlawpc.com

                                               *Attorneys for Plaintiff and the Proposed Class*

**DECLARATION REGARDING VENUE**

I, Elliot Conn, declare:

1.     I am an attorney duly licensed to practice law in all of the courts of the State of California and the United States District Court for the Northern District of California. I am an attorney in the law firm CONN LAW, PC, attorneys for Plaintiff in this lawsuit.

2.     I have personal knowledge of the facts stated herein and am competent to testify thereto.

3.     We have selected venue in San Francisco County because, per the California Secretary of State website, Defendant Anthropic's principal place of business is in San Francisco, California, in San Francisco County. In addition, Anthropic is headquartered in San Francisco County and does business in San Francisco County.

4.     Cal. Civil Code § 1780(d) allows for venue for an action such as the present matter in the county where the person against whom it has been brought has his or her principal place of business or is doing business. For the above reasons, venue is proper in the San Francisco Division of the Northern District of California pursuant to the Consumers Legal Remedies Act, Cal. Civil Code § 1780.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct, and this Declaration is executed on June 14, 2026, in San Francisco, California.


/s/ *Elliot Conn*
Elliot Conn

Class Action Complaint – 35