DAVID R. SINGH (Bar No. 300840)
david.singh@weil.com
MORGAN D. MACBRIDE (Bar No. 301248)
morgan.macbride@weil.com
WEIL, GOTSHAL & MANGES LLP
201 Redwood Shores Parkway, 6th Floor
Redwood Shores, CA 94065-1134
Telephone: (650) 802-3000
Facsimile: (650) 802-3100

*Attorneys for Defendant ANTHROPIC PBC*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

KARL KAHN, individually, on behalf of all others similarly situated, and on behalf of the general public,

Plaintiff,

v.

ANTHROPIC, PBC dba ANTHROPIC, INC.,

Defendant.

Case No. 3:26-cv-05763-AGT

**DEFENDANT ANTHROPIC PBC'S NOTICE OF MOTION AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF ITS MOTION TO DISMISS PLAINTIFF'S FIRST AMENDED COMPLAINT**

Date: November 6, 2026
Time: 10:00 AM
Judge: Honorable Alex G. Tse

## NOTICE OF MOTION AND MOTION

TO THE COURT AND ALL PARTIES OF RECORD:

PLEASE TAKE NOTICE that on Friday, November 6, 2026, at 10:00 AM, or as soon thereafter as the matter may be heard before the Honorable Alex G. Tse, in Courtroom A – 15th Floor, 450 Golden Gate Avenue, San Francisco, CA 94102, Defendant Anthropic PBC ("Anthropic") will and hereby does move to dismiss the First Amended Complaint ("FAC") filed by Plaintiff Karl Kahn in this action. Anthropic's motion to dismiss is brought pursuant to Rules 12(b)(1), 12(b)(6), and 9(b) of the Federal Rules of Civil Procedure.

Anthropic's motion is based upon this Notice of Motion and Motion, the Memorandum of Points and Authorities in support thereof, and all other pleadings and papers on file herein, and such argument and evidence as may be presented to the Court.

Dated: August 19, 2026

Respectfully submitted,

By: *<u>/s/ David R. Singh</u>*

DAVID R. SINGH (Bar No. 300840)
david.singh@weil.com
MORGAN D. MACBRIDE (Bar No. 301248)
morgan.macbride@weil.com
WEIL, GOTSHAL & MANGES LLP
201 Redwood Shores Parkway, 6th Floor
Redwood Shores, CA 94065-1134
Telephone: (650) 802-3000
Facsimile: (650) 802-3100

*Attorneys for Defendant ANTHROPIC PBC*

# TABLE OF CONTENTS

INTRODUCTION ....................1

BACKGROUND ....................3

A. Anthropic's Claude Product and Subscription Plans ....................3

B. Anthropic's Statements About Usage Limits ....................3

C. Plaintiff's Subscription History and Claims ....................5

LEGAL STANDARD ....................7

ARGUMENT ....................7

I. Plaintiff Fails to Plausibly Allege CLRA, FAL, and UCL Claims Because No Reasonable Consumer Could Be Deceived by Anthropic's Statements (Counts I–II and V) ....................7

A. Anthropic's Statements Are Clear, as Plaintiff's Own Graphics Confirm ....................8

B. Plaintiff's Theory of Deception Is Implausible ....................10

C. Anthropic's 50% Savings Claim Confirms the Implausibility of Plaintiff's Theory ..11

II. Plaintiff Does Not Adequately Plead His Claims Under Rule 9(b) (Counts I–III and V) .......12

III. Plaintiff Fails to Allege Facts Establishing Article III Standing for Injunctive Relief (Counts I–III and V) ....................13

IV. Plaintiff Fails to Plausibly Allege CLRA, FAL, and UCL Claims Because He Is Not a California Resident (Counts I–II and V) ....................14

V. Plaintiff Fails to Plausibly Allege a Negligent Misrepresentation Claim (Count III) ....................15

A. California Law Bars Tort Claims that Duplicate Contract Claims Seeking Identical Economic Losses ....................15

B. Plaintiff Does Not Plausibly Allege Any Misrepresentation ....................16

C. Plaintiff's Omission Theory Identifies No Omitted Fact and No Duty to Disclose ....16

VI. Plaintiff Fails to Plausibly Allege a CLRA Claim for Two Additional, Independent Reasons (Count I) ....................18

A. The Max Subscriptions Are Neither "Goods" nor "Services" Under the CLRA ........18

B. Plaintiff Does Not Plausibly Allege that He Is a "Consumer," and the Facts He Does Plead Describe Professional, Not Personal, Use ....................19

VII. Plaintiff Does Not Plausibly State a Claim Under the UCL (Count V) ....................20

VIII. Plaintiff Does Not State a Breach of Contract Claim (Count IV) ....................21

A. The Statements on Which Plaintiff Relies Are Not Terms of the Contract ....................21

B. Anthropic's Challenged Statements Were Not Incorporated by Reference ................22

C. Even If the Statements Were Incorporated, Plaintiff Has Not Plausibly Alleged a Breach ..........23

D. The Consumer Terms Expressly Reserve Anthropic's Discretion Over Usage Limits ..........23

IX. Plaintiff Fails to Plausibly Allege Entitlement to Equitable Relief (Counts II and V)............24

X. Dismissal Should Be with Prejudice..........25

CONCLUSION..........25

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Ahern v. Apple Inc.*,
411 F. Supp. 3d 541 (N.D. Cal. 2019)....................17

*In re Arris Cable Modem Consumer Litig.*,
2018 WL 288085 (N.D. Cal. Jan. 4, 2018) ....................12, 13

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ....................7, 18, 20, 24

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ....................7

*Bluemel v. Conduent State & Local Solutions, Inc.*,
2026 WL 1710303 (N.D. Cal. June 9, 2026) ....................24

*Bodenburg v. Apple Inc.*,
146 F.4th 761 (9th Cir. 2025)....................9, 10

*Brown v. Brita Prods. Co.*,
172 F.4th 1113 (9th Cir. 2026)....................10, 25

*Brown v. Google LLC*,
685 F. Supp. 3d 909 (N.D. Cal. 2023)....................22

*Burton v. Alaska Airlines*,
2025 WL 3443155 (N.D. Cal. Dec. 1, 2025) ....................24

*Cafasso v. Gen. Dynamics C4 Sys., Inc.*,
637 F.3d 1047 (9th Cir. 2011)....................7, 12

*Cannon v. Wells Fargo Bank N.A.*,
917 F. Supp. 2d 1025 (N.D. Cal. 2013)....................15

*Carma Devs. (Cal.), Inc. v. Marathon Dev. Cal., Inc.*,
2 Cal. 4th 342 (1992)....................24

*Collins v. eMachines, Inc.*,
202 Cal. App. 4th 249 (2011)....................17

*Davidson v. Kimberly-Clark Corp.*,
889 F.3d 956 (9th Cir. 2018)....................13

*Debono v. Cerebral Inc.*,
2023 WL 300141 (N.D. Cal. Jan. 18, 2023) (Tse, J.) ....................13, 14, 15

*Diediker v. Peelle Fin. Corp.*,
60 Cal. App. 4th 288 (1997) ........ 16

*Ebner v. Fresh, Inc.*,
838 F.3d 958 (9th Cir. 2016) ........ 7

*Elias v. Hewlett-Packard Co.*,
903 F. Supp. 2d 843 (N.D. Cal. 2012) ........ 12

*Fairbanks v. Superior Ct.*,
46 Cal. 4th 56 (2009) ........ 19

*Ferrington v. McAfee, Inc.*,
2010 WL 3910169 (N.D. Cal. Oct. 5, 2010) ........ 18, 19

*Frezza v. Google Inc.*,
2012 WL 5877587 (N.D. Cal. Nov. 20, 2012) ........ 20

*Gerber v. Twitter, Inc.*,
2024 WL 5173313 (N.D. Cal. Dec. 18, 2024) ........ 23

*In re Google Assistant Priv. Litig.*,
457 F. Supp. 3d 797 (N.D. Cal. May 6, 2020) ........ 6

*Guido v. Mount Lemmon Fire Dist.*,
859 F.3d 1168 (9th Cir. 2017), *aff'd*, 586 U.S. 1 (2018) ........ 8

*Hadley v. Kellogg Sales Co.*,
243 F. Supp. 3d 1074 (N.D. Cal. 2017) ........ 21

*Heagney v. John Paul Mitchell Sys.*,
2023 WL 4947974 (N.D. Cal. Aug. 2, 2023) ........ 14

*Herron v. Best Buy Co. Inc.*,
924 F. Supp. 2d 1161 (E.D. Cal. 2013) ........ 18

*Hodgers-Durgin v. de la Vina*,
199 F.3d 1037 (9th Cir. 1999) (en banc) ........ 14

*Ibarra v. Pharmagenics*,
660 F. Supp. 3d 914 (C.D. Cal. 2023) ........ 13

*In re iPhone Application Litig.*,
844 F. Supp. 2d 1040 (N.D. Cal. 2012) ........ 19

*Kearns v. Ford Motor Co.*,
567 F.3d 1120 (9th Cir. 2009) ........ 7, 12, 20

*Kokkonen v. Guardian Life Ins. Co. of Am.*,
511 U.S. 375 (1994) ........ 7

*Kroessler v. CVS Health Corp.*,
977 F.3d 803 (9th Cir. 2020) .......... 25

*LiMandri v. Judkins*,
52 Cal. App. 4th 326 (1997) .......... 17

*Little v. Pac. Seafood Procurement, LLC*,
2024 WL 2305603 (N.D. Cal. May 21, 2024) (Tse, J.) .......... 13

*McGinity v. Procter & Gamble Co.*,
69 F.4th 1093 (9th Cir. 2023) .......... 8, 9

*McWhorter v. Procter & Gamble Co.*,
2025 WL 948061 (N.D. Cal. Mar. 28, 2025) .......... 9, 10, 16

*Meyer v. Uber Techs., Inc.*,
868 F.3d 66 (2d Cir. 2017) .......... 9

*Mier v. CVS Pharmacy, Inc.*,
2024 WL 121880 (C.D. Cal. Jan. 10, 2024), *aff'd*, 2025 WL 1905109 (9th Cir. July 10, 2025) 10

*Moore v. Trader Joe's Co.*,
4 F.4th 874 (9th Cir. 2021) .......... 7, 9, 10, 11

*Narayan v. EGL, Inc.*,
616 F.3d 895 (9th Cir. 2010) .......... 19

*In re NJOY, Inc. Consumer Class Action Litig.*,
2014 WL 12586074 (C.D. Cal. Oct. 20, 2014) .......... 13

*Norwest Mortg., Inc. v. Superior Ct.*,
72 Cal. App. 4th 214 (1999) .......... 14

*O'Connor v. Uber Technologies, Inc.*,
58 F. Supp. 3d 989 (N.D. Cal. 2014) .......... 14

*Oster v. Caithness Corp.*,
2017 WL 3727174 (N.D. Cal. Aug. 30, 2017) .......... 22

*Palmer v. Apple Inc.*,
2016 WL 1535087 (N.D. Cal. Apr. 15, 2016) .......... 12

*Phan v. Sargento Foods, Inc.*,
2021 WL 2224260 (N.D. Cal. June 2, 2021) .......... 24

*Phillips v. Apple Inc.*,
2016 WL 1579693 (N.D. Cal. Apr. 19, 2016) .......... 14

*Ramirez v. Charter Commc'ns, Inc.*,
16 Cal. 5th 478 (2024) .......... 23

*Ramos v. EyeBuyDirect, Inc.*,
2025 WL 2633103 (C.D. Cal. Aug. 27, 2025) ....................14

*Robinson Helicopter Co. v. Dana Corp.*,
34 Cal. 4th 979 (2004) ....................16

*Rodriguez v. Google LLC*,
2021 WL 6621070 (N.D. Cal. Aug. 18, 2021) ....................23

*Rojas-Lozano v. Google, Inc.*,
159 F. Supp. 3d 1101 (N.D. Cal. 2016) ....................18, 19

*Safe Air for Everyone v. Meyer*,
373 F.3d 1035 (9th Cir. 2004) ....................7

*Shaw v. Regents of the Univ. of Cal.*,
58 Cal. App. 4th 44 (1997) ....................22

*Sheen v. Wells Fargo Bank, N.A.*,
12 Cal. 5th 905 (2022) ....................15

*Song fi Inc. v. Google, Inc.*,
108 F. Supp. 3d 876 (N.D. Cal. 2015) ....................24

*Sonner v. Premier Nutrition Corp.*,
971 F.3d 834 (9th Cir. 2020) ....................24

*Ting v. AT&T*,
319 F.3d 1126 (9th Cir. 2003) ....................20

*TransUnion LLC v. Ramirez*,
594 U.S. 413 (2021) ....................7

*Vargas v. JP Morgan Chase Bank, N.A.*,
30 F. Supp. 3d 945 (C.D. Cal. 2014) ....................20

*Von Grabe v. Sprint PCS*,
312 F. Supp. 2d 1285 (S.D. Cal. 2003) ....................20

*Williams v. Gerber Prods. Co.*,
552 F.3d 934 (9th Cir. 2008) ....................8

*Williamson v. McAfee, Inc.*,
2014 WL 4220824 (N.D. Cal. Aug. 22, 2014) ....................19

*Wolf v. Superior Court*,
107 Cal. App. 4th 25 (2003) ....................17

*Zeiger v. WellPet LLC*,
526 F. Supp. 3d 652 (N.D. Cal. 2021) ....................16

**Statutes**

Cal. Bus. & Prof. Code § 17200 .......... 20

Cal. Civ. Code § 1625 .......... 22

Cal. Civ. Code § 1710 .......... 17

Cal. Civ. Code § 1761 .......... 18, 19, 20

Cal. Civ. Code § 1770 .......... 18

Cal. Civ. Proc. Code § 1856 .......... 22

**Other Authorities**

Claude Support, https://support.claude.com/en/articles/8325606-what-is-the-pro-plan (last visited Aug. 1, 2026) .......... 4

Fed. R. Evid. 201 .......... 6

Fed. R. Civ. P. 9 .......... 2, 7, 12, 13, 21

Fed. R. Civ. P. 12 .......... 7

**INTRODUCTION**

Plaintiff's complaint ignores what Anthropic actually tells its subscribers. Anthropic's platform, Claude, is a versatile, industry-leading large language model capable of interpreting and responding to a wide range of inputs—including analyzing and summarizing text, writing and debugging code, and reasoning through complex problems. Usage of Claude—providing a question or prompt and obtaining a response—requires computing resources. Anthropic offers subscriptions to Claude at several tiers of cost and usage (or capacity) limits: a free version, an individual Pro plan, and premium Max plans (Max 5x and Max 20x). Contrary to Plaintiff's assertions, Anthropic explains how much Claude usage subscribers receive at each plan level. Anthropic tells subscribers that Claude's Max 5x and Max 20x plans provide 5 or 20 times more usage *per session* than Pro—not 5 or 20 times more cumulative *hours per week*—and explains that a session is a five-hour window, not a week. Anthropic also discloses that Max plans have separate limits on a subscriber's weekly usage, which operate independently of the per-session limits. Plaintiff's own First Amended Complaint ("FAC") confirms Anthropic's distinction between the per-session usage and weekly usage limits. Indeed, the FAC reproduces Anthropic's disclosures expressly distinguishing per-session usage from weekly usage limits, identifies explanatory materials available during the purchase process, and acknowledges that Anthropic emailed subscribers plan-specific weekly-limit expectations.

Plaintiff cannot plausibly allege a false-advertising theory given Anthropic's statements. A plaintiff must challenge the defendant's actual statements, not alternative versions stripped of explanation and context. Here, Plaintiff's claim of deception requires the Court to disregard the "per session" qualifier, treat two separately disclosed metrics as one, and conclude that Anthropic promised something it never said. In fact, Plaintiff's own experience with Claude shows that he was not misled by Anthropic or dissatisfied with the usage he purchased: Although he admits that he was able to "budget[] and monitor[] his usage," he never alleges that he canceled his subscription, and after being a Max 5x subscriber for nearly four months, he decided to upgrade to Max 20x, rather than exercising his right to cancel.

Plaintiff asserts five claims against Anthropic, each under California law: violations of the Consumers Legal Remedies Act, False Advertising Law, and Unfair Competition Law; negligent

misrepresentation; and breach of contract. These claims fail on several independent grounds.

***First***, a reasonable consumer would not be misled by unambiguous and transparent statements that distinguish per-session usage limits from weekly usage limits, particularly when the explanatory materials (which are reproduced in the FAC) are easily available during the purchase process. At every stage of the purchase process, Anthropic explained precisely what each plan delivers—disclosing the per-session usage metric, the existence of separate weekly usage limits, and the factors affecting usage consumption rate. Plaintiff cannot manufacture deception by selectively excerpting Anthropic's statements while ignoring their full context.

***Second***, Plaintiff's fraud-based claims do not satisfy Rule 9(b)'s heightened pleading requirement because he does not (and cannot) identify with particularity the specific statements he saw and relied upon.

***Third***, Plaintiff lacks standing to seek injunctive relief because he faces no plausible threat of future injury. Plaintiff is a long-time and ongoing subscriber who understands how Claude works and who can monitor his usage in real time and cancel at any time.

***Fourth***, as a non-California resident, Plaintiff must show that wrongful conduct actually occurred in California—yet his only allegation is that Anthropic maintains a San Francisco headquarters. This Court has already held insufficient precisely this kind of conclusory assertion.

***Fifth***, Plaintiff's other claims fail for a variety of reasons. Plaintiff's negligent misrepresentation claim is precluded by the economic loss rule, and his omission theory identifies no fact, let alone a material one, Anthropic failed to disclose or duty Anthropic failed to fulfill. Plaintiff's CLRA claim independently fails because a subscription to a large language model does not fall within the statute's definitions of "goods" or "services." Plaintiff's own allegations also say that he uses Claude primarily for professional software-development work, not for personal or household purposes. Plaintiff's breach of contract claim fails because the statements he challenges are not part of the integrated Consumer Terms, and the Terms themselves expressly reserve Anthropic's discretion to modify usage limits. Plaintiff's request for equitable restitution under the FAL and UCL also fails because he has not plausibly alleged that legal remedies are inadequate.

For these reasons, the Court should dismiss Plaintiff's First Amended Complaint in its entirety

without leave to amend.

## BACKGROUND

### A. Anthropic's Claude Product and Subscription Plans

Anthropic PBC is a Delaware public benefit corporation headquartered in San Francisco, California. Dkt. 20 ("FAC") ¶ 16. In March 2023, Anthropic launched Claude, a state-of-the-art AI assistant and industry-leading large language model. *Id.* ¶¶ 2, 17. Subscribers can prompt Claude to "answer research questions, draft or edit text, and write code, among other things." *Id.* ¶ 2. Anthropic offers Claude subscriptions at different levels of usage, including a free version, individual plans, and commercial—team and enterprise—plans. *Id.* ¶¶ 3, 18.

At issue here are the paid individual plans, which are sold in three tiers "that have increasing usage allowances": Pro, Max 5x, and Max 20x. *Id.* ¶ 21. A monthly subscription to Pro costs $17 to $20 per month, while Max 5x and 20x cost $100 and $200 per month, respectively. *Id.* ¶¶ 4, 21. Anthropic began offering individual Pro subscriptions in September 2023 and announced individual Max subscriptions in April 2025. *Id.* ¶ 17.

Anthropic offers subscriptions to Claude on its website and through its desktop application. *Id.* ¶ 19. A person interested in subscribing must first create an account, and before doing so must check a box stating: "I agree to Anthropic's Consumer Terms and Acceptable Use Policy and confirm that I am at least 18 years of age." *Id.* ¶ 22. The Consumer Terms are hyperlinked at that point in the purchase process, and again on the payment screen, where the person must check a second box acknowledging that "Anthropic will charge your card in the amount above now and on a recurring monthly basis until you cancel in accordance with our terms. You can cancel at any time in your account settings." *Id.* ¶¶ 28–29. Only subscribers who have paid for Pro and Max 5x or Max 20x subscriptions may access tools like Claude Code and Claude Cowork. *Id.* ¶ 18.

### B. Anthropic's Statements About Usage Limits

The FAC reproduces, as Graphics A through I, partial screenshots of the screens and webpages on which Plaintiff's claims rest. *Id.* ¶¶ 20–46. When subscribers sign up for Claude, they typically begin at the Claude landing page, which shows them how to "Get started with Claude Code." *Id.* ¶ 20 (Graphic A). The page also displays a disclaimer stating that "Usage limits apply . . . . Price and plans

are subject to change at Anthropic's discretion." *Id.* ¶¶ 20, 41. After a person creates an account, they move to the "Plans that grow with you" page, which offers three Claude subscriptions, identifying "more usage" as a principal feature of the Max plans and inviting them to "Choose 5x or 20x more usage than Pro." *Id.* ¶¶ 23–24 (Graphic B). This page shows the same "Usage limits apply" disclaimer, hyperlinked to Anthropic's usage-limit materials. *Id.* ¶¶ 41–42. When a subscriber selects a plan, the website again compares Max to Pro, lists the price of each Max plan, and identifies a savings of "50%" for the Max 20x plan. *Id.* ¶¶ 25–26 (Graphic C). Graphics D through F partially depict the price-detail, payment, and upgrade screens. *Id.* ¶¶ 27–33. To upgrade from an existing plan, a subscriber must view at least Graphics D through F. *Id.* ¶ 74.

Graphics G through I depict the materials to which the "Usage limits" hyperlink leads. *Id.* ¶ 42. The "Usage limit best practices" page is partially depicted in FAC Graphic G, which directs subscribers to additional pages, including a page addressing the "Max plan[s]." *Id.* ¶¶ 42–43. That page—partially depicted as Graphic H in the FAC—states that the Max 5x and 20x plans provide 5 or 20 times "more usage *per session*" than the Pro plan, respectively. *Id.* ¶ 43 (emphasis added). Plaintiff also acknowledges that the per-session usage limits, as opposed to the weekly usage limits, reset every five hours, which Anthropic discloses on its website. *See* FAC ¶ 38 (citing a subscriber review as describing Claude's "5-hour sessions"); *see also* Claude Support, https://support.claude.com/en/articles/8325606-what-is-the-pro-plan (last visited Aug. 1, 2026) ("Your session-based usage limit will reset every five hours."). Graphic H further states that the plans "*also* have two weekly usage limits," depending on the model selected, which reset every seven days, and that Anthropic "may limit your usage in other ways, such as weekly and monthly caps or model and feature usage, at our discretion." FAC ¶ 43 (emphasis added).

**Does the Max plan have any usage limits?**

Yes. The Max plan offers substantially higher usage compared to our Pro plan and is available in two tiers:

**Max 5x** provides 5 times more usage per session than the Pro plan. This tier is ideal for frequent users who work with Claude on a variety of tasks.

**Max 20x** provides 20 times more usage per session than the Pro plan. This tier is ideal for daily users who collaborate often with Claude for most tasks.

Max plans also have two weekly usage limits: one that applies across all models and another for Sonnet models only. Both limits reset seven days after your session starts.

In addition, to manage capacity and ensure fair access to all users, we may limit your usage in other ways, such as weekly and monthly caps or model and feature usage, at our discretion.

**GRAPHIC H**

*Id.*

Graphic H in turn links to an article titled "How do usage and length limits work?"—partially depicted in the FAC as Graphic I—which explains what usage limits are and the factors that affect them, such as the "length and complexity of your conversations." *Id.* ¶ 46. A page titled "What are usage limits" describes a usage limit as a "'conversation budget' that determines how many messages you can send to Claude, or how long you can work with Claude Code, before needing to wait for your limit to reset." *Id.* ¶¶ 46–47, 51 (Graphic I). Anthropic's site also enables subscribers to monitor the percentage of their limits that they have consumed. *Id.* ¶ 50. In July 2025, Anthropic communicated with subscribers regarding their weekly usage expectations, subject to the same qualifications about model selection, conversation length, and complexity that Anthropic disclosed elsewhere. *Id.* ¶¶ 55–59.

### C. Plaintiff's Subscription History and Claims

Plaintiff Karl Kahn is, and at all relevant times was, a resident of Washington, District of Columbia. *Id.* ¶ 15. He subscribed to Claude Pro on or about June 23, 2025, and alleges that he was "interested in using Claude Code to accomplish computer programming tasks." *Id.* ¶ 68. He remained a Pro subscriber for approximately six months. *Id.* ¶¶ 68–69. On or about January 5, 2026, after "increasingly us[ing] Claude," he upgraded to the Max 5x plan. *Id.* ¶ 69. He then "began to use Claude Code extensively," and "budgeted and monitored his usage." *Id.* ¶ 71. On or about April 21, 2026—

after nearly four months of firsthand experience with the Max 5x plan—he upgraded again, to Max 20x. *Id.* ¶ 72. In connection with each upgrade, Plaintiff alleges that he "viewed an upgrade page that looked similar to Graphics D and F." *Id.* ¶ 74.[1] He alleges that he "saw and relied on Defendant's usage and savings claims in the purchase funnel." *Id.* ¶ 66. Plaintiff does not allege that he read any particular statement, when he read it, or what he personally understood it to mean. He does not allege that he canceled any subscription.

Plaintiff's theory is based entirely on what Anthropic says to subscribers during the purchase process. *Id.* ¶¶ 34–36. But instead of acknowledging Anthropic's express statements that the Max 5x and 20x plans provide 5 or 20 times "more usage *per session* than the Pro plan," *id.* ¶ 43 (emphasis added), Plaintiff has compared the estimated *weekly* hours expectation among the three plans described in Anthropic's July 28, 2025 emails. And Plaintiff has done so even though Anthropic's own statements make clear that per-session usage limits and weekly usage limits are separate. Plaintiff concludes that, based on those estimated *weekly* hour limits, the Max 5x and 20x plans deliver 3.5 and 6-8 times the usage of Pro, respectively. *Id.* ¶¶ 6–7, 60–63. On that basis, Plaintiff also alleges that the "50% savings" offered by the Max 20x plan is false because the per-*hour* price of Max 20x exceeds the per-*hour* price of Max 5x. *Id.* ¶ 64.

Plaintiff filed this putative class action on behalf of all natural persons in the United States who purchased or upgraded to a Max 5x or Max 20x plan from April 9, 2025 to the present. *Id.* ¶¶ 82, 85. He asserts five claims under California law: violation of the Consumers Legal Remedies Act, Cal. Civ. Code § 1750 *et seq.* (Count I); violation of the False Advertising Law, Cal. Bus. & Prof. Code § 17500 *et seq.* (Count II); negligent misrepresentation (Count III); breach of contract (Count IV); and violation of the Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 *et seq.* (Count V). *Id.* ¶¶ 100–145.

[1] The Court may consider the Consumer Terms to which Plaintiff and Anthropic agreed during his purchase and upgrades—pursuant to both the incorporation-by-reference doctrine and Federal Rule of Evidence 201. *See* Anthropic's Request for Judicial Notice and Incorporation by Reference in Support of Its Motion to Dismiss at 2–3; Exs. A–B to the Declaration of Amol Avasare in Support of Anthropic's Motion to Dismiss ("Avasare Decl."); *see also In re Google Assistant Priv. Litig.*, 457 F. Supp. 3d 797, 813–14 (N.D. Cal. May 6, 2020) (holding incorporated terms of service that formed the basis of contract and warranty claims). The May 1, 2025 Consumer Terms (Ex. A) were the operative terms when Plaintiff purchased his Pro subscription on June 23, 2025, and the October 8, 2025 Consumer Terms (Ex. B) were the operative version when he upgraded to Max 5x on January 5, 2026, and to Max 20x on April 21, 2026. Avasare Decl. ¶¶ 4–5; FAC ¶¶ 15, 68–69, 72.

He seeks damages, restitution, injunctive and declaratory relief, and attorneys' fees and costs. *Id.* ¶¶ 11, Prayer for Relief.

## LEGAL STANDARD

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* Instead, Plaintiff bears the burden of pleading facts that "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 663.

Rule 9(b)'s heightened pleading standard applies where a claim is grounded in fraud, regardless of the claim's label and even if fraud is not an element. *Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1125 (9th Cir. 2009). Rule 9(b) requires Plaintiff to plead "the particular circumstances surrounding" the challenged "representations," *id.* at 1126, including the "who, what, when, where, and how" of the alleged misconduct, *Cafasso v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1055 (9th Cir. 2011).

Under Rule 12(b)(1), the applicable standard for an argument that Plaintiff lacks Article III standing to pursue injunctive relief, Plaintiff bears the burden of establishing federal jurisdiction. *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994). In a facial jurisdictional attack, the defendant accepts the allegations as true and asserts that the allegations are insufficient on their face to invoke federal jurisdiction. *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004). To establish Article III standing and survive a Rule 12(b)(1) challenge, Plaintiff must demonstrate a concrete and particularized injury in fact that is caused by the defendant and likely to be redressed by a favorable decision. *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021).

## ARGUMENT

### I. Plaintiff Fails to Plausibly Allege CLRA, FAL, and UCL Claims Because No Reasonable Consumer Could Be Deceived by Anthropic's Statements (Counts I–II and V)

Plaintiff's CLRA, FAL, and UCL claims are subject to the "reasonable consumer test." *Moore v. Trader Joe's Co.*, 4 F.4th 874, 881 (9th Cir. 2021). Plaintiff must "show that 'members of the public are likely to be deceived.'" *Ebner v. Fresh, Inc.*, 838 F.3d 958, 965 (9th Cir. 2016) (citation omitted). There must be more than a "mere possibility" that a statement could deceive a few consumers

interpreting it unreasonably—the statement must mislead "a significant portion" of the public acting reasonably under the circumstances. *McGinity v. Procter & Gamble Co.*, 69 F.4th 1093, 1097 (9th Cir. 2023); *see Williams v. Gerber Prods. Co.*, 552 F.3d 934, 938 (9th Cir. 2008) (similar).

### A. Anthropic's Statements Are Clear, as Plaintiff's Own Graphics Confirm

Plaintiff's claims fail because they rest on a statement Anthropic never made. Rather than challenge what Anthropic actually stated—that Max plans provide 5 or 20 times more usage *per session* than Pro—Plaintiff rewrites "per session" to mean "hours per week," and then claims deception, all while ignoring the clarifying information readily available in Graphic H.

Anthropic stated that the Max 5x and 20x plans provide five or twenty times "more usage than Pro." FAC ¶¶ 24–25, 33. Graphic H, the "Does the Max plan have any usage limits?" page, available to potential subscribers in the purchase process, *id.* ¶ 43, explicitly explains the relevant metric is a "session":

> Max 5x provides 5 times more usage ***per session*** than the Pro plan . . . .
> Max 20x provides 20 times more usage ***per session*** than the Pro plan . . . .
> Max plans ***also have two weekly usage limits***: one that applies across all models and another for Sonnet models only. Both limits reset seven days after your ***session*** starts.

*Id.* (emphasis added). The word "also" signals that the weekly usage limits are an additional, independent limit—separate from the per-session 5x and 20x multipliers. *See, e.g.*, *Guido v. Mount Lemmon Fire Dist.*, 859 F.3d 1168, 1171 (9th Cir. 2017) (noting that the word "also" created "two *separate* definitions": "[T]he ordinary meaning of 'also' . . . is . . . '*in addition*; *besides*' and 'likewise; too.'" (emphasis added)), *aff'd*, 586 U.S. 1, 6 (2018) (holding that the phrase "also means" in a statutory definition "create[d] *separate* categor[ies]" because the phrase is "*additive*" (emphasis added)). No reasonable consumer reading these statements, with the full context, could conclude that "5x" means five times more hours per week, rather than five times more usage per session.

Plaintiff tries to insert words of his own into Anthropic's statements, inaccurately asserting that Anthropic represented that it would "deliver five times the usage of Pro with its Max 5x plan *per month or per week*." *Id.* ¶ 114 (emphasis added); *see id.* ¶ 45. Anthropic said no such thing. It represented that the 5x and 20x plans provide 5 and 20 times more usage *per session* than Pro. *Id.* ¶ 43 (emphasis added). "Per session" does not mean "per week" or "per month." Plaintiffs' own quotations of Max

subscriber reviews establish that subscribers understood this distinction, *id.* ¶ 38 (quoting a review of Anthropic's "*5-hour sessions*" (emphasis added)); *id.* ¶ 76 (alleging that "using Claude in *a single 5-hour window* to the fullest extent permitted could burn a whopping 15% of the *weekly usage* allotment" (emphasis added)).[2]

At most, Plaintiff alleges that Anthropic's statements are ambiguous. *Id.* ¶ 44. They are not. But even if the statements were ambiguous, a subscriber cannot ignore a product's own materials to manufacture confusion when those materials explain the meaning of a challenged statement. *See, e.g.*, *McGinity*, 69 F.4th at 1099 (noting that any ambiguity in a "front label" can often "be resolved by reference to the back label" and imputing knowledge conveyed by considering the representations made across the "entire product"); *McWhorter v. Procter & Gamble Co.*, 2025 WL 948061, at *6 (N.D. Cal. Mar. 28, 2025) ("Where the label expressly defines a claim, Plaintiffs cannot ignore that definition in favor of their own preferred interpretation."); *see also Moore*, 4 F.4th at 882–83 ("[W]here plaintiffs base deceptive advertising claims on unreasonable or fanciful interpretations of labels or other advertising, dismissal on the pleadings may well be justified."). That principle applies here: Assuming that the purchase flow's use of "5x" and "20x" could, standing alone, bear more than one interpretation, any arguable ambiguity is dispelled by the "per session" qualifier and the separate disclosure of weekly usage limits in Graphic H—materials that were available to Plaintiff during his purchase and upgrades. FAC ¶¶ 42–47.

Accessing this clarifying information in Graphic H required nothing more than clicking hyperlinks available in the purchase process—the digital equivalent of flipping a product over to read the back label. *McGinity*, 69 F.4th at 1097; *cf. Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 71, 74–75, 78–79 (2d Cir. 2017) (applying California law and holding that consumers had reasonably conspicuous notice of contract terms accessible through two layers of hyperlinks). *Bodenburg v. Apple Inc.*, 146 F.4th 761 (9th Cir. 2025), is instructive. There, the Ninth Circuit affirmed dismissal of a consumer deception claim against Apple's iCloud storage marketing, holding that, "to the extent that some of

[2] Plaintiff's allegations confirm that the five-hour window tells the subscriber *how often* a new session begins, not *how much* usage a session involves. And Anthropic tells subscribers that how much usage a session involves depends on several factors, including "length," "complexity," "features" used, and "Claude model" selection. *Id.* ¶ 46.

Apple's representations [were] ambiguous, their ambiguity [was] dispelled by the specific descriptions of the [storage] plans that Apple provide[d] in the [iCloud Legal] Agreement." *Id.* at 769. Similarly, in *Brown v. Brita Prods. Co.*, 172 F.4th 1113 (9th Cir. 2026), the Ninth Circuit affirmed the dismissal of CLRA, UCL, and FAL claims because QR codes on a water filter's packaging provided "readily accessible information" and context sufficient to dispel any asserted ambiguity of representations elsewhere on the packaging. *Id.* at 1115–16, 1119; *see also Mier v. CVS Pharmacy, Inc.*, 2024 WL 121880, at *7–9 (C.D. Cal. Jan. 10, 2024) (dismissing deception claim based on hand sanitizer's "99.99% of all germs" statement where qualifying language on the back label clarified), *aff'd*, 2025 WL 1905109 (9th Cir. July 10, 2025).

Anthropic explained what 5x and 20x "more usage" meant, and a reasonable consumer could not plausibly have been deceived given the information and context Anthropic provided.

**B. Plaintiff's Theory of Deception Is Implausible**

Plaintiff alleges Anthropic's statements are deceptive because the Max 5x and 20x plans deliver only "~3.5x" and "6x" more usage than the Pro plan, respectively. FAC ¶¶ 6–7, 60–63. Plaintiff's theory asks the Court to make two impermissible leaps. Plaintiff's theory requires the Court to: (1) read a nonexistent guarantee into Anthropic's statements; and (2) ignore Anthropic's explanations that the 5x and 20x Pro usage multipliers are calculated "per session," not "hours per week." Without these impermissible leaps, Plaintiff's theory is implausible. *Id.* ¶ 43; *supra* § I.A; *Bodenburg*, 146 F.4th at 769–71 (plaintiff could not ignore Apple's express definition in favor of a broader interpretation); *McWhorter*, 2025 WL 948061, at *6 (similar); *Moore*, 4 F.4th at 883 (affirming dismissal where plaintiff's interpretation was unreasonable).

Basic arithmetic further exposes the implausibility of Plaintiff's "hours per week" theory. Plaintiff cites a July 2025 email in which Anthropic communicated estimated hours-per-week usage expectations to existing subscribers for two models: Sonnet (less usage-intensive) and Opus (more usage-intensive). FAC ¶¶ 55–59. This July 2025 email explained to Pro subscribers that they could expect approximately 40–80 hours per week of Sonnet 4 usage depending on subscriber settings and tool selection, e.g., Claude Code. FAC ¶ 56. If Plaintiff's theory were correct, the Max 20x plan would guarantee 20 times that amount—800 to 1,600 hours per week of usage—which exceeds the 168 hours

total hours that exist in a week by a factor of five to ten. A reasonable consumer would not interpret a product's statements to promise an impossibility. *See Moore*, 4 F.4th at 883 (affirming dismissal of false advertising claims where a "reasonable consumer would not understand [the] label . . . as promising something that is impossible"). Additionally, the email contained the same express qualifications—tying estimates to model selection and usage intensity—that pervade Anthropic's other disclosures. *E.g.*, FAC ¶ 56. In any event, that post-purchase communication is irrelevant to the reasonable-consumer analysis: It was sent only to then-current subscribers and thus could not have induced any subscription decision.

Plaintiff's likely response—that subscribers can run "multiple Claude Code instances in parallel," FAC ¶ 60 n.1—defeats rather than rescues his theory. Alleging the possibility of running parallel, simultaneous Claude windows confirms that the per-session usage metric is an aggregate of multiple factors, including model selection, conversation length, computational complexity, and configuration settings—just as Anthropic represented, *id.* ¶ 46 ("Your usage is affected by several factors, including" "length," "complexity," "features" used, and "Claude model" selection.). The nature of the metric underscores why Anthropic expressly described the 5x and 20x multipliers in per-session terms, and why no reasonable consumer would equate "per session" usage with a weekly-hours guarantee.

### C. Anthropic's 50% Savings Claim Confirms the Implausibility of Plaintiff's Theory

Plaintiff also alleges that the Max 20x plan falsely claims a "50% savings," which Plaintiff contends "make[s] matters worse" because the "per hour price of the Max 20x subscription is *more* than the per hour price of the Max 5x subscription or Pro subscription for Opus 4." FAC ¶¶ 8, 64; *see id.* ¶¶ 80, 114(c), 123(c). To the contrary, this savings claim is mathematically consistent with Anthropic's per-session usage statements. Max 20x provides 20 times the Pro plan's per-session usage at $200 per month. FAC ¶¶ 21, 25, 27, 33, 43. To obtain equivalent per-session usage, a subscriber would need to purchase four Max 5x subscriptions at $100 each, for a total of $400 per month. Max 20x at $200 per month thus costs 50% less than the alternative—and the savings claim is literally true. Plaintiff's claim of falsity relies on switching the metric of the savings claim from what Anthropic said—"usage per session"—to hours per week; that is wrong, and the math proves it. *E.g.*, *id.* ¶¶ 8, 64.

The internal consistency of the savings claim with the per-session statement independently confirms that Anthropic's statements mean exactly what they say.

**II. Plaintiff Does Not Adequately Plead His Claims Under Rule 9(b) (Counts I–III and V)**

Each Count of the FAC, except Count IV for breach of contract, rests on the premise that Anthropic's usage and savings statements were "false," "untrue or misleading," and "likely to deceive." FAC ¶¶ 103, 113–115, 122–126, 141. Plaintiff's claims "under the UCL, FAL, CLRA, and for Negligent Misrepresentation" therefore "sound in fraud, and are subject to the heightened pleading requirements of Rule 9(b)." *Palmer v. Apple Inc.*, 2016 WL 1535087, at *4 (N.D. Cal. Apr. 15, 2016). Rule 9(b) accordingly requires Plaintiff to plead "the particular circumstances surrounding" the challenged statements, *Kearns*, 567 F.3d at 1126, and the "who, what, when, where, and how" of the alleged misconduct, *Cafasso*, 637 F.3d at 1055. Plaintiff satisfies none of these requirements.

Plaintiff never identifies which specific statements he read and relied on. Indeed, it appears that Plaintiff is unable to identify any specific statements that misled him because he was not actually misled at all. The FAC partially reproduces nine screens and support pages, Graphics A through I, each containing different language. FAC ¶¶ 20–47. Plaintiff's single bare-bones allegation that he reviewed the "usage and savings claims in the purchase funnel," *id.* ¶ 66, does not specify which statements he read and relied on, when he read them, or how they allegedly caused him to subscribe. *See Kearns*, 567 F.3d at 1126 (plaintiff did not plead "which sales material he relied upon in making his decision"); *In re Arris Cable Modem Consumer Litig.*, 2018 WL 288085, at *8 (N.D. Cal. Jan. 4, 2018) ("[A] plaintiff does not satisfy Rule 9(b) when the plaintiff generally identifies allegedly misleading statements but fails to specify which statements the plaintiff actually saw and relied upon."). Plaintiff does not even allege that he viewed the graphics contained in the FAC, asserting instead that he "viewed an upgrade page that *looked similar* to Graphics D and F." FAC ¶ 74 (emphasis added). And although Plaintiff alleges his upgrade decisions were "based on" Anthropic's statement that he would receive 5x and 20x the usage of Pro under the Max 5x and 20x plans, respectively, he never actually alleges that he read any specific statements, nor does he explain how they affected his upgrade decisions. *Id.* ¶¶ 70, 73.

Nor does Plaintiff allege what he understood Anthropic's statements to mean, or how or why

any statement caused him to subscribe. *See Kearns*, 567 F.3d at 1126; *see Elias v. Hewlett-Packard Co.*, 903 F. Supp. 2d 843, 858 (N.D. Cal. 2012) (allegations insufficient where plaintiff "failed to specifically allege . . . how [the statements] impacted his purchasing decision"). The FAC alleges only what Anthropic's "enrollment interface leads reasonable consumers to understand," *id.* ¶¶ 34–36—a legal conclusion, not a factual allegation about Plaintiff's purchases or decisions, *see In re NJOY, Inc. Consumer Class Action Litig.*, 2014 WL 12586074, at *10 (C.D. Cal. Oct. 20, 2014) ("[N]amed plaintiffs must, under Rule 9(b), plead separately and with particularity their individual exposure to the purportedly deceptive advertising campaign."); *Arris*, 2018 WL 288085, at *9 (similar). Because the FAC does not comply with Rule 9(b), the Court should dismiss Counts I–III and V. *See, e.g. Debono v. Cerebral Inc.*, 2023 WL 300141, at *1 (N.D. Cal. Jan. 18, 2023) (Tse, J.); *Little v. Pac. Seafood Procurement, LLC*, 2024 WL 2305603, at *5 (N.D. Cal. May 21, 2024) (Tse, J.).

## III. Plaintiff Fails to Allege Facts Establishing Article III Standing for Injunctive Relief (Counts I–III and V)

Plaintiff must adequately allege standing "separately for each form of relief requested," and for injunctive relief, the threatened injury must be "actual and imminent, not conjectural or hypothetical." *Davidson v. Kimberly-Clark Corp.*, 889 F.3d 956, 967 (9th Cir. 2018) (citation omitted). A plaintiff may seek an injunction only where he plausibly alleges a "threat of future harm"—by alleging either (1) that he "will be unable to rely on the product's advertising or labeling in the future, and so will not purchase the product although [he] would like to," or (2) that he "might purchase the product in the future . . . as [he] may reasonably, but incorrectly, assume the product was improved." *Davidson*, 889 F.3d at 969–70; *see Ibarra v. Pharmagenics*, 660 F. Supp. 3d 914, 921 (C.D. Cal. 2023) ("[N]o plausible threat of future harm is pled, and standing for injunctive relief is lacking."). Plaintiff alleges neither.

First, Plaintiff does not allege that he is unable to rely on Anthropic's advertising and has thus chosen not to purchase a subscription. His own allegations confirm why: Plaintiff upgraded his subscription not once but twice—a course of conduct inconsistent with disappointed usage expectations after the first upgrade. *E.g.*, FAC ¶ 15. He upgraded from Pro to Max 5x in January 2026 "based on Defendant's representations that he would receive five times the usage of the Pro plan." *Id.* ¶ 70. After three months of using Max 5x where he "budgeted and monitored his usage," he then chose to upgrade

to Max 20x." *Id.* ¶¶ 15, 71. He does not allege that he has cancelled his subscription and apparently remains a Max 20x subscriber on an automatically renewing plan. *Id.* ¶¶ 72, 78.

Second, Plaintiff does not allege that he intends to purchase a subscription in the future based on an assumption that the subscription has changed. Rather, Plaintiff alleges that he believes his subscription is not providing the promised usage, yet he does not allege that Anthropic will change its practices and provide that promised usage in the future. A subscriber who understands how a subscription's limits operate and who can track them in real time cannot plausibly be misled again by the very statements he challenges. *See Heagney v. John Paul Mitchell Sys.*, 2023 WL 4947974, at *3 (N.D. Cal. Aug. 2, 2023) ("You can't be misled by—or even uncertain about—something that you know . . . ."); *Ramos v. EyeBuyDirect, Inc.*, 2025 WL 2633103, at *13 (C.D. Cal. Aug. 27, 2025) (dismissing request for injunctive relief without leave to amend because, "now that Ramos is aware of the included 'Shipping Insurance' fee and the ability to opt-out, she does not risk being harmed by the fee again").

Plaintiff's conclusory assertion of a "continuing threat" does not suffice. FAC ¶¶ 104, 142. As named plaintiff, he must show that he personally faces a likelihood of future injury, and here, his own allegations refute any threat of future harm. *Hodgers-Durgin v. de la Vina*, 199 F.3d 1037, 1044–45 (9th Cir. 1999) (en banc); *Phillips v. Apple Inc.*, 2016 WL 1579693, at *9 (N.D. Cal. Apr. 19, 2016). Plaintiff thus lacks standing to seek an injunction.

## IV. Plaintiff Fails to Plausibly Allege CLRA, FAL, and UCL Claims Because He Is Not a California Resident (Counts I–II and V)

Plaintiff alleges that he is, and at all relevant times was, a resident of Washington, District of Columbia. FAC ¶ 15. As a non-California resident, Kahn may invoke California's CLRA, FAL, and UCL only if he alleges that he was harmed by "wrongful conduct occurring in California." *Debono*, 2023 WL 300141, at *2 (Tse, J.) (citing *Norwest Mortg., Inc. v. Superior Ct.*, 72 Cal. App. 4th 214, 224–25 (1999)). Plaintiff asserts two bases for extraterritorial application of California law: (1) Anthropic and its subscribers agreed that Anthropic's Consumer Terms would be governed by California law, FAC ¶¶ 94–95; and (2) Anthropic's San Francisco headquarters is "where [Anthropic's] high-level employees and officers direct, control, and coordinate [its] activities, including its marketing," *id.* ¶¶ 92–93. Neither is sufficient.

The California choice-of-law clause in Anthropic's Consumer Terms does not allow Plaintiff to invoke California consumer protection statutes. *O'Connor v. Uber Technologies, Inc.*, 58 F. Supp. 3d 989, 1005 (N.D. Cal. 2014) ("A contractual choice of law provision that incorporates California law presumably incorporates *all* of California law—including California's presumption against extraterritorial application of its law."); *see also Debono*, 2023 WL 300141, at *2. Plaintiff's bare allegation that Anthropic is headquartered in California and that its activities emanate from the state does not change the result. FAC ¶ 92. The Court's decision in *Debono* is illustrative. In that case, the defendant's terms provided that disputes would be resolved "in accordance with California law," and this Court held that provision "immaterial to this analysis," concluding that "[t]he parties' choice-of-law clause didn't authorize [the two out-of-state plaintiffs] to sue for violations of California's UCL, FAL, and CLRA based on wrongful conduct occurring outside of California." 2023 WL 300141, at *2. The same is true here. FAC ¶¶ 94–95. *Debono* also rejects as insufficient Plaintiff's bare allegation that Anthropic has a California headquarters from which marketing materials "emanate[]" and at which "high-level employees" "direct" or "control" Anthropic's "activities." FAC ¶¶ 92–93. Allegations that a defendant is headquartered in California and that all of its activities emanate from the state are precisely the type of allegations that courts of this district have held insufficient. *See Debono*, 2023 WL 300141, at *2 ("These allegations fall short" of plausibility); *see also Cannon v. Wells Fargo Bank N.A.*, 917 F. Supp. 2d 1025, 1055–56 (N.D. Cal. 2013) (allegation that challenged conduct "emanate[d]" from California headquarters was insufficient absent any "additional facts"). To hold these allegations sufficient would erase any limiting principle, enabling a litigant to apply California law extraterritorially whenever they allege a defendant is headquartered in California.

## V. Plaintiff Fails to Plausibly Allege a Negligent Misrepresentation Claim (Count III)

Plaintiff's negligent misrepresentation claim is barred by California's economic loss rule; fails on the merits; and is not saved by the FAC's omission theory, which is devoid of any actionable duty or omitted fact.

### A. California Law Bars Tort Claims that Duplicate Contract Claims Seeking Identical Economic Losses

Plaintiff's negligent misrepresentation claim seeks the same relief, based on the same conduct, as his breach of contract claim, precisely what California's economic loss rule prohibits. The California

Supreme Court has held that "there is no recovery in tort for negligently inflicted purely economic losses" where the claim arises from—or is not independent of—the parties' underlying contract. *Sheen v. Wells Fargo Bank, N.A.* , 12 Cal. 5th 905, 922–23 (2022). The rule "prevents the law of contract and the law of tort from dissolving one into the other" and limits a plaintiff to trying to "recover in contract for purely economic loss due to disappointed expectations, unless he can demonstrate harm above and beyond a broken contractual promise." *Robinson Helicopter Co. v. Dana Corp.*, 34 Cal. 4th 979, 988 (2004).

Here, Plaintiff's alleged damages consist entirely of overpayment for a subscription that allegedly delivered less than what was "advertised," FAC ¶¶ 65, 128–129—the same disappointed-expectations injury he alleges in Count IV, *id.* ¶¶ 134–135. He does not allege personal injury, property damage, or other harm independent of the subscription payments he made. Those payments are purely economic losses purportedly flowing directly from Anthropic's alleged failure to perform, and they are recoverable (if at all) in contract, not in tort. *See, e.g.*, *McWhorter*, 2025 WL 948061, at *8 (the "negligent misrepresentation claim [does not] fall within the category of intentional misrepresentation claims that the California Supreme Court has held are not barred" by the economic loss rule); *accord Zeiger v. WellPet LLC*, 526 F. Supp. 3d 652, 689 (N.D. Cal. 2021) (citing *Robinson Helicopter*, 34 Cal. 4th at 988–91).

**B. Plaintiff Does Not Plausibly Allege Any Misrepresentation**

Even if the economic loss rule did not apply, the claim would fail because the FAC does not plausibly allege a misrepresentation. As established in detail above, *see supra* § I, Anthropic's representations state that the Max plans provide five or twenty times "more usage per session" than the Pro plan and separately disclose distinct limits on a subscriber's weekly usage limits. FAC ¶ 43. A representation that is true and not misleading in context cannot be a misrepresentation. *See, e.g.*, *Diediker v. Peelle Fin. Corp.*, 60 Cal. App. 4th 288, 297–98 (1997) ("[Plaintiff] cannot read something into a neutral statement in order to justify a claim for negligent misrepresentation.").

**C. Plaintiff's Omission Theory Identifies No Omitted Fact and No Duty to Disclose**

Plaintiff alleges that Anthropic "failed to disclose or disclose adequately material facts to correct its misleading claims." FAC ¶ 125. Plaintiff's omission theory—added in the FAC, Dkt. 21-1 at 28—

appears designed to salvage claims that cannot survive scrutiny under an affirmative misrepresentation framework. An omission claim requires "suppression of fact, by one who is bound to disclose it, or who gives information of other facts which are likely to mislead for want of communication of that fact." Cal. Civ. Code § 1710(3). That claim requires both an omitted fact and a duty to disclose it. Plaintiff has pleaded neither.

Plaintiff's omission theory simply repackages his affirmative misrepresentation theory. Plaintiff claims that Anthropic failed to disclose that the hours-per-week allotments for Max 5x and Max 20x allegedly translate to approximately 3.5 and 6–8 times the Pro plan's weekly hours, respectively. FAC ¶¶ 119–130. But Anthropic did not "omit" a weekly-hours ratio; it never represented that the 5x and 20x multipliers applied to a hours-per-week limit.

Further, Plaintiff has not alleged any duty to disclose. California recognizes four circumstances creating such a duty: (1) a fiduciary relationship, (2) exclusive knowledge of material facts inaccessible to the plaintiff, (3) active concealment, or (4) partial representations that suppress material qualifying facts. *LiMandri v. Judkins*, 52 Cal. App. 4th 326, 336 (1997). None is alleged here.

<u>No fiduciary relationship</u>. Plaintiff alleges an arm's-length commercial subscription transaction. FAC ¶¶ 2–5, 68–72. A contract between a company and a subscriber does not create a fiduciary relationship. *Wolf v. Superior Court*, 107 Cal. App. 4th 25, 33–34 (2003) ("A mere contract . . . does not . . . create a fiduciary relationship.").

<u>No exclusive knowledge</u>. Plaintiff does not plead that additional information about the difference between the per-session usage limit and the weekly usage limit was unavailable to him. FAC ¶¶ 37, 123–126. This information was publicly available on Anthropic's own website, including Graphic H. *Id.* ¶¶ 42–47. And to the extent Plaintiff claims that Anthropic failed to disclose the estimated hours-per-week for the Max 5x and 20x plans, *id.* ¶¶ 119–130, that information is available to Plaintiff as well. Indeed, Plaintiff calculated the purported weekly-hours ratios himself from available data and pleaded them in his own FAC. *Id.* ¶¶ 6–7, 60–63. A plaintiff cannot plead exclusive knowledge where the allegedly omitted facts were concededly accessible to him. *Ahern v. Apple Inc.*, 411 F. Supp. 3d 541, 575 (N.D. Cal. 2019) (plaintiff must show "how plaintiffs did not have access to or could not learn this information").

No active concealment. Plaintiff does not allege that Anthropic took any affirmative steps to "preclude consumer discovery" of any information. *Collins v. eMachines, Inc.*, 202 Cal. App. 4th 249, 256 (2011). To the contrary, the FAC reproduces the pages disclosing that weekly usage limits exist as limits separate from per-session usage limits, that usage varies by model and query complexity, and that Anthropic reserves the right to limit usage at its discretion. FAC ¶¶ 43, 46–47.

No misleading partial representations. Plaintiff does not allege that Anthropic did "not disclose facts which materially qualify the facts disclosed." *Herron v. Best Buy Co. Inc.*, 924 F. Supp. 2d 1161, 1177 (E.D. Cal. 2013). Anthropic's per-session usage statement is fully qualified by the separate, express disclosure of the existence of weekly usage limits on the same page. FAC ¶ 43.

Because Plaintiff has not identified an omitted fact and because he has not alleged any cognizable duty to disclose, he fails to state a claim for negligent misrepresentation by omission.

## VI. Plaintiff Fails to Plausibly Allege a CLRA Claim for Two Additional, Independent Reasons (Count I)

Plaintiff's CLRA claim also fails because a subscription to a general-purpose large language model is neither a "good" nor a "service" within the meaning of the CLRA, and because Plaintiff has not plausibly alleged that he is a "consumer" under the statute.

### A. The Max Subscriptions Are Neither "Goods" nor "Services" Under the CLRA

The CLRA applies, in defined circumstances, to the "sale or lease of goods or services to any consumer." Cal. Civ. Code § 1770(a). The CLRA narrowly defines goods to be "tangible chattels bought or leased for use primarily for personal, family, or household purposes," and "services" to be "work, labor, and services for other than a commercial or business use, including services furnished in connection with the sale or repair of goods." *Id.* § 1761(a)–(b). Claude subscriptions are neither.

Goods. Because a Claude Max plan subscription is not a tangible chattel, it is not a good. Plaintiff alleges he received "access" to a "generative AI agentic coding product" that he can prompt to "answer research questions, draft or edit text, and write code." FAC ¶ 2. Nothing tangible changed hands. Plaintiff's contrary allegation—that the Max subscriptions "are tangible chattel [sic] that result in a physical change to computer hardware [and] possess corporeal form," *id.* ¶ 102(b)—is a factually unsupported legal conclusion that is contrary to his own factual allegations and not entitled to a presumption of truth, *Iqbal*, 556 U.S. at 678. Further, courts in this District consistently reject the

proposition that software constitutes a "good" under the CLRA. *See, e.g.*, *Ferrington v. McAfee, Inc.*, 2010 WL 3910169, at *18–19 (N.D. Cal. Oct. 5, 2010) (holding that "the software Plaintiffs purchase is not a good covered by the CLRA"); *Rojas-Lozano v. Google, Inc.*, 159 F. Supp. 3d 1101, 1116 (N.D. Cal. 2016) (holding Google's ReCAPTCHA program—a "one-time use software program" used entirely online—was not a "good" under the CLRA). Anthropic's offered subscriptions are no different.

Services. Nor are Claude Max plans "services" as the CLRA defines that term. The statutory definition contemplates work or labor performed for the consumer—a person or entity doing something on the consumer's behalf—as the Legislature's own inclusion of "services furnished in connection with the sale or repair of goods" confirms. Cal. Civ. Code § 1761(b). A license granting a consumer access to software is different in kind, and courts in this District have repeatedly held that it falls outside the statute. *See, e.g.*, *Ferrington*, 2010 WL 3910169, at *19 ("[S]oftware generally is not a service for purposes of the CLRA."); *In re iPhone Application Litig.*, 844 F. Supp. 2d 1040, 1070 (N.D. Cal. 2012) ("[T]he CLRA does not apply to the sale or license of software, because software is neither a 'good' nor a 'service' covered by the CLRA."); *Williamson v. McAfee, Inc.*, 2014 WL 4220824, at *7 (N.D. Cal. Aug. 22, 2014) ("[T]he CLRA does not cover software licenses."); *Rojas-Lozano*, 159 F. Supp. 3d at 1116 (holding Google's ReCAPTCHA program not to be a service under the CLRA).

The FAC's allegations place the Claude Max plans squarely within this line of cases. Plaintiff alleges that he purchased "*access*" *to* software. FAC ¶ 2; *see also id.* (describing Claude as a "generative AI agentic coding product"); *id.* ¶ 17 (describing Claude as a "generative artificial intelligence product" that Anthropic "launched"); Ex. A at 1 (noting that the Consumer Terms govern "software"); Ex. B at 1 (same). And Plaintiff does not allege that Anthropic failed to perform any work or labor for him—he instead complains that Plaintiff received too little of the software's *capacity*. *E.g.*, *id.* ¶¶ 6–7, 60–63. Nor does Plaintiff's reliance on the Consumer Terms' use of the word "services" advance his claim. *Id.* ¶ 102(a). The statutory definition as construed by the courts—not the Terms' word choice—controls. *See Fairbanks v. Superior Ct.*, 46 Cal. 4th 56, 63, 65 (2009); *cf. Narayan v. EGL, Inc.*, 616 F.3d 895, 899 (9th Cir. 2010) (plaintiffs' claims "depend[ed] on the definition that the otherwise governing law—not the parties—gives to the [controlling term]").

Plaintiff has failed to plausibly allege that the Max plans are goods or services under the CLRA.

**B. Plaintiff Does Not Plausibly Allege that He Is a "Consumer," and the Facts He Does Plead Describe Professional, Not Personal, Use**

The CLRA independently requires that Plaintiff be a "consumer"—"an individual who seeks or acquires, by purchase or lease, any goods or services for personal, family, or household purposes." Cal. Civ. Code § 1761(d); *Von Grabe v. Sprint PCS*, 312 F. Supp. 2d 1285, 1303 (S.D. Cal. 2003) (citing *Ting v. AT&T*, 319 F.3d 1126 (9th Cir. 2003)). His single relevant allegation is the bare recital that he "used the Claude subscription plans for personal, family or household purposes." FAC ¶ 67. That is an insufficient legal conclusion with no supporting facts (*Iqbal*, 556 U.S. at 678); it also stops short of alleging that Plaintiff used Claude *primarily* for personal, family, or household purposes.

Further, the facts that Plaintiff does plead describe professional—not personal—use. He alleges that he subscribed because he "was interested in using Claude Code to accomplish computer programming *tasks*"; that he "found himself needing additional usage to manage his *projects*"; and that, when he encountered weekly usage limits, he had "either to halt his *work* . . . or purchase additional usage to ensure that he could complete his *work*," FAC ¶¶ 68, 71, 77 (emphasis added). He escalated from Pro to Max 5x to Max 20x over ten months and "paid to purchase additional usage when the Max subscription fell short." *Id.* ¶¶ 65(g), 68–72. Plaintiff thus alleges an escalating, budget-managed program of software development. Those are allegations of professional work warranting dismissal—not of personal, family, or household activity governed by the CLRA. *See, e.g.*, *Frezza v. Google Inc.*, 2012 WL 5877587, at *4 (N.D. Cal. Nov. 20, 2012) (dismissing CLRA claim with prejudice because plaintiffs signed up for Google Tags to promote their respective small businesses or employers and thus were not consumers, even though they purchased the product in their individual capacity). Because Plaintiff alleges he used his subscriptions for "projects" and for "work" he needed to "complete," FAC ¶¶ 68, 71, 77, he has not plausibly alleged that he is a "consumer" under the CLRA.

**VII. Plaintiff Does Not Plausibly State a Claim Under the UCL (Count V)**

The UCL prohibits any "unlawful, unfair or fraudulent business act or practice." Cal. Bus. & Prof. Code § 17200. "Each prong of the UCL is a separate and distinct theory of liability." *Kearns*, 567 F.3d at 1127. Plaintiff asserts claims under all three UCL prongs, FAC ¶¶ 139–141, but fails to plead facts sufficient to state a claim under any of them.

Because Plaintiff predicates his unlawful prong claim on violations of the CLRA and FAL, *see* FAC ¶ 139, Plaintiff's unlawful prong claim falls with his other claims, *see Vargas v. JP Morgan Chase Bank, N.A.*, 30 F. Supp. 3d 945, 952–53 (C.D. Cal. 2014) ("If unable to state a claim for the underlying offense, the plaintiff similarly cannot state a claim under UCL for unlawful practices."). Plaintiff's fraudulent prong claim fares no better: For the reasons set forth, *supra* §§ I, II, the FAC does not satisfy the Rule 9(b) pleading standard and does not plausibly allege any deception that would mislead a reasonable consumer. Finally, Plaintiff's unfair prong claim fails because where, as here, "the unfair business practices alleged under the unfair prong of the UCL overlap entirely with the business practices addressed in the fraudulent and unlawful prongs of the UCL, the unfair prong of the UCL cannot survive if the claims under the other two prongs of the UCL do not survive." *Hadley v. Kellogg Sales Co.*, 243 F. Supp. 3d 1074, 1104–05 (N.D. Cal. 2017); *see* FAC ¶ 140.

## VIII. Plaintiff Does Not State a Breach of Contract Claim (Count IV)

Plaintiff's contract claim rests on text that appears nowhere in his contract. The FAC alleges that Plaintiff and Anthropic "have valid contracts for the acquisition of Claude via monthly subscriptions to the Max 5x and 20x plans," FAC ¶ 132; that Plaintiff performed by paying the subscription fee, *id.* ¶ 133; and that Anthropic breached "by failing to provide Max subscribers with five and twenty times more usage than it provides to its Pro subscribers per month (or per week, in the alternative), as advertised," *id.* ¶ 134 (emphasis added). Although the FAC identifies Anthropic's Consumer Terms as the governing contract, *id.* ¶¶ 22, 29, 95–96, Plaintiff does not quote a single provision of those Terms, does not allege that any provision guarantees a usage multiplier, and does not allege that Anthropic failed to do anything the Terms require. He instead asks the Court to convert statements in marketing graphics into contractual terms, rewrite the statements' text from "per session" statements to weekly-hours metrics, and then find breach. California contract law permits none of those steps.

### A. The Statements on Which Plaintiff Relies Are Not Terms of the Contract

Plaintiff's breach theory relies on statements made outside the Consumer Terms he signed. The FAC identifies the "5x" and "20x" statements on various pages such as Anthropic's plan-selection and upgrade screens and in its support articles. FAC ¶¶ 20–35, 41–47. By contrast, the FAC identifies the

governing contract as the Consumer Terms, which the subscriber must affirmatively accept prior to becoming a subscriber. *Id.* ¶¶ 22, 28–29; *see id.* ¶¶ 95–96 (alleging the Consumer Terms "govern individual subscriptions" to which consumers must agree before subscribing). Plaintiff's own allegations confirm that he understood the purchase-funnel statements not to be part of the Consumer Terms. *Compare id.* ¶ 48 ("Graphics G, H, and I are outside the sales funnel, and consumers *do not need to interact with them in order to subscribe* to a Max plan." (emphasis added)), *with id.* ¶ 22, 28–29, 95–96 (alleging that a consumer must "agree" to the Consumer Terms to subscribe).

The Consumer Terms also clearly indicate that "[t]hese Terms and any other terms expressly incorporated by reference form the entire agreement between you and us regarding the subject matter of our Terms." Exs. A–B to the Avasare Decl. § 12. Under California law, a "plaintiff cannot reasonably rely on extra contractual promises when an unambiguous integration clause excludes such promises or representations from the parties' agreement." *Oster v. Caithness Corp.*, 2017 WL 3727174, at *13 (N.D. Cal. Aug. 30, 2017); *see also* Cal. Civ. Code § 1625 ("The execution of a contract in writing . . . supersedes all the negotiations or stipulations concerning its matter which preceded or accompanied the execution of the instrument."); Cal. Civ. Proc. Code § 1856(a) ("Terms set forth in a writing intended by the parties as a final expression of their agreement with respect to the terms included therein may not be contradicted by evidence of a prior agreement or of a contemporaneous oral agreement."). The integration clause in the governing Consumer Terms therefore forecloses precisely what Plaintiff attempts—treating pre-contractual statements as though they were bargained terms.

### B. Anthropic's Challenged Statements Were Not Incorporated by Reference

The "5x" and "20x" statements on which Plaintiff relies were not incorporated by reference into the Consumer Terms. Incorporation by reference requires that: (1) the reference to the extrinsic document be "clear and unequivocal"; (2) the reference be "called to the attention of the other party," who must "consent thereto"; and (3) the terms of the incorporated document be "known or easily available to the contracting parties." *Shaw v. Regents of the Univ. of Cal.*, 58 Cal. App. 4th 44, 54 (1997); *see Brown v. Google LLC*, 685 F. Supp. 3d 909, 929 (N.D. Cal. 2023).

The FAC pleads no facts satisfying any *Shaw* prong. Plaintiff does not allege that the Consumer Terms refer to the marketing pages at all, let alone clearly and unequivocally, and in fact, the Consumer Terms contain no such reference. Exs. A–B to the Avasare Decl. Plaintiff does not allege that any such reference was called to his attention or that he consented to it. To the contrary, he alleges the opposite: that the "5x" and "20x" statements were outside the Consumer Terms to which a subscriber had to agree before subscribing. *Compare id.* ¶ 48 ("Graphics G, H, and I are outside the sales funnel, and consumers *do not need to interact with them in order to subscribe* to a Max plan." (emphasis added)), *with id.* ¶ 22, 28–29, 95–96 (alleging that a consumer must "agree" to the Consumer Terms to subscribe). Accordingly, Anthropic's "5x" and "20x" statements were not incorporated into the Consumer Terms. *See, e.g.*, *Gerber v. Twitter, Inc.*, 2024 WL 5173313, at *8 (N.D. Cal. Dec. 18, 2024) (links "below the end" of the agreement to which "the user is not guided" by the agreement itself were not incorporated); *Rodriguez v. Google LLC*, 2021 WL 6621070, at *4 (N.D. Cal. Aug. 18, 2021) (help page, linked but not "reference[d]" in agreement, was not incorporated).

### C. Even If the Statements Were Incorporated, Plaintiff Has Not Plausibly Alleged a Breach

Even if the Consumer Terms did expressly incorporate Anthropic's "5x" and "20x" statements, Plaintiff has still not stated a claim for breach of contract. The particular statement Plaintiff identifies in his breach-of-contract claim is that the Max 5x and Max 20x plans provide five or twenty times "more usage *per session*" than the Pro plan. *Id.* ¶ 43 (emphasis added); *see id.* ¶ 134. But the same Graphic H on which Plaintiff relies states that the plans "*also* have two weekly usage limits," which reset every seven days, and that Anthropic "may limit your usage *in other ways*, *such as weekly* and monthly *caps* or model and feature usage, at [its] discretion," *id.* ¶ 43 (emphasis added); *see supra* § I. Per-session usage and weekly usage limits are, on the face of the statement, two different limits. Plaintiff's theory requires the Court to read "per session" out of the sentence and to treat a per-session usage multiplier as a guarantee of cumulative hours per week. That request is not interpretation; it is impermissible rewriting. *See, e.g.*, *Ramirez v. Charter Commc'ns, Inc.*, 16 Cal. 5th 478, 502–03 (2024) (rejecting a "strained interpretation" and explaining that courts may not "rewrite or alter by construction the unambiguous terms the parties agreed upon").

### D. The Consumer Terms Expressly Reserve Anthropic's Discretion Over Usage

**Limits**

In any event, the Consumer Terms expressly reserve Anthropic's right to "add or remove features, *increase or decrease capacity limits*, offer new Services, or stop offering certain Services." Exs. A–B to the Avasare Decl. § 12 (emphasis added). The Terms also disclaim liability "for any *change to* . . . the Services or your access to them." *Id.*; *see also id.* (reserving Anthropic's "right to modify" the "Services" "in whole or in part" at "any time" unless otherwise specifically agreed). Anthropic's own extra-contractual statements, including Graphic H on which Plaintiff relies, similarly state that Anthropic "may limit your usage in other ways, such as weekly and monthly caps or model and feature usage, at our discretion." FAC ¶ 43; *see also id.* ¶¶ 23, 41 (alleging that the "Plans that grow with you" page states: "Price and plans are subject to change at Anthropic's discretion").

Conduct that a contract expressly permits cannot constitute a breach of that contract. *See, e.g.*, *Carma Devs. (Cal.), Inc. v. Marathon Dev. Cal., Inc.*, 2 Cal. 4th 342, 374 (1992) ("[I]f defendants were given the right to do what they did by the express provisions of the contract there can be no breach."). For example, in *Song fi Inc. v. Google, Inc.*, 108 F. Supp. 3d 876 (N.D. Cal. 2015), a court in this District considered a similar reservation-of-rights clause in YouTube's terms of services and held that "Plaintiffs cannot state a claim for breach of the Terms of Service in removing the video, because conduct authorized by a contract cannot give rise to a claim for breach of the agreement." *Id.* at 885. Like Anthropic's reservation-of-rights clause here, YouTube's terms of service reserved the right to make the relevant determinations "at any time, without prior notice and in its sole discretion," further providing that YouTube could "discontinue any aspect of the Service at any time." *Id.* Because Anthropic's reservation-of-rights clause is materially the same as YouTube's, Plaintiff has failed to state a breach of contract claim. *See also, e.g.*, *Burton v. Alaska Airlines*, 2025 WL 3443155, at *6 (N.D. Cal. Dec. 1, 2025) (dismissing breach of contract claim because "the Terms of Use expressly gave Defendant the right to modify the Program's terms at any time").

## IX. Plaintiff Fails to Plausibly Allege Entitlement to Equitable Relief (Counts II and V)

Lastly, Plaintiff's demand for equitable restitution in connection with his FAL and UCL claims is barred by *Sonner v. Premier Nutrition Corp.*, 971 F.3d 834, 845 (9th Cir. 2020). Because remedies under the UCL are "equitable in nature," a plaintiff "must establish that she lacks an adequate remedy

at law before securing" equitable relief. *Id.* at 839 n.2, 844; *see also Phan v. Sargento Foods, Inc.*, 2021 WL 2224260, at *5 (N.D. Cal. June 2, 2021) (no monetary equitable relief where "[p]laintiffs have failed to explain how restitution could be different from damages").

Here, Plaintiff makes no attempt to allege that the damages he seeks in connection with his other claims, including his CLRA and negligent misrepresentation claims, are inadequate. He offers only the boilerplate allegation that he "has no adequate remedy at law," FAC ¶ 144, which is nothing more than a conclusory legal conclusion, *see Iqbal*, 556 U.S. at 678; *Bluemel v. Conduent State & Local Solutions, Inc.*, 2026 WL 1710303, at *3 (N.D. Cal. June 9, 2026) (dismissing FAL and UCL claims where plaintiff failed to plausibly allege inadequate remedy at law). His request for restitution fails.

### X. Dismissal Should Be with Prejudice

Leave to amend should be denied where "no amendment would allow the complaint to withstand dismissal as a matter of law." *Kroessler v. CVS Health Corp.*, 977 F.3d 803, 815 (9th Cir. 2020). Plaintiff has already amended once, and no further amendment would save his claims from dismissal.

The defects identified above are not pleading oversights that further factual allegations could cure. Plaintiff cannot rewrite what Anthropic said: Graphic H states that the Max plans provide 5 or 20 times "more usage per session," and separately that the plans "also have two weekly usage limits." FAC ¶ 43. Because Plaintiff reproduced that language in his own pleading, no amendment can unsay it, and no amendment can make a per-session statement into a weekly-hours guarantee. Where, as here, the FAC's allegations fail as a matter of law, dismissal with prejudice is appropriate. *See Brown*, 172 F.4th at 1120 ("[N]o amendment could save Brown's complaint [because] reasonable consumers have not been misled." (cleaned up)).

## CONCLUSION

For the foregoing reasons, the Court should dismiss all of Plaintiff's claims with prejudice.

Dated: August 19, 2026

Respectfully submitted,

By: */s/ David R. Singh*

DAVID R. SINGH (Bar No. 300840)
david.singh@weil.com

MORGAN D. MACBRIDE (Bar No. 301248)
morgan.macbride@weil.com
WEIL, GOTSHAL & MANGES LLP
201 Redwood Shores Parkway, 6th Floor
Redwood Shores, CA 94065-1134
Telephone: (650) 802-3000
Facsimile: (650) 802-3100

*Attorneys for Defendant ANTHROPIC PBC*