DAVID R. SINGH (Bar No. 300840)
david.singh@weil.com
MORGAN D. MACBRIDE (Bar No. 301248)
morgan.macbride@weil.com
WEIL, GOTSHAL & MANGES LLP
201 Redwood Shores Parkway, 6th Floor
Redwood Shores, CA 94065-1134
Telephone: (650) 802-3000
Facsimile: (650) 802-3100

*Attorneys for Defendant ANTHROPIC PBC*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

KARL KAHN and SOLOMON SMITH, individually, on behalf of all others similarly situated, and on behalf of the general public,

Plaintiffs,

v.

ANTHROPIC, PBC dba ANTHROPIC, INC.,

Defendant.

Case No. 3:26-cv-05763-AGT
(Consolidated with 4:26-cv-07789-AGT)

**DEFENDANT ANTHROPIC PBC'S NOTICE OF MOTION AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF ITS MOTION TO DISMISS PLAINTIFFS' CONSOLIDATED COMPLAINT**

Date: November 6, 2026
Time: 10:00 AM
Judge: Honorable Alex G. Tse

Action Filed: June 14, 2026
Consolidated Complaint: Sept. 8, 2026

**NOTICE OF MOTION AND MOTION**

TO THE COURT AND ALL PARTIES OF RECORD:

PLEASE TAKE NOTICE that on Friday, November 6, 2026, at 10:00 AM, or as soon thereafter as the matter may be heard before the Honorable Alex G. Tse, in Courtroom A – 15th Floor, 450 Golden Gate Avenue, San Francisco, CA 94102, Defendant Anthropic PBC ("Anthropic") will and hereby does move to dismiss the Consolidated Complaint ("Complaint" or "Compl.") filed by Plaintiffs Karl Kahn and Solomon Smith in this action. Anthropic's motion to dismiss is brought pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure.

Anthropic's motion is based upon this Notice of Motion and Motion, the Memorandum of Points and Authorities in support thereof, and all other pleadings and papers on file herein, and such argument and evidence as may be presented to the Court.

Dated: September 22, 2026

Respectfully submitted,

By: *<u>/s/ David R. Singh</u>*

DAVID R. SINGH (Bar No. 300840)
david.singh@weil.com
MORGAN D. MACBRIDE (Bar No. 301248)
morgan.macbride@weil.com
WEIL, GOTSHAL & MANGES LLP
201 Redwood Shores Parkway, 6th Floor
Redwood Shores, CA 94065-1134
Telephone: (650) 802-3000
Facsimile: (650) 802-3100

*Attorneys for Defendant Anthropic PBC*

# TABLE OF CONTENTS


INTRODUCTION .......... 1

BACKGROUND .......... 2

A. Anthropic's Subscription Plans for Claude .......... 2

B. Anthropic's Statements About Usage Limits .......... 3

C. Plaintiffs' Subscription History and Claims .......... 5

LEGAL STANDARD .......... 6

ARGUMENT .......... 6

I. Plaintiffs Fail to Plausibly Allege CLRA, FAL, and UCL Claims Because No Reasonable Consumer Could Be Deceived by Anthropic's Statements (Counts I–II and V) .......... 6

A. Anthropic Accurately Promised More Usage Per Session for Max Plans .......... 7

B. Anthropic Never Promised "Fixed" Usage or Features for Its Plans .......... 10

C. Anthropic's 50% Savings Claim Confirms the Implausibility of Plaintiffs' Theory .......... 12

II. Plaintiffs Fail to Allege Facts Establishing Article III Standing for Injunctive Relief (Counts I–III and V) .......... 12

III. Plaintiffs Fail to Plausibly Allege a Negligent Misrepresentation Claim (Count III) .......... 13

A. California Law Bars Tort Claims that Duplicate Contract Claims Seeking Identical Economic Losses .......... 13

B. Plaintiffs Do Not Plausibly Allege Any Misrepresentation .......... 14

C. Plaintiffs' Omission Theory Identifies No Omitted Fact and No Duty to Disclose 14

IV. Plaintiffs Fail to Plausibly Allege a CLRA Claim for Two Additional, Independent Reasons (Count I) .......... 15

A. The Max Subscriptions Are Neither "Goods" nor "Services" Under the CLRA .......... 15

B. Plaintiffs Do Not Plausibly Allege that They Are "Consumers," and the Facts They Do Plead Describe Professional, Not Personal, Use .......... 17

V. Plaintiffs Do Not Plausibly State a Claim Under the UCL (Count V) .......... 18

VI. Plaintiffs Do Not State a Breach of Contract Claim (Count IV) .......... 18
A. The Statements on Which Plaintiffs Rely Are Not Terms of the Contract .......... 19
B. Anthropic's Challenged Statements Were Not Incorporated by Reference .......... 19
C. Even If the Statements Were Incorporated, Plaintiffs Have Not Plausibly Alleged a Breach of the 5x or 20x Per-Session Multiplier .......... 20
D. The Terms Expressly Reserve Anthropic's Discretion Over Usage Limits .......... 21
VII. Plaintiffs Do Not State a Breach of Implied Covenant of Good Faith and Fair Dealing Claim (Count VI) .......... 22
A. Plaintiffs Do Not Identify Any Frustrated Contractual Provision .......... 22
B. Plaintiffs Do Not Plausibly Allege They Were Deprived of the Benefit of Their Agreement .......... 23
C. Plaintiffs' Dilution Theory Fails .......... 23
VIII. Plaintiffs Fail to Plausibly Allege Entitlement to Equitable Relief (Counts II and V) .......... 24
IX. Dismissal Should Be with Prejudice .......... 25
CONCLUSION .......... 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ahern v. Apple Inc.*,
411 F. Supp. 3d 541 (N.D. Cal. 2019) .......... 15

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) .......... 6, 16, 17, 25

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) .......... 6

*Bluemel v. Conduent State & Local Solutions, Inc.*,
2026 WL 1710303 (N.D. Cal. June 9, 2026) .......... 25

*Bodenburg v. Apple Inc.*,
146 F.4th 761 (9th Cir. 2025) .......... 8, 10, 11

*Brown v. Brita Prods. Co.*,
172 F.4th 1113 (9th Cir. 2026) .......... 10, 25

*Brown v. Google LLC*,
685 F. Supp. 3d 909 (N.D. Cal. 2023) .......... 20

*Burton v. Alaska Airlines*,
2025 WL 3443155 (N.D. Cal. Dec. 1, 2025) .......... 21

*Carma Devs. (Cal.), Inc. v. Marathon Dev. Cal., Inc.*,
2 Cal. 4th 342 (1992) .......... 21

*Collins v. eMachines, Inc.*,
202 Cal. App. 4th 249 (2011) .......... 15

*Damabeh v. 7-Eleven, Inc.*,
2013 WL 1915867 (N.D. Cal. May 8, 2013) .......... 22

*Davidson v. Kimberly-Clark Corp.*,
889 F.3d 956 (9th Cir. 2018) .......... 12

*Diediker v. Peelle Fin. Corp.*,
60 Cal. App. 4th 288 (1997) .......... 14

*Dinan v. SanDisk LLC*,
2020 WL 364277 (N.D. Cal. Jan. 22, 2020) .......... 11

*Ebner v. Fresh, Inc.*,
838 F.3d 958 (9th Cir. 2016) .......... 6

*Ferrington v. McAfee, Inc.*,
2010 WL 3910169 (N.D. Cal. Oct. 5, 2010) .......... 16

*Frezza v. Google Inc.*,
2012 WL 5877587 (N.D. Cal. Nov. 20, 2012) .......... 17

*Gerber v. Twitter, Inc.*,
2024 WL 5173313 (N.D. Cal. Dec. 18, 2024) ....................20

*In re Google Assistant Priv. Litig.*,
457 F. Supp. 3d 797 (N.D. Cal. 2020) ....................3

*Guido v. Mount Lemmon Fire Dist.*,
859 F.3d 1168 (9th Cir. 2017), *aff'd*, 586 U.S. 1 (2018) ....................7

*Hadley v. Kellogg Sales Co.*,
243 F. Supp. 3d 1074 (N.D. Cal. 2017) ....................18

*Heagney v. John Paul Mitchell Sys.*,
2023 WL 4947974 (N.D. Cal. Aug. 2, 2023) ....................13

*Herron v. Best Buy Co. Inc.*,
924 F. Supp. 2d 1161 (E.D. Cal. 2013) ....................15

*Hodgers-Durgin v. de la Vina*,
199 F.3d 1037 (9th Cir. 1999) (en banc) ....................13

*Ibarra v. Pharmagenics*,
660 F. Supp. 3d 914 (C.D. Cal. 2023) ....................12

*In re iPhone Application Litig.*,
844 F. Supp. 2d 1040 (N.D. Cal. 2012) ....................16

*Kazmucha v. Fitness Alliance LLC*,
2026 WL 1261992 (D. Ariz. May 8, 2026) ....................24

*Kearns v. Ford Motor Co.*,
567 F.3d 1120 (9th Cir. 2009) ....................18

*Khan v. CitiMortgage, Inc.*,
975 F. Supp. 2d 1127 (E.D. Cal. 2013) ....................24

*Kokkonen v. Guardian Life Ins. Co. of Am.*,
511 U.S. 375 (1994) ....................6

*Kroessler v. CVS Health Corp.*,
977 F.3d 803 (9th Cir. 2020) ....................25

*LiMandri v. Judkins*,
52 Cal. App. 4th 326 (1997) ....................15

*Lothlen v. Wells Fargo Bank, N.A.*,
2014 WL 1266854 (N.D. Cal. Mar. 27, 2014) ....................22

*McGinity v. Procter & Gamble Co.*,
69 F.4th 1093 (9th Cir. 2023) ....................7, 9, 10, 11

*McWhorter v. Procter & Gamble Co.*,
2025 WL 948061 (N.D. Cal. Mar. 28, 2025) ....................8, 9, 14

*Meyer v. Uber Techs., Inc.*,
868 F.3d 66 (2d Cir. 2017) ....................10

*Mier v. CVS Pharmacy, Inc.*,
2024 WL 121880 (C.D. Cal. Jan. 10, 2024) ..... 10

*Missud v. Oakland Coliseum Joint Venture*,
2013 WL 3286193 (N.D. Cal. June 27, 2013) ..... 22, 23, 24

*Moore v. Trader Joe's Co.*,
4 F.4th 874 (9th Cir. 2021) ..... 6, 7, 8, 9

*O'Coirbhin v. PNC Bank, Nat'l Ass'n*,
2025 WL 2223433 (N.D. Cal. Aug. 5, 2025) ..... 23

*Oliver v. SD-3C LLC*,
2015 WL 10890656 (N.D. Cal. Sept. 30, 2015) ..... 23

*Oster v. Caithness Corp.*,
2017 WL 3727174 (N.D. Cal. Aug. 30, 2017) ..... 19

*Penaloza v. Select Portfolio Servicing Inc.*,
2014 WL 6910334 (C.D. Cal. Dec. 8, 2014) ..... 22, 23

*Phan v. Sargento Foods, Inc.*,
2021 WL 2224260 (N.D. Cal. June 2, 2021) ..... 24

*Phillips v. Apple Inc.*,
2016 WL 1579693 (N.D. Cal. Apr. 19, 2016) ..... 13

*Ramirez v. Charter Commc'ns, Inc.*,
16 Cal. 5th 478 (2024) ..... 20

*Ramos v. EyeBuyDirect, Inc.*,
2025 WL 2633103 (C.D. Cal. Aug. 27, 2025) ..... 13

*Robinson Helicopter Co. v. Dana Corp.*,
34 Cal. 4th 979 (2004) ..... 13

*Rodriguez v. Google LLC*,
2021 WL 6621070 (N.D. Cal. Aug. 18, 2021) ..... 20

*Rojas-Lozano v. Google, Inc.*,
159 F. Supp. 3d 1101 (N.D. Cal. 2016) ..... 16

*Sensible Foods, LLC v. World Gourmet, Inc.*,
2011 WL 5244716 (N.D. Cal. Nov. 3, 2011) ..... 23

*Shaw v. Regents of the Univ. of Cal.*,
58 Cal. App. 4th 44 (1997) ..... 20

*Sheen v. Wells Fargo Bank, N.A.*,
12 Cal. 5th 905 (2022) ..... 13

*Song fi, Inc. v. Google, Inc.*,
108 F. Supp. 3d 876 (N.D. Cal. 2015) ..... 21, 23

*Sonner v. Premier Nutrition Corp.*,
971 F.3d 834 (9th Cir. 2020) ..... 24

*Ting v. AT&T*,
319 F.3d 1126 (9th Cir. 2003) .......... 17

*TransUnion LLC v. Ramirez*,
594 U.S. 413 (2021) .......... 6

*United States v. Martin*,
526 F.3d 926 (6th Cir. 2008) .......... 10

*Vargas v. JP Morgan Chase Bank, N.A.*,
30 F. Supp. 3d 945 (C.D. Cal. 2014) .......... 18

*Von Grabe v. Sprint PCS*,
312 F. Supp. 2d 1285 (S.D. Cal. 2003) .......... 17

*Whiteside v. Kimberly Clark Corp.*,
108 F.4th 771 (9th Cir. 2024) .......... 11

*Williamson v. McAfee, Inc.*,
2014 WL 4220824 (N.D. Cal. Aug. 22, 2014) .......... 16

*Wolf v. Superior Court*,
107 Cal. App. 4th 25 (2003) .......... 15

*Zeiger v. WellPet LLC*,
526 F. Supp. 3d 652 (N.D. Cal. 2021) .......... 14

**Statutes**

Cal. Bus. & Prof. Code § 17200 .......... 6, 18

Cal. Civ. Code § 1625 .......... 19

Cal. Civ. Code § 1710 .......... 14

Cal. Civ. Code § 1750 .......... 6

Cal. Civ. Code § 1761 .......... 16, 17

Cal. Civ. Code § 1770 .......... 16

Cal. Civ. Proc. Code § 1856 .......... 19

**Other Authorities**

Claude Support, https://support.claude.com/en/articles/8325606-what-is-the-pro-plan (last visited Sept. 10, 2026) .......... 4, 15

Fed. R. Civ. P. 12 .......... 6

Fed. R. Evid. 201 .......... 3

# INTRODUCTION

Plaintiffs ignore what Anthropic actually tells subscribers about its platform, Claude, in a failed effort to accuse Anthropic of deception. Claude is a versatile, industry-leading large language model capable of interpreting and responding to a wide range of inputs, including analyzing and summarizing text, writing and debugging code, and reasoning through complex problems. Usage of Claude—providing a question or prompt and obtaining a response—requires computing resources. Anthropic offers subscriptions to Claude at several tiers of cost and usage (or capacity) limits: a free version, an individual Pro plan, and premium Max plans (Max 5x and Max 20x). As Plaintiffs' Consolidated Complaint confirms, Anthropic makes clear that its Max 5x and Max 20x plans provide 5 or 20 times more usage "*per session*" than the Pro plan, as opposed to the separate "weekly usage limits." And for each of these plans, Anthropic discloses that, while it will maintain the 5 and 20 times "per session" usage multipliers, it may increase or decrease the total amount of usage available.

Plaintiffs' false-advertising theory ignores Anthropic's actual statements altogether and strips them of their explanation and context. Plaintiffs assert that Anthropic promised subscribers "5 times more usage . . . [or] 20 times more usage than Pro on a monthly (or at least weekly) basis" without any "capacity constraints." But Anthropic never promised a fixed total amount of usage or capacity. Instead, all that Anthropic promised is that Max subscribers would receive 5 or 20 times proportionally more per-session usage "than Pro" subscribers, while disclosing that Anthropic may alter or limit the total amount of usage. Plaintiffs never allege (nor could they) that they actually received less than 5 or 20 times the amount of per-session usage that a Pro user received. And Plaintiffs concede that Anthropic's Consumer Terms ("Terms"), purchase flow, and support pages reiterate that Anthropic can alter the total amount of usage. Accordingly, Plaintiffs' own pleadings preclude their theory of deception.

Plaintiffs assert six California-law claims—under the CLRA, FAL, and UCL, and for negligent misrepresentation, breach of contract, and breach of the implied covenant of good faith and fair dealing. Each of these claims fails.

***First***, no reasonable consumer would be misled by clear statements distinguishing per-session limits from weekly limits, particularly where the clarifying materials (reproduced in the Complaint)

were called to subscribers' attention and readily available in the subscription purchase flow. Plaintiffs cannot manufacture deception by excerpting Anthropic's statements and ignoring their context.

***Second***, Plaintiffs lack standing to seek injunctive relief. They are current subscribers who know how Claude's limits work, can monitor their usage in real time, and can cancel at any time.

***Third***, Plaintiffs' claims fail for several additional and independent reasons. The negligent misrepresentation claim is barred by the economic loss rule, and the omission theory identifies neither an omitted fact nor a duty to disclose. The CLRA claim fails because a Claude subscription is neither a "good" nor a "service" under the statute and Plaintiffs fail to plead that their use of Claude is primarily personal. The contract claim fails because the challenged statements are not part of the Terms, which reserve Anthropic's discretion to change total usage limits. The implied covenant of good faith and fair dealing claim identifies no contractual provision that was frustrated. And Plaintiffs' request for restitution fails because they do not plausibly allege that legal remedies are inadequate.

For these reasons, the Court should dismiss the Complaint without leave to amend.

## BACKGROUND

### A. Anthropic's Subscription Plans for Claude

Anthropic, PBC is a Delaware public benefit corporation headquartered in San Francisco, California. Dkt. 37 ("Compl.") ¶ 20. In March 2023, Anthropic launched Claude, a state-of-the-art AI assistant and industry-leading large language model. *Id.* ¶¶ 2, 23. Subscribers can prompt Claude to "conduct research, draft and edit text," and "generate computer code, among other tasks." *Id.* ¶ 2. Anthropic offers Claude subscriptions at different levels of usage, including a free version, individual plans, and commercial—team and enterprise—plans. *Id.* ¶¶ 3, 24.

At issue here are the paid individual plans, which are sold in three tiers "that have increasing usage allowances": Pro, Max 5x, and Max 20x. *Id.* ¶ 26. A monthly subscription to Pro costs $17 to $20 per month, while Max 5x and 20x cost $100 and $200 per month, respectively. *Id.* ¶¶ 4–5, 26. Anthropic began offering individual Pro subscriptions in September 2023 and announced individual Max subscriptions in April 2025. *Id.* ¶ 23.

A person interested in subscribing must first create an account, and before they can do so must check a box stating: "I agree to Anthropic's <u>Consumer Terms</u> and <u>Acceptable Use Policy</u> and confirm

that I am at least 18 years of age." *Id.* ¶ 34. The Terms are hyperlinked at that point in the purchase flow, and again on the payment screen, where the person must check a second box acknowledging that "Anthropic will charge your card in the amount above now and on a recurring monthly basis until you cancel in accordance with our terms. You can cancel at any time in your account settings." *Id.* ¶¶ 40–41. The Terms explain that: (i) Anthropic "may sometimes add or remove features, increase or decrease capacity limits, offer new Services, or stop offering certain Services"; (ii) Anthropic "may change the content, features, and other services [it provides] from time to time, and do[es] not guarantee that any particular piece of content, feature, or other service will always be available through the Services"; (iii) "services, outputs, and actions are provided on an 'as is' and 'as available' basis and, to the fullest extent permissible under applicable law, are provided without warranties of any kind"; and (iv) Anthropic "reserve[s] the right to modify, suspend, or discontinue the Services or your access to the Services, in whole or in part, at any time without notice to you." Avasare Decl. Ex. A at 6, 9–10; Ex. B at 6, 9, 11 (capitalization removed).[1] Only subscribers who have accepted the Terms and paid for Pro or Max subscriptions may access tools like Claude Code and Claude Cowork. Compl. ¶ 24.

**B. Anthropic's Statements About Usage Limits**

When subscribers sign up for Claude, they typically begin at the Claude landing page, which shows them how to "Get started," which begins the "purchase flow." *Id.* ¶¶ 25, 59 (Graphic A). The page also displays a disclaimer stating that "Usage limits apply . . . . Price and plans are subject to change at Anthropic's discretion." *Id.* ¶¶ 25, 59. After a person creates an account, they move to another page that offers three Claude subscriptions, identifying "more usage"—followed by an asterisk—as a principal feature of the Max plans and inviting them to "Choose 5x or 20x more usage than Pro." *Id.* ¶¶ 35–36 (Graphic B). This page shows the same "Usage limits apply" disclaimer,

---

[1] The Court may consider the Terms to which Plaintiffs agreed during their purchases and upgrades under both the incorporation-by-reference doctrine and Federal Rule of Evidence 201. *See* Anthropic's Request for Judicial Notice and Incorporation by Reference in Support of Its Motion to Dismiss at 2–3; Exs. A–B to Declaration of Amol Avasare in Support of Anthropic's Motion to Dismiss ("Avasare Decl."); *see also In re Google Assistant Priv. Litig.*, 457 F. Supp. 3d 797, 813–14 (N.D. Cal. 2020) (holding incorporated terms of service formed the basis of contract and warranty claims). The May 1, 2025 Terms (Ex. A) were the operative terms when Kahn purchased his Pro subscription on June 23, 2025, and the October 8, 2025 Terms (Ex. B) were the operative version when he upgraded to Max 5x on January 5, 2026, and to Max 20x on April 21, 2026. Avasare Decl. ¶¶ 4–5; Compl. ¶¶ 18, 96–97, 100. The October 8, 2025 Terms (Ex. B) were the operative version when Smith subscribed to Claude Pro on March 16, 2026, and upgraded to Max 5x on March 21, 2026. Compl. ¶¶ 109–110.

hyperlinked to Anthropic's usage-limit materials. *Id.* ¶¶ 34–35, 59–60. When a subscriber selects a plan, the website again compares Max to Pro, lists the price of each Max plan, and identifies a savings of "50%" for the Max 20x plan. *Id.* ¶¶ 37–38 (Graphic C). Graphics D through F in the Complaint partially depict the price-detail, payment, and upgrade screens. *Id.* ¶¶ 39–48. To upgrade from an existing plan, a subscriber must view those webpages. *Id.* ¶¶ 43–45, 102.

The Complaint also depicts the materials to which the "Usage limits" hyperlink leads. *Id.* ¶ 60. The "Usage limit best practices" page directs subscribers to additional pages, including a page addressing the "Max plan[s]." *Id.* ¶¶ 60–61 (Graphic G). That page—partially depicted in the Complaint as Graphic H—states that the Max 5x and 20x plans provide 5 or 20 times "more usage *per session*" than the Pro plan, respectively. *Id.* ¶ 61 (emphasis added). Plaintiffs also acknowledge that the per-session usage limits, as opposed to the weekly usage limits, reset every five hours, which Anthropic discloses on its website. *See id.* ¶ 53 (citing a subscriber review as describing Claude's "5-hour sessions"); *see also* Claude Support, https://support.claude.com/en/articles/8325606-what-is-the-pro-plan (last visited Sept. 10, 2026) ("Your session-based usage limit will reset every five hours."). The webpage further states that the plans "*also* have two weekly usage limits," depending on the model selected, which reset every seven days, and that Anthropic "may limit your usage in other ways, such as weekly and monthly caps or model and feature usage, at our discretion":

> **Does the Max plan have any usage limits?**
>
> Yes. The Max plan offers substantially higher usage compared to our Pro plan and is available in two tiers:
>
> **Max 5x** provides 5 times more usage per session than the Pro plan. This tier is ideal for frequent users who work with Claude on a variety of tasks.
>
> **Max 20x** provides 20 times more usage per session than the Pro plan. This tier is ideal for daily users who collaborate often with Claude for most tasks.
>
> Max plans also have two weekly usage limits: one that applies across all models and another for Sonnet models only. Both limits reset seven days after your session starts.
>
> In addition, to manage capacity and ensure fair access to all users, we may limit your usage in other ways, such as weekly and monthly caps or model and feature usage, at our discretion.

**GRAPHIC H**

Compl. ¶ 61 (emphasis added).

The webpage in turn links to an article titled "How do usage and length limits work?"—which explains what usage limits are and the factors that affect them, such as the "length and complexity of

your conversations." *Id.* ¶ 64 (Graphic I). A page titled "What are usage limits" describes a usage limit as a "'conversation budget' that determines how many messages you can send to Claude, or how long you can work with Claude Code, before needing to wait for your limit to reset." *Id.* ¶¶ 64–65, 69 (Graphic I). Anthropic's site also enables subscribers to monitor the percentage of their limits that they have consumed in real time. *Id.* ¶ 68. In July 2025, Anthropic communicated to subscribers quantitative weekly usage expectations, subject to the same qualifications about model selection, conversation length, and complexity that Anthropic disclosed elsewhere. *Id.* ¶¶ 73–78. Those weekly limits were in addition to, and did not supplant, the per-session limits. *Id.*

### C. Plaintiffs' Subscription History and Claims

Plaintiff Karl Kahn is, and at all relevant times was, a resident of Washington, D.C. *Id.* ¶ 18. He subscribed to Claude Pro on or about June 23, 2025, and alleges he was "interested in using Claude Code to accomplish computer programming tasks." *Id.* ¶ 96. He remained a Pro subscriber for about six months before he upgraded to the Max 5x plan. *Id.* ¶¶ 96–97. He then "began to use Claude Code extensively," and "budgeted and monitored his usage." *Id.* ¶ 99. After nearly four months of firsthand experience with the Max 5x plan, he upgraded again to Max 20x. *Id.* ¶ 100. In connection with each upgrade, Kahn alleges that he "viewed an upgrade page that looked similar to Graphics D and F." *Id.* ¶ 102. He alleges that he "saw and relied on Anthropic's usage and savings claims in the purchase funnel." *Id.* ¶ 94. He does not allege that he canceled any subscription.

Plaintiff Solomon Smith subscribed to Claude Pro on or about March 16, 2026, before upgrading to the Max 5x plan on or about March 21, 2026. *Id.* ¶¶ 109–110. When Smith upgraded to the Max 5x plan, he alleges that he understood the plan "would provide approximately five times the usable capacity." *Id.* ¶ 111. Smith does not allege that he canceled his subscription. Instead, he alleges that he "continues to use" Claude. *Id.* ¶ 116.

Plaintiffs filed this putative class action on behalf of all natural persons in the United States who purchased or upgraded to a Max 5x or Max 20x plan from April 9, 2025 to the present. *Id.* ¶¶ 118, 121. Despite Anthropic's express statements that the Max 5x and 20x plans provide 5 or 20 times "more usage *per session* than the Pro plan," *id.* ¶ 61 (emphasis added), Plaintiffs compare the estimated *weekly* hour limits that Anthropic said each plan was expected to have in its July 28, 2025 emails, *id.* ¶¶ 73–

82. Based on those estimated *weekly* hour limits, Plaintiffs conclude that the Max 5x and 20x plans deliver 3.5 and 6–8 times the usage of Pro, respectively. *Id.* ¶¶ 8–9, 73–82. On that basis, Plaintiffs also allege that the "50% savings" offered by the Max 20x plan is also false because the per-*hour* price of Max 20x exceeds the per-*hour* price of Max 5x. *Id.* ¶ 82.

Plaintiffs assert six claims under California law: violation of the Consumers Legal Remedies Act, Cal. Civ. Code § 1750 (Count I); violation of the False Advertising Law, Cal. Bus. & Prof. Code § 17500 (Count II); negligent misrepresentation (Count III); breach of contract (Count IV); violation of the Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 (Count V); and breach of the implied covenant of good faith and fair dealing (Count VI). *Id.* ¶¶ 138–194.

## LEGAL STANDARD

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* Instead, Plaintiffs bear the burden of pleading facts that "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678.

Under Rule 12(b)(1), Plaintiffs bear the burden of establishing Article III standing to pursue injunctive relief. *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994). To establish Article III standing and survive a Rule 12(b)(1) challenge, Plaintiffs must show a concrete and particularized injury in fact that is caused by the defendant and likely to be redressed by a favorable decision. *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021).

## ARGUMENT

### I. Plaintiffs Fail to Plausibly Allege CLRA, FAL, and UCL Claims Because No Reasonable Consumer Could Be Deceived by Anthropic's Statements (Counts I–II and V)

Plaintiffs' CLRA, FAL, and UCL claims are subject to the "reasonable consumer test." *Moore v. Trader Joe's Co.*, 4 F.4th 874, 881 (9th Cir. 2021). Plaintiffs must "show that 'members of the public are likely to be deceived.'" *Ebner v. Fresh, Inc.*, 838 F.3d 958, 965 (9th Cir. 2016) (citation omitted). There must be more than a "mere possibility" that a statement could deceive a few consumers interpreting it unreasonably—the statement must mislead "a significant portion" of the public acting

reasonably under the circumstances. *McGinity v. Procter & Gamble Co.*, 69 F.4th 1093, 1097 (9th Cir. 2023).

Plaintiffs' claims fail the reasonable consumer test because they rest on statements Anthropic never made. ***First***, instead of challenging what Anthropic actually stated—that Max plans provide 5 or 20 times more usage *per session* than the Pro plan—Plaintiffs rewrite "per session" to mean "hours per week," all while ignoring the clarifying information readily available during the purchase flow. ***Second***, Plaintiffs claim that Anthropic somehow promised users a "fixed" amount of usage or features, even though Anthropic's pricing page merely promised Max subscribers 5 or 20 times more usage "than Pro," subject to usage limits. Where, as here, "plaintiffs base deceptive advertising claims on unreasonable or fanciful interpretations of labels or other advertising, dismissal on the pleadings may well be justified." *Moore*, 4 F.4th at 882–83.

### A. Anthropic Accurately Promised More Usage Per Session for Max Plans

Plaintiffs claim that Anthropic's statements are false or misleading because the Max 5x and 20x plans allegedly do not provide 5 or 20 times "more usage than Pro" "per month or per week." Compl. ¶¶ 36–37, 39, 155. But a webpage available to potential users in the mandatory subscription purchase flow, depicted as Graphic H in the Complaint, expressly explains the relevant metric is a "session":

> Max 5x provides 5 times more usage ***<u>per session</u>*** than the Pro plan . . . .
> Max 20x provides 20 times more usage ***<u>per session</u>*** than the Pro plan . . . .
> Max plans ***<u>also have two weekly usage limits</u>***: one that applies across all models and another for Sonnet models only. Both limits reset seven days after your ***<u>session</u>*** starts.

*Id.* ¶ 61 (emphasis added). The word "also" signals that the weekly usage limits are an additional, independent limit—separate from the per-session 5x and 20x usage limits. *See, e.g.*, *Guido v. Mount Lemmon Fire Dist.*, 859 F.3d 1168, 1171 (9th Cir. 2017) (noting that the word "also" created "two *separate* definitions": "[T]he ordinary meaning of 'also' . . . is . . . '*in addition*; *besides*' and 'likewise; too.'" (emphasis added)), *aff'd*, 586 U.S. 1, 6 (2018). No reasonable consumer reading these statements, with the full context, could conclude that "5x" or "20x" means 5 or 20 times more hours per week, rather than 5 or 20 times more usage per session.

Plaintiffs try to insert their own words into Anthropic's statements, inaccurately asserting that Anthropic represented that it would "deliver five times the usage of Pro with its Max 5x plan *per month*

*or per week*." Compl. ¶ 155 (emphasis added); *see id.* ¶ 63. Anthropic said no such thing. To the contrary, Anthropic repeatedly represented that the 5x and 20x plans provide 5 and 20 times more usage "*per session*" than the Pro plan. *Id.* ¶ 61 (emphasis added). "Per session" does not mean "per week" or "per month." Indeed, the very Max subscriber reviews that Plaintiffs cite establish that subscribers understood this distinction. *Id.* ¶ 53 (quoting a review of Anthropic's "*5-hour sessions*" (emphasis added)); *id.* ¶ 104 (alleging that "using Claude in *a single 5-hour window* to the fullest extent permitted could burn a whopping 15% of the *weekly usage* allotment" (emphasis added)).[2]

After impermissibly inserting Plaintiffs' own words into Anthropic's statements, Plaintiffs then allege that these doctored statements are deceptive because the Max 5x and 20x plans purportedly deliver only "3.5x" and "6x" more "hours per week," respectively, than the Pro plan. *Id.* ¶¶ 8–9, 73–82. Plaintiffs' theory asks the Court to: (1) read a nonexistent per-week hours guarantee into Anthropic's statements; and (2) ignore Anthropic's explanations that the 5x and 20x usage multipliers are calculated "per session," not "hours per week." Without these impermissible leaps—which the Court should not make—Plaintiffs' theory is implausible. *Id.* ¶ 61; *Bodenburg v. Apple Inc.*, 146 F.4th 761, 769–71 (9th Cir. 2025) (plaintiff could not ignore Apple's express definition in favor of a broader interpretation); *McWhorter v. Procter & Gamble Co.*, 2025 WL 948061, at *6 (N.D. Cal. Mar. 28, 2025) (similar); *Moore*, 4 F.4th at 883 (affirming dismissal where plaintiff's interpretation was unreasonable).

Indeed, basic arithmetic further exposes the implausibility of Plaintiffs' "hours per week" theory. Plaintiffs cite a July 2025 email in which Anthropic communicated hours-per-week usage estimates to existing subscribers for the Sonnet and Opus models. Compl. ¶¶ 73–82. This July 2025 email explained to Pro subscribers that they could expect approximately 40–80 hours per week of Sonnet 4 usage depending on subscriber settings and tool selection, *e.g.*, Claude Code. *Id.* ¶ 74. If Plaintiffs' theory were correct, the Max 20x plan would guarantee 20 times that amount—800 to 1,600 hours per week of usage—which exceeds the 168 total hours that exist in a week by a factor of roughly five to ten. A "reasonable consumer would not interpret [a product's statements] . . . as promising

[2] Plaintiffs' allegations confirm that the five-hour session tells the subscriber *how often* a new session begins, not *how much* usage a session involves. *Id.* ¶¶ 53, 104. And Anthropic tells subscribers that how much usage a session involves depends on several factors, including "length," "complexity," "features" used, and "Claude model" selection. *Id.* ¶ 64.

something that is impossible." *See Moore*, 4 F.4th at 883 (affirming dismissal of false advertising claims on this basis). Additionally, the email contained the same express qualifications—tying these estimates to model selection and usage intensity—that pervade Anthropic's other disclosures. *E.g.*, Compl. ¶ 74. And in any event, that post-purchase communication is irrelevant to the reasonable-consumer analysis: It was sent only to then-current subscribers and thus could not have induced any subscription decision.

Plaintiffs' likely response is that subscribers can run "multiple Claude Code instances in parallel," Compl. ¶ 78 n.6. But that defeats rather than rescues their theory. Alleging the possibility of running parallel, simultaneous Claude windows confirms that the per-session usage metric is an aggregate of multiple factors, including model selection, conversation length, computational complexity, and configuration settings, just as Anthropic represented, *id.* ¶ 64 ("Your usage is affected by several factors, including" "length," "complexity," "features" used, and "Claude model" selection). The nature of the metric underscores why Anthropic described the 5x and 20x multipliers in per-session terms, and why no reasonable consumer would equate "per session" usage with a weekly-hours guarantee.

At most, Plaintiffs allege that Anthropic's statements are ambiguous. *Id.* ¶ 62. They are not. But even if they were ambiguous, a subscriber cannot ignore a product's own materials to manufacture confusion when those materials explain the meaning of a challenged statement. *See, e.g.*, *McGinity*, 69 F.4th at 1099 (ambiguity in a "front label" can often "be resolved by reference to the back label"; imputing knowledge conveyed by considering the representations made across the "entire product"); *McWhorter*, 2025 WL 948061, at *6 ("Where the label expressly defines a claim, Plaintiffs cannot ignore that definition in favor of their own preferred interpretation."). That principle applies here: Even assuming the purchase flow's use of "5x" and "20x" could, standing alone, bear more than one interpretation, any arguable ambiguity is dispelled by the "per session" qualifier and the separate disclosure of weekly usage limits on the webpages that were available to Plaintiffs during their purchases and upgrades. Compl. ¶¶ 60–65.

Accessing this clarifying information in Graphic H required nothing more than clicking hyperlinks available in the mandatory purchase flow—the digital equivalent of flipping a product over

to read the back label. *McGinity*, 69 F.4th at 1097; *cf. Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 71, 74–75, 78–79 (2d Cir. 2017) (applying California law and holding that consumers had reasonably conspicuous notice of contract terms accessible through two layers of hyperlinks). *Bodenburg*, 146 F.4th 761, is instructive. There, the Ninth Circuit affirmed dismissal of a consumer deception claim against Apple's iCloud Storage marketing, holding that, "to the extent that some of Apple's representations [were] ambiguous, their ambiguity [was] dispelled by the specific descriptions of the [storage] plans that Apple provide[d] in the [iCloud Legal] Agreement." *Id.* at 769. Similarly, in *Brown v. Brita Prods. Co.*, 172 F.4th 1113 (9th Cir. 2026), the Ninth Circuit affirmed the dismissal of CLRA, UCL, and FAL claims because QR codes on a water filter's packaging provided "readily accessible information" and context sufficient to dispel any asserted ambiguity of representations elsewhere on the packaging. *Id.* at 1115–16, 1119; *see also Mier v. CVS Pharmacy, Inc.*, 2024 WL 121880, at *7–9 (C.D. Cal. Jan. 10, 2024) (dismissing deception claim based on hand sanitizer's "99.99% of all germs" statement where qualifying language on the back label clarified), *aff'd*, 2025 WL 1905109 (9th Cir. July 10, 2025). So too here. Anthropic explained what 5x and 20x "more usage" meant, and a reasonable consumer could not plausibly have been deceived given the information and context Anthropic provided.

### B. Anthropic Never Promised "Fixed" Usage or Features for Its Plans

Plaintiffs also contend that Anthropic's statements were false or misleading because "the advertised multiples are not fixed," and the "amount of service a subscriber receives" varies based on "capacity constraints." Compl. ¶ 7. But, in Plaintiffs' own words, Anthropic advertised that "the Max 5x plan provides '5x *more usage than* Pro' and that the Max 20x plan provides '20x *more usage than* Pro.'" *Id.* ¶ 5 (emphasis added). "The adjective phrase 'more than' 'serves as a quantifier meaning greater in size or amount'"—clearly indicating that the comparison was to Pro, not some fixed amount of usage. *See United States v. Martin*, 526 F.3d 926, 941 n.10 (6th Cir. 2008) (citation omitted). As Anthropic stated, "weekly [or] monthly caps" on "usage" may change to "manage capacity," but the 5x and 20x per-session multipliers themselves would remain the same. Compl. ¶ 61. No reasonable consumer could conclude that "5x or 20x" means 5 or 20 times more "fixed" usage, as alleged.

Anthropic also made clear on its pricing page and in the Terms that the overall limits may change

at Anthropic's discretion. The pricing page, which all subscribers must view, states that the Pro plan provides "[m]ore usage*" than the free plan and that the Max 5x and 20x plans provide "5x or 20x more usage than Pro*." *Id.* ¶¶ 34–35. The asterisks at the end of those statements "put a [subscriber] on notice that there are qualifications or caveats, making it unreasonable to assume" that the statement is unqualified. *Whiteside v. Kimberly Clark Corp.*, 108 F.4th 771, 785 (9th Cir. 2024). This is because an asterisk "denote[s] that the 'reader' should be aware that there is more than meets the eye." *Dinan v. SanDisk LLC*, 2020 WL 364277, at *8 (N.D. Cal. Jan. 22, 2020) (explaining "the asterisk calls the consumer's attention to the fact that there is supplemental information on the package that the consumer should read"), *aff'd*, 844 F. App'x 978 (9th Cir. 2021). Here, the asterisks directed the subscriber to a line stating, "Usage limits apply . . . . Price and plans are subject to change at Anthropic's discretion." Compl. ¶ 35. Anthropic thus made clear that all subscriptions would be subject to usage limits that Anthropic could change—not a carte blanche capacity increase as Plaintiffs contend.

In its Terms, which Plaintiffs consented to when they signed up for the Pro and Max plans, Anthropic also "dispelled" any ambiguity by providing "specific descriptions" of its discretion to modify capacity limits across plans. *See Bodenburg*, 146 F.4th at 769; *see also McGinity*, 69 F.4th at 1099 (imputing knowledge conveyed by considering the representations made across the "entire product"). The Terms disclose that: (i) Anthropic "may sometimes add or remove features, increase or decrease capacity limits, offer new Services, or stop offering certain Services"; (ii) Anthropic "may change the content, features, and other services [it provides] from time to time, and do[es] not guarantee that any particular piece of content, feature, or other service will always be available through the Services"; (iii) "services, outputs, and actions are provided on an 'as is' and 'as available' basis and, to the fullest extent permissible under applicable law, are provided without warranties of any kind"; and (iv) Anthropic "reserve[s] the right to modify, suspend, or discontinue the Services or your access to the Services, in whole or in part, at any time without notice to you." Avasare Decl. Ex. A at 6, 9–10; Ex. B at 6, 9, 11 (capitalization removed). Indeed, Plaintiffs admit that "[t]he agreements conferred discretion on Anthropic concerning capacity management, plan limits, model access, feature availability, and product changes." Compl. ¶ 188. Plaintiffs cannot now simply disregard the Terms.

### C. Anthropic's 50% Savings Claim Confirms the Implausibility of Plaintiffs' Theory

Additionally, Plaintiffs allege that the Max 20x plan falsely claims a "50% savings" because the "per hour price of the Max 20x subscription is *more* than the per hour price of the Max 5x subscription or Pro subscription for Opus 4." Compl. ¶¶ 10, 82; *see id.* ¶¶ 154(c), 155(c), 164(c). To the contrary, this savings claim is consistent with Anthropic's per-session usage statements. Max 20x provides 20 times the Pro plan's per-session usage at $200 per month. *Id.* ¶¶ 26, 37, 39, 45, 61. To obtain equivalent per-session usage, a subscriber would need to purchase four Max 5x subscriptions at $100 each, totaling $400 per month. Max 20x at $200 per month thus costs 50% less than the alternative, and the savings statement is literally true. Plaintiffs' assertion of falsity relies on switching the metric of the savings claim from what Anthropic said—"usage per session"—to hours per week; that is wrong, and the math proves it. *See, e.g.*, *id.* ¶¶ 10, 82. The internal consistency of the savings claim with the per-session statement independently confirms that Anthropic's statements mean what they say.

## II. Plaintiffs Fail to Allege Facts Establishing Article III Standing for Injunctive Relief (Counts I–III and V)

Plaintiffs must adequately allege standing "separately for each form of relief requested," and for injunctive relief, the threatened injury must be "actual and imminent, not conjectural or hypothetical." *Davidson v. Kimberly-Clark Corp.*, 889 F.3d 956, 967 (9th Cir. 2018) (citation omitted). A plaintiff may seek an injunction only where he plausibly alleges a "threat of future harm"—by alleging either (1) that he "will be unable to rely on the product's advertising or labeling in the future, and so will not purchase the product although [he] would like to," or (2) that he "might purchase the product in the future . . . as [he] may reasonably, but incorrectly, assume the product was improved." *Davidson*, 889 F.3d at 969–70; *see Ibarra v. Pharmagenics*, 660 F. Supp. 3d 914, 921 (C.D. Cal. 2023) ("[N]o plausible threat of future harm is pled, and standing for injunctive relief is lacking."). Plaintiffs allege neither.

***First***, Plaintiffs do not allege that they are unable to rely on Anthropic's advertising and have thus chosen not to purchase a subscription. Their own allegations confirm why: Plaintiffs upgraded their subscriptions not once but twice—conduct inconsistent with disappointed usage expectations after the first upgrade. *See, e.g.*, Compl. ¶¶ 18, 109–110. And neither Plaintiff alleges that he has canceled his subscription at any time, and both apparently remain Max subscribers on an automatically renewing plan. *Id.* ¶¶ 18, 106, 109–110, 116.

***Second***, Plaintiffs do not allege that they intend to purchase a subscription in the future based on an assumption that the subscription has changed. Rather, Plaintiffs allege that they believe their subscription is not providing the promised usage, yet they do not allege that Anthropic will change its practices in the future. A subscriber who understands how a subscription's limits operate and who can track them in real time cannot plausibly be misled again by the very statements he challenges. *See Heagney v. John Paul Mitchell Sys.*, 2023 WL 4947974, at *3 (N.D. Cal. Aug. 2, 2023) ("You can't be misled by—or even uncertain about—something that you know . . . ."); *Ramos v. EyeBuyDirect, Inc.*, 2025 WL 2633103, at *13 (C.D. Cal. Aug. 27, 2025) (dismissing request for injunctive relief without leave to amend because, "now that Ramos is aware of the included 'Shipping Insurance' fee and the ability to opt-out, she does not risk being harmed by the fee again").

Plaintiffs' conclusory assertions that they "cannot presently rely on the challenged representations" and that Anthropic's representations constitute a "continuing threat" do not suffice. Compl. ¶¶ 116, 143, 184. As named plaintiffs, they must show that they personally face a likelihood of future injury, and here, their own allegations refute any threat of future harm. *Hodgers-Durgin v. de la Vina*, 199 F.3d 1037, 1044–45 (9th Cir. 1999) (en banc); *Phillips v. Apple Inc.*, 2016 WL 1579693, at *9 (N.D. Cal. Apr. 19, 2016). Plaintiffs thus lack standing to seek an injunction.

## III. Plaintiffs Fail to Plausibly Allege a Negligent Misrepresentation Claim (Count III)

### A. California Law Bars Tort Claims that Duplicate Contract Claims Seeking Identical Economic Losses

Plaintiffs' negligent misrepresentation claim seeks the same relief, based on the same conduct, as the breach of contract claim, precisely what California's economic loss rule prohibits. The law is clear: "[T]here is no recovery in tort for negligently inflicted purely economic losses" where the claim arises from—or is not independent of—the parties' underlying contract. *Sheen v. Wells Fargo Bank, N.A.*, 12 Cal. 5th 905, 922–23 (2022). The rule "prevents the law of contract and the law of tort from dissolving one into the other" and limits a plaintiff to trying to "recover in contract for purely economic loss due to disappointed expectations, unless he can demonstrate harm above and beyond a broken contractual promise." *Robinson Helicopter Co. v. Dana Corp.*, 34 Cal. 4th 979, 988 (2004).

Here, Plaintiffs' alleged damages consist entirely of overpayment for a subscription that allegedly delivered less than what was "advertised," Compl. ¶¶ 93, 169–170—the same disappointed-

expectations injury they allege in their breach of contract claim, *id.* ¶¶ 175–176. They do not allege personal injury, property damage, or other harm independent of the subscription payments they made. Those payments are purely economic losses purportedly flowing directly from Anthropic's alleged failure to perform, and they are recoverable (if at all) in contract, not in tort. *See, e.g.*, *McWhorter*, 2025 WL 948061, at *8 ("negligent misrepresentation" does not "fall within the category of intentional misrepresentation claims that the California Supreme Court has held are not barred" by the economic loss rule); *accord Zeiger v. WellPet LLC*, 526 F. Supp. 3d 652, 689 (N.D. Cal. 2021).

**B. Plaintiffs Do Not Plausibly Allege Any Misrepresentation**

Even if the economic loss rule did not apply, the claim would fail because the Complaint does not plausibly allege a misrepresentation. As established in detail above, *see supra* § I, Anthropic's representations state that the Max plans provide 5 or 20 times "more usage per session" than the Pro plan and separately disclose distinct limits on a subscriber's weekly usage limits. Compl. ¶ 61. A representation that is true and not misleading in context cannot be a misrepresentation. *See, e.g.*, *Diediker v. Peelle Fin. Corp.*, 60 Cal. App. 4th 288, 297–98 (1997) ("[Plaintiff] cannot read something into a neutral statement in order to justify a claim for negligent misrepresentation.").

**C. Plaintiffs' Omission Theory Identifies No Omitted Fact and No Duty to Disclose**

Plaintiffs' omission theory fares no better and appears designed merely to try to salvage claims that cannot survive scrutiny under the affirmative misrepresentation framework. An omission claim requires "suppression of fact, by one who is bound to disclose it, or who gives information of other facts which are likely to mislead for want of communication of that fact." Cal. Civ. Code § 1710(3). That claim requires both an omitted fact and a duty to disclose it. Plaintiffs have pleaded neither.

<u>No omitted fact</u>. Plaintiffs' omission theory simply repackages their affirmative misrepresentation theory. Plaintiffs claim that Anthropic failed to disclose that the hours-per-week allotments for Max 5x and Max 20x allegedly translate to approximately 3.5 and 6–8 times the Pro plan's weekly hours, respectively. Compl. ¶¶ 8–9, 160–171. But Anthropic did not "omit" a weekly-hours ratio because it never represented that the 5x and 20x multipliers applied to an hours-per-week limit.

<u>No duty to disclose</u>. California recognizes four circumstances creating a duty to disclose: (1) a

fiduciary relationship; (2) exclusive knowledge of material facts inaccessible to the plaintiff; (3) active concealment; or (4) partial representations that suppress material qualifying facts. *LiMandri v. Judkins*, 52 Cal. App. 4th 326, 336 (1997). None is adequately alleged here.

*No fiduciary relationship*. Plaintiffs allege an arm's-length commercial subscription transaction. Compl. ¶¶ 2–5, 18, 109–110. A contract between a company and a subscriber does not create a fiduciary relationship. *Wolf v. Superior Court*, 107 Cal. App. 4th 25, 33–34 (2003) ("A mere contract . . . does not . . . create a fiduciary relationship.").

*No exclusive knowledge*. Plaintiffs do not plausibly plead that information about the difference between the per-session and weekly-usage limits was unavailable to them. Compl. ¶¶ 49, 92, 164–167. This information was publicly available on Anthropic's own website, including Graphic H. *Id.* ¶¶ 60–65; Claude Support, https://support.claude.com/en/articles/8325606-what-is-the-pro-plan (last visited Sept. 10, 2026) ("Your session-based usage limit will reset every five hours."). A plaintiff cannot plead exclusive knowledge where the allegedly omitted facts were concededly accessible to him. *Ahern v. Apple Inc.*, 411 F. Supp. 3d 541, 575 (N.D. Cal. 2019) (plaintiff must show "how plaintiffs did not have access to or could not learn this information").

*No active concealment*. Plaintiffs do not allege that Anthropic took any affirmative steps to "preclude consumer discovery" of any information. *Collins v. eMachines, Inc.*, 202 Cal. App. 4th 249, 256 (2011). To the contrary, the Complaint reproduces the pages disclosing that weekly usage limits exist as limits separate from per-session usage limits, that usage varies by model and query complexity, and that Anthropic reserves the right to limit usage at its discretion. Compl. ¶¶ 61, 64–65.

*No misleading partial representations*. Plaintiffs do not allege that Anthropic failed to "disclose facts which materially qualify the facts disclosed." *Herron v. Best Buy Co. Inc.*, 924 F. Supp. 2d 1161, 1177 (E.D. Cal. 2013). Anthropic's per-session usage statement is fully qualified by the separate, express disclosure of the existence of weekly usage limits on the same page. Compl. ¶ 61.

Because Plaintiffs identify no omitted fact or duty to disclose, their omission-based theory fails.

## IV. Plaintiffs Fail to Plausibly Allege a CLRA Claim for Two Additional, Independent Reasons (Count I)

### A. The Max Subscriptions Are Neither "Goods" nor "Services" Under the CLRA

The CLRA applies, in defined circumstances, to the "sale or lease of goods or services to any

consumer." Cal. Civ. Code § 1770(a). The CLRA narrowly defines goods to be "tangible chattels bought or leased for use primarily for personal, family, or household purposes," and "services" to be "work, labor, and services for other than a commercial or business use, including services furnished in connection with the sale or repair of goods." *Id.* § 1761(a)–(b). Claude subscriptions are neither.

Goods. Because a Claude Max plan subscription is not a tangible chattel, it is not a good. Plaintiffs allege they received "access" to a "generative AI agentic coding product" that they can prompt to "conduct research, draft and edit text," and "generate computer code." Compl. ¶ 2. Nothing tangible changed hands. Plaintiffs' contrary allegation—that the Max subscriptions "are tangible chattel [sic] that result in a physical change to computer hardware [and] possess corporeal form," *id.* ¶ 140(b)—is a factually unsupported legal conclusion that is contrary to their own factual allegations and not entitled to a presumption of truth, *Iqbal*, 556 U.S. at 678. Further, courts in this District consistently reject the proposition that software constitutes a "good" under the CLRA. *See, e.g.*, *Ferrington v. McAfee, Inc.*, 2010 WL 3910169, at *18–19 (N.D. Cal. Oct. 5, 2010) (holding that "the software Plaintiffs purchase is not a good covered by the CLRA"); *Rojas-Lozano v. Google, Inc.*, 159 F. Supp. 3d 1101, 1116 (N.D. Cal. 2016) (holding Google's ReCAPTCHA program—a "one-time use software program" used entirely online—was not a "good" under the CLRA). Anthropic's offered subscriptions are no different.

Services. Nor are Claude Max plans "services" as the CLRA defines that term. The statutory definition contemplates work or labor performed for the consumer—a person or entity doing something on the consumer's behalf—as the Legislature's own inclusion of "services furnished in connection with the sale or repair of goods" confirms. Cal. Civ. Code § 1761(b). A license granting access to software is different in kind, and courts in this District have repeatedly held that it falls outside the statute. *See, e.g.*, *Ferrington*, 2010 WL 3910169, at *19 ("[S]oftware generally is not a service for purposes of the CLRA."); *In re iPhone Application Litig.*, 844 F. Supp. 2d 1040, 1070 (N.D. Cal. 2012) ("[T]he CLRA does not apply to the sale or license of software, because software is neither a 'good' nor a 'service' covered by the CLRA."); *Williamson v. McAfee, Inc.*, 2014 WL 4220824, at *7 (N.D. Cal. Aug. 22, 2014) ("[T]he CLRA does not cover software licenses."); *Rojas-Lozano*, 159 F. Supp. 3d at 1116 (holding Google's ReCAPTCHA program not to be a service under the CLRA).

The Complaint's allegations place the Claude Max plans squarely within this line of cases.

Plaintiffs allege that they purchased "*access*" to software. Compl. ¶ 2; *see id.* (describing Claude as a "generative AI agentic coding product"); *id.* ¶ 23 (describing Anthropic as "launch[ing]" Claude); Avasare Decl. Ex. A at 1 (noting that the Terms govern "software"); Ex. B at 1 (same). And Plaintiffs do not allege that Anthropic failed to perform any work or labor for them—they instead complain that Plaintiffs received too little of the software's *capacity*. *See*, *e.g.*, *id.* ¶¶ 8–9, 78–81.

Plaintiffs fail to plausibly allege that the Max plans are goods or services under the CLRA.

### B. Plaintiffs Do Not Plausibly Allege that They Are "Consumers," and the Facts They Do Plead Describe Professional, Not Personal, Use

The CLRA independently requires that Plaintiffs be "consumers"—"individual[s] who seek[] or acquire[], by purchase or lease, any goods or services for personal, family, or household purposes." Cal. Civ. Code § 1761(d); *Von Grabe v. Sprint PCS*, 312 F. Supp. 2d 1285, 1303 (S.D. Cal. 2003) (citing *Ting v. AT&T*, 319 F.3d 1126 (9th Cir. 2003)). Their only relevant allegation is the bare recital that Kahn "used the Claude subscription plans for personal, family or household purposes." Compl. ¶ 95. That is an insufficient legal conclusion with no supporting facts. *Iqbal*, 556 U.S. at 678. It also stops short of alleging that Plaintiffs used Claude *primarily* for personal, family, or household purposes.

Further, the facts that Plaintiffs do plead describe professional—not personal—use. Kahn alleges that he "was interested in using Claude Code to accomplish computer programming *tasks*"; that he "found himself needing additional usage to manage his *projects*"; and that, when he encountered weekly usage limits, he had "either to halt his *work* . . . or purchase additional usage to ensure that he could complete his *work*," Compl. ¶¶ 96, 99, 105 (emphasis added). He escalated from Pro to Max 5x to Max 20x over ten months and "paid to purchase additional usage when the Max subscription fell short." *Id.* ¶¶ 18, 93(g). Likewise, Smith "used Claude while developing an academic-advising tool for an IBM hackathon," also upgrading first to Pro and then to Max 5x. Compl. ¶¶ 108–110. Plaintiffs thus allege an escalating, budget-managed program of software development. Those allegations evidence professional work warranting dismissal—not personal, family, or household activity. *See, e.g.*, *Frezza v. Google Inc.*, 2012 WL 5877587, at *4 (N.D. Cal. Nov. 20, 2012) (dismissing CLRA claim with prejudice because plaintiffs signed up for Google Tags to promote their respective small businesses or employers and thus were not consumers, even though they purchased the product in their individual capacity). Plaintiffs have not plausibly alleged that they are "consumers" under the CLRA.

## V. Plaintiffs Do Not Plausibly State a Claim Under the UCL (Count V)

The UCL prohibits any "unlawful, unfair or fraudulent business act or practice." Cal. Bus. & Prof. Code § 17200. "Each prong of the UCL is a separate and distinct theory of liability." *Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1127 (9th Cir. 2009). Plaintiffs assert claims under all three UCL prongs, Compl. ¶¶ 177–185, but fail to plead facts sufficient to state a claim under any of them.

Because Plaintiffs predicate their unlawful prong claim on violations of the CLRA and FAL, *see* Compl. ¶ 180, Plaintiffs' unlawful prong claim falls with their other claims, *see Vargas v. JP Morgan Chase Bank, N.A.*, 30 F. Supp. 3d 945, 952–53 (C.D. Cal. 2014) ("If unable to state a claim for the underlying offense, the plaintiff similarly cannot state a claim under UCL for unlawful practices."). Plaintiffs' fraudulent prong claim fares no better: For the reasons set forth, *supra* § I, the Complaint does not plausibly allege any deception that would mislead a reasonable consumer. Finally, Plaintiffs' unfair prong claim fails because where, as here, "the unfair business practices alleged under the unfair prong of the UCL overlap entirely with the business practices addressed in the fraudulent and unlawful prongs of the UCL, the unfair prong of the UCL cannot survive if the claims under the other two prongs of the UCL do not survive." *Hadley v. Kellogg Sales Co.*, 243 F. Supp. 3d 1074, 1104–05 (N.D. Cal. 2017); *see* Compl. ¶ 181.

## VI. Plaintiffs Do Not State a Breach of Contract Claim (Count IV)

Plaintiffs' contract claim rests on text that appears nowhere in their contract. The Complaint alleges that Plaintiffs "have valid contracts with Anthropic for the acquisition of Claude via monthly subscriptions to the Max 5x and 20x plans," Compl. ¶ 173; that Plaintiffs performed by paying the subscription fee, *id.* ¶ 174; and that Anthropic breached "by failing to provide Max subscribers with five and twenty times more usage than it provides to its Pro subscribers per month (or per week, in the alternative), as advertised," *id.* ¶ 175. Although the Complaint identifies Anthropic's Terms as the governing contract, *id.* ¶¶ 34, 41, 133–134, Plaintiffs do not quote a single provision of those Terms, do not allege that any provision guarantees a fixed amount of usage per month or a fixed amount of usage per week, and do not allege that Anthropic failed to do anything the Terms require. They instead ask the Court to convert statements in marketing graphics into contractual terms, rewrite the statements' text from "per session" statements to weekly-hours metrics, and then find breach. California contract

law permits none of those steps.

**A. The Statements on Which Plaintiffs Rely Are Not Terms of the Contract**

Plaintiffs' breach theory relies on statements made outside the Terms they agreed to. The Complaint identifies the "5x" and "20x" statements on various pages such as Anthropic's plan-selection and upgrade screens and in its support articles. Compl. ¶¶ 25–40, 59–65. By contrast, the Complaint identifies the governing contract as the Terms, which the subscriber must affirmatively accept prior to becoming a subscriber. *Id.* ¶¶ 34, 40–41; *see id.* ¶¶ 133–134 (alleging the Terms "govern individual subscriptions" to which consumers must agree before subscribing). Plaintiffs' own allegations confirm that they understood the statements included in the purchase funnel not to be part of the Terms. *Compare id.* ¶ 66 ("Graphics G, H, and I are outside the sales funnel, and consumers *do not need to interact with them in order to subscribe* to a Max plan." (emphasis added)), *with id.* ¶¶ 34, 40–41, 133–134 (alleging that a consumer must "agree" to the Terms to subscribe).

The Terms also clearly indicate that "[t]hese Terms and any other terms expressly incorporated by reference form the entire agreement between you and us regarding the subject matter of our Terms." Avasare Decl. Exs. A–B § 12. Under California law, a "plaintiff cannot reasonably rely on extra contractual promises when an unambiguous integration clause excludes such promises or representations from the parties' agreement." *Oster v. Caithness Corp.*, 2017 WL 3727174, at *13 (N.D. Cal. Aug. 30, 2017); *see also* Cal. Civ. Code § 1625 ("The execution of a contract in writing . . . supersedes all the negotiations or stipulations concerning its matter which preceded or accompanied the execution of the instrument."); Cal. Civ. Proc. Code § 1856(a) ("Terms set forth in a writing intended by the parties as a final expression of their agreement with respect to the terms included therein may not be contradicted by evidence of a prior agreement or of a contemporaneous oral agreement."). The integration clause in the governing Terms therefore forecloses precisely what Plaintiffs attempt—treating pre-contractual statements as though they were bargained terms.

**B. Anthropic's Challenged Statements Were Not Incorporated by Reference**

The "5x" and "20x" statements on which Plaintiffs rely were not incorporated by reference into the Terms. Incorporation by reference requires that: (1) the reference to the extrinsic document be "clear and unequivocal"; (2) the reference be "called to the attention of the other party," who must

"consent thereto"; and (3) the terms of the incorporated document be "known or easily available to the contracting parties." *Shaw v. Regents of the Univ. of Cal.*, 58 Cal. App. 4th 44, 54 (1997); *see Brown v. Google LLC*, 685 F. Supp. 3d 909, 929 (N.D. Cal. 2023).

The Complaint pleads no facts satisfying any prong of this test. Plaintiffs do not allege that the Terms refer to the marketing pages at all, let alone clearly and unequivocally, and in fact, the Terms contain no such reference. Avasare Decl. Exs. A–B. Plaintiffs do not allege that any such reference was called to their attention or that they consented to it. To the contrary, they allege that the "5x" and "20x" statements were outside the Terms to which a subscriber had to agree before subscribing. *Compare* Compl. ¶ 66 ("Graphics G, H, and I are outside the sales funnel, and consumers *do not need to interact with them in order to subscribe* to a Max plan." (emphasis added)), *with id.* ¶¶ 34, 40–41, 133–134 (alleging that a consumer must "agree" to the Terms to subscribe). Accordingly, Anthropic's "5x" and "20x" statements were not incorporated into the Terms. *See, e.g.*, *Gerber v. Twitter, Inc.*, 2024 WL 5173313, at *8 (N.D. Cal. Dec. 18, 2024) (links "below the end" of the agreement to which "the user is not guided" by the agreement itself were not incorporated); *Rodriguez v. Google LLC*, 2021 WL 6621070, at *4 (N.D. Cal. Aug. 18, 2021) (help page, linked but not "reference[d]" in agreement, was not incorporated).

### C. Even If the Statements Were Incorporated, Plaintiffs Have Not Plausibly Alleged a Breach of the 5x or 20x Per-Session Multiplier

Even if the Terms did expressly incorporate Anthropic's "5x" and "20x" statements, Plaintiffs have still not stated a claim for breach of contract. The particular statement Plaintiffs identify in their breach-of-contract claim is that the Max 5x and Max 20x plans provide 5 or 20 times "more usage *per session*" than the Pro plan. Compl. ¶ 61 (emphasis added); *see id.* ¶ 175. But the same Graphic H on which Plaintiffs rely states that the plans "*also* have two weekly usage limits," which reset every seven days, and that Anthropic "may limit your usage *in other ways*, *such as weekly and monthly caps* or model and feature usage, at [its] discretion," *id.* ¶ 61 (emphasis added); *see supra* § I. Per-session usage and weekly usage limits are, on the face of the statement, two different limits. Plaintiffs' theory requires the Court to read "per session" out of the statement and to treat a per-session usage multiplier as a guarantee of cumulative hours per week. That request is not interpretation; it is impermissible rewriting. *See, e.g.*, *Ramirez v. Charter Commc'ns, Inc.*, 16 Cal. 5th 478, 502–03 (2024) (rejecting a "strained

interpretation" and explaining that courts may not "rewrite or alter by construction the unambiguous terms the parties agreed upon"). And because Plaintiffs have not pleaded that they received less than 5 or 20 times more usage *per session* than the Pro plan, they have not plausibly alleged a breach claim, even if the statements were incorporated into the Terms.

### D. The Terms Expressly Reserve Anthropic's Discretion Over Usage Limits

Nor can Plaintiffs plausibly plead that Anthropic failed to abide by a contractual promise to provide subscribers with a fixed amount of total usage or features because the Terms expressly reserve Anthropic's right to "add or remove features, *increase or decrease capacity limits*, offer new Services, or stop offering certain Services." Avasare Decl. Exs. A–B § 12 (emphasis added). The Terms also disclaim liability "for any *change to* . . . the Services or your access to them." *Id.*; *see id.* (reserving Anthropic's "right to modify" the "Services" "in whole or in part" at "any time" unless otherwise specifically agreed). Anthropic's own extra-contractual statements, including Graphic H on which Plaintiffs rely, similarly state that Anthropic "may limit your usage in other ways, such as weekly and monthly caps or model and feature usage, at our discretion." Compl. ¶ 61; *see also id.* ¶¶ 35, 59 (alleging that the "Plans that grow with you" page states: "Price and plans are subject to change at Anthropic's discretion").

Conduct that a contract expressly permits cannot constitute a breach of that contract. *See, e.g.*, *Carma Devs. (Cal.), Inc. v. Marathon Dev. Cal., Inc.*, 2 Cal. 4th 342, 374 (1992) ("[I]f defendants were given the right to do what they did by the express provisions of the contract there can be no breach."). In *Song fi, Inc. v. Google, Inc.*, 108 F. Supp. 3d 876 (N.D. Cal. 2015), a court in this District considered a similar reservation-of-rights clause in YouTube's Terms and held that "Plaintiffs cannot state a claim for breach of the Terms of Service in removing the video, because conduct authorized by a contract cannot give rise to a claim for breach." *Id.* at 885. Like Anthropic's reservation-of-rights clause, YouTube's Terms reserved its right to make the relevant determinations "at any time, without prior notice and in its sole discretion," further providing that YouTube could "discontinue any aspect of the Service at any time." *Id.* Anthropic's reservation-of-rights clause is materially the same as YouTube's, so for the same reason, Plaintiffs have failed to state a breach of contract claim. *See also, e.g.*, *Burton*

*v. Alaska Airlines*, 2025 WL 3443155, at *6 (N.D. Cal. Dec. 1, 2025) (dismissing breach claim because "the Terms of Use expressly gave Defendant the right to modify the Program's terms at any time").

## VII. Plaintiffs Do Not State a Breach of Implied Covenant of Good Faith and Fair Dealing Claim (Count VI)

The implied covenant of good faith and fair dealing operates only "to protect the express covenants or promises of a contract." *Lothlen v. Wells Fargo Bank, N.A.*, 2014 WL 1266854, at *3 (N.D. Cal. Mar. 27, 2014). Accordingly, the implied covenant "cannot contradict the express terms of a contract." *Missud v. Oakland Coliseum Joint Venture*, 2013 WL 3286193, at *15 (N.D. Cal. June 27, 2013) (citation omitted). Nor can it "impose substantive duties or limits on the contracting parties beyond those incorporated in the specific terms of the parties' agreement." *Id.* (cleaned up). Rather, "to state a claim for breach of the implied covenant of good faith and fair dealing, a plaintiff must identify the specific contractual provision that was frustrated." *Lothlen*, 2014 WL 1266854, at *3 (citation omitted). And the plaintiff must show the defendant took deliberate actions to deprive him of the benefits conferred by that provision. *Penaloza v. Select Portfolio Servicing Inc.*, 2014 WL 6910334, at *7 (C.D. Cal. Dec. 8, 2014). As a result, this creates "a high bar for succeeding on a claim alleging that a party to a contract who has expressly been granted discretion to make a decision has violated the implied covenant." *Damabeh v. 7-Eleven, Inc.*, 2013 WL 1915867, at *6 n.4 (N.D. Cal. May 8, 2013).

### A. Plaintiffs Do Not Identify Any Frustrated Contractual Provision

Plaintiffs fail to identify any specific contractual provision that was allegedly frustrated and fail to allege that Anthropic deprived them of the benefit of their bargain. Instead, Plaintiffs' claim is that "Anthropic breached the implied covenant by, among other things, reducing or accelerating depletion of usage . . . ; changing limits during billing cycles without adequate notice; testing materially different limits . . . ; and migrating premium features to lower-priced or free tiers." Compl. ¶ 190. But as discussed above, the parties expressly agreed in the Terms that Anthropic can undertake such actions.

The Terms expressly provide that the use of Claude is "on an 'as is' and 'as available' basis"; Anthropic "may change the content, features, and other services" subscribers receive; Anthropic does "not guarantee that any particular piece of content, feature, or other service will always be available"; Anthropic may "add or remove features, increase or decrease capacity limits, offer new Services, or stop offering certain Services"; and Anthropic "reserve[s] the right to modify, suspend, or discontinue

the Services or your access to the Services, in whole or in part, at any time without notice to you." Avasare Decl. Ex. A at 6, 9–10; Ex. B at 6, 9, 11 (capitalization removed). Plaintiffs cannot use the implied covenant to overwrite those express provisions by which they are legally bound, *Missud*, 2013 WL 3286193, at *16, and Plaintiffs have otherwise failed to identify any "express term in the contract alleged [of] which" Anthropic has deprived Plaintiffs the benefit, *Penaloza*, 2014 WL 6910334, at *7.

*Song fi Inc.* is again instructive. 108 F. Supp. 3d at 885. There, the court found the plaintiff failed to state a breach of the implied covenant claim for the same reason it failed to state a breach of contract claim: "[T]he defendants were given the right to do what they did by the express provisions of the contract[, so] there can be no breach" of the implied covenant. *Id.* (citation omitted). Here too, the parties agreed Anthropic can undertake the challenged actions, so there can be no breach of the implied covenant of good faith and fair dealing. *Id.*; *see also O'Coirbhin v. PNC Bank, Nat'l Ass'n*, 2025 WL 2223433, at *3 (N.D. Cal. Aug. 5, 2025) (explaining where a plaintiff "seeks to impose limits 'beyond those to which the parties actually agreed, the implied covenant claim is invalid'" (brackets omitted)).

### B. Plaintiffs Do Not Plausibly Allege They Were Deprived of the Benefit of Their Agreement

Additionally, Plaintiffs fail to plead that Anthropic deprived them of the benefit of their agreement. Indeed, Smith alleges that he has been able to use "artificial-intelligence coding tools for coursework, coding projects, and hackathon work," while also being able to use "Claude while developing an academic-advising tool for an IBM hackathon." Compl. ¶ 108. Kahn alleges that he has been able to use Claude "to accomplish computer programming tasks." *Id.* ¶ 96; *see Sensible Foods, LLC v. World Gourmet, Inc.*, 2011 WL 5244716, at *3 (N.D. Cal. Nov. 3, 2011) (explaining a defendant must have taken "a conscious and deliberate act" to deprive plaintiff of the benefit of his bargain (citation omitted)). And, as Plaintiffs explain, any discretion Anthropic exercised to impose usage limits was due to "pressure" on computing "output capacity capabilities," Compl. ¶ 22, not a conscious or deliberate act aimed at depriving them of the benefit of their bargain, *see Oliver v. SD-3C LLC*, 2015 WL 10890656, at *6 (N.D. Cal. Sept. 30, 2015) (explaining that "based on the factual allegations of the Complaint, [the claim] is implausible").

### C. Plaintiffs' Dilution Theory Fails

Plaintiffs' "dilution" theory also does not succeed. Compl. ¶¶ 83–87. Plaintiffs allege that

Anthropic "migrat[ed] premium features to lower-priced or free tiers," *id.* ¶ 190, and that making those features available to non-paying users "diluted" the relative value of their Max subscriptions, entitling them to refunds or credits. *Id.* ¶ 85. But the implied covenant cannot "impose substantive duties or limits on the contracting parties beyond those incorporated in the specific terms of the parties' agreement." *Missud*, 2013 WL 3286193, at *15 (cleaned up); *see also Khan v. CitiMortgage, Inc.*, 975 F. Supp. 2d 1127, 1143 (E.D. Cal. 2013). Plaintiffs do not and cannot identify any provision of the Terms promising that any feature would remain exclusive to Max subscribers or be withheld from the free tier. Nor do Plaintiffs allege that they lost access to any feature or usage for which they paid; their grievance is that others allegedly gained access for free.

Courts routinely reject arguments of this type. In *Kazmucha v. Fitness Alliance LLC*, 2026 WL 1261992 (D. Ariz. May 8, 2026), the plaintiff paid for a gym's highest membership tier and alleged the tier was illusory because lower-tier members were permitted to use its supposedly exclusive amenities. *Id.* at *1. The court dismissed his implied-covenant and unjust enrichment claims under California law because he received every benefit his membership promised, nothing in the agreement obligated the gym to exclude lower-tier members from accessing certain amenities, and the agreement reserved the gym's right to make reasonable changes to what it offered. *Id.* at *2–4. The same is true here.

Plaintiffs' dilution theory is also untethered from their own allegations: Plaintiffs measure their claimed injury in weekly hours of usage, Compl. ¶¶ 73–82, and plead no facts suggesting that the price of a Max plan reflected a promise of feature exclusivity rather than more "usage," *id.* ¶¶ 25–27, 35–36. Finally, the rule Plaintiffs propose—that a company owes refunds or credits to its paying subscribers whenever it improves its free tier—would discourage any improvements to lower-priced tiers. Accordingly, Plaintiffs' implied covenant claim should be dismissed.

**VIII. Plaintiffs Fail to Plausibly Allege Entitlement to Equitable Relief (Counts II and V)**

Plaintiffs' demand for equitable restitution in connection with their FAL and UCL claims is barred by *Sonner v. Premier Nutrition Corp.*, 971 F.3d 834, 845 (9th Cir. 2020). Because remedies under the UCL are "equitable in nature," a plaintiff "must establish that she lacks an adequate remedy at law before securing" equitable relief. *Id.* at 839 n.2, 844; *see also Phan v. Sargento Foods, Inc.*, 2021

WL 2224260, at *5 (N.D. Cal. June 2, 2021) (no monetary equitable relief where "[p]laintiffs have failed to explain how restitution could be different from damages").

Here, Plaintiffs make no attempt to allege that the damages they seek in connection with their other claims are inadequate. They offer only the boilerplate allegation that they "have no adequate remedy at law," Compl. ¶ 193, which is nothing more than a conclusory legal conclusion, *see Iqbal*, 556 U.S. at 678; *Bluemel v. Conduent State & Local Solutions, Inc.*, 2026 WL 1710303, at *3 (N.D. Cal. June 9, 2026) (dismissing FAL and UCL claims where plaintiff failed to plausibly allege inadequate remedy at law). Their restitution request fails.

## IX. Dismissal Should Be with Prejudice

Leave to amend should be denied where "no amendment would allow the complaint to withstand dismissal as a matter of law." *Kroessler v. CVS Health Corp.*, 977 F.3d 803, 815 (9th Cir. 2020). Plaintiffs have already amended once and further revised their allegations when they filed their Consolidated Complaint following Anthropic's submission of motions to dismiss the amended complaints. No further amendment would save their claims from dismissal.

The defects identified above are not pleading oversights that further factual allegations could cure. Plaintiffs cannot rewrite what Anthropic said: Graphic H states that the Max plans provide 5 or 20 times "more usage per session," and separately that the plans "also have two weekly usage limits." Compl. ¶ 61. Because Plaintiffs reproduced that language in their own pleading, no amendment can unsay it, and no amendment can make a per-session statement into a weekly-hours guarantee. Where, as here, the Complaint's allegations fail as a matter of law, dismissal with prejudice is appropriate. *See Brown*, 172 F.4th at 1120 ("[N]o amendment could save Brown's complaint [because] reasonable consumers have not been misled." (cleaned up)).

## CONCLUSION

For the foregoing reasons, the Court should dismiss all of Plaintiffs' claims with prejudice.

Dated: September 22, 2026

Respectfully submitted,

By: /s/ David R. Singh

DAVID R. SINGH (Bar No. 300840)
david.singh@weil.com
MORGAN D. MACBRIDE (Bar No. 301248)
morgan.macbride@weil.com

WEIL, GOTSHAL & MANGES LLP
201 Redwood Shores Parkway, 6th Floor
Redwood Shores, CA 94065-1134
Telephone: (650) 802-3000
Facsimile: (650) 802-3100

*Attorneys for Defendant Anthropic PBC*