UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KARL KAHN, et al.,<br>Plaintiffs,<br>v.<br>ANTHROPIC PBC,<br>Defendant. | Case No. 26-cv-05763-AGT<br>**ORDER ON MOTION TO DISMISS**<br>Re: Dkt. No. 39 |

Karl Kahn and Solomon Smith allege that Anthropic PBC misleadingly markets its Claude Max subscriptions as providing "5x or 20x more usage" than Pro plans. Dkt. 37, Consolidated Compl. ¶ 35. On behalf of a putative class of Claude Max subscribers, they are suing Anthropic under California's consumer-protection statutes (the CLRA, UCL, and FAL) and for negligent misrepresentation, breach of contract, and breach of the implied covenant of good faith and fair dealing. Anthropic has moved to dismiss all claims. Dkt. 39.

Some of Plaintiffs' claims have shortcomings as pled, but not all. The advertising in question is plausibly misleading, so the case will move forward. The Court will grant in part and deny in part the motion and give Plaintiffs leave to amend the dismissed claims.

## A. DISCUSSION

### 1. CLRA Claim

Anthropic moves to dismiss Plaintiffs' CLRA claim on several grounds: (a) Plaintiffs have failed to plausibly allege that a reasonable consumer would be deceived by Anthropic's "5x or 20x more usage" representations, (b) Claude Max subscriptions are neither "goods" nor "services" under the CLRA, and (c) Plaintiffs are not "consumers" under the CLRA.

The third argument has merit as applied to Plaintiff Kahn, who hasn't offered enough detail to establish that he uses Claude Max for personal, not commercial, use. The first and second arguments, and the third argument as applied to Plaintiff Smith, fall short.

#### a. Reasonable Consumer Test

The CLRA prohibits deceptive advertising. *See generally* Cal. Civ. Code § 1770. CLRA claims are subject to a reasonable consumer test. *Bodenburg v. Apple Inc.*, 146 F.4th 761, 769 (9th Cir. 2025). The test requires plaintiffs to establish that "a significant portion of the general consuming public or of targeted consumers, acting reasonably in the circumstances, could be misled" by the defendant's advertising. *Id.* (quoting *Ebner v. Fresh, Inc.*, 838 F.3d 958, 965 (9th Cir. 2016)).

Courts "rare[ly]" dismiss CLRA claims at the pleading stage for failure to satisfy the reasonable consumer test; deceptiveness is usually a question of fact. *Id.* (quoting *Whiteside v. Kimberly Clark Corp.*, 108 F.4th 771, 778 (9th Cir. 2024)). Dismissal is only appropriate "when the advertisement itself makes it impossible for the plaintiff to prove that a reasonable consumer is likely to be deceived." *Whiteside*, 108 F.4th at 778 (citation modified).

This isn't one of those rare cases. When "[a]ll allegations of material fact in the complaint are taken as true and construed in the light most favorable to the plaintiff," *id.* at 777, Plaintiffs satisfy the reasonable consumer test.

For individuals who want to use Anthropic's flagship Claude product, the company offers four tiers of service: free, Pro, Max 5x, and Max 20x. Compl. ¶¶ 24, 26. The Pro plan costs $17 to $20 per month, the Max 5x plan costs $100 per month, and the Max 20x plan costs $200 per month. *Id.* ¶ 26. The three paid plans all include access to Claude Code, an "agentic coding system," which isn't available at the free tier. *Id.* ¶ 24.

The main distinction Anthropic draws between the paid tiers is the amount of "usage" each plan provides. *Id.* ¶ 27. On claude.com, Anthropic promises Max 5x subscribers "5x more usage than Pro" and promises Max 20x subscribers "20x more usage than Pro." *Id.*; *see also id.* ¶ 37, Graphic C. Because payments are due monthly, reasonable consumers would plausibly understand the phrases "5x more usage than Pro" and "20x more usage than Pro" to mean that if they pay a premium for Max 5x or Max 20x, they will get 5x or 20x more usage than Pro *per month*. But they don't.

Users who pay a premium for Claude Max get 5x or 20x more usage per *five-hour session*, but like other Claude users they are subject to weekly usage limits. *See id.* ¶ 61, Graphic H; *id.* ¶¶ 53, 104. And although the weekly usage limits are higher for Max subscribers than for Pro subscribers, they are not 5x or 20x higher. *See id.* ¶ 78, Table 1 (calculating that for Claude's Sonnet 4 model, Max 5x users get 3.5x more usage than Pro users per week, while Max 20x users get 6x more usage than Pro users per week).

Thus, even though a Max subscriber can use Claude more in a five-hour session than a Pro subscriber can, a Max subscriber may hit his weekly usage limit sooner than a Pro

subscriber will, and similarly, a Max 20x subscriber may hit his weekly usage limit sooner than a Max 5x subscriber will. Some Max subscribers have expressed surprise and frustration with this result. *See, e.g.*, Compl. ¶ 53 (Consumer Complaint: "I am only on my third day of the week[,] and I have already used 50% of my weekly allowance on the 20x Max plan. . . . Last week when using Claude Code just as heavily on the 5x Max plan I only hit 100% on Saturday. Now, with the 20x Max plan it looks like I will not even make it through the week . . . ."); *id.* ¶ 104 ("Plaintiff Kahn discovered that using Claude [Max 20x] in a single 5-hour window to the fullest extent permitted could burn a whopping 15% of the weekly usage allotment that Anthropic set."); *id.* ¶ 113 (alleging that after Plaintiff Smith upgraded to Max 5x, he "was required to ration or postpone usage, [and] alter how he worked").

Although at least some consumers are confused, Anthropic responds that consumer confusion isn't likely widespread or reasonable. This is because Anthropic *does* disclose on claude.com that Max plans have weekly and per-session limits. On one of the main sales pages on claude.com, where Anthropic represents that Max provides subscribers with "5x or 20x more usage than Pro," the phrase "more usage" is followed by an asterisk and the qualifying statement "Usage limits apply. Prices and plans are subject to change at Anthropic's discretion." *Id.* ¶ 35, Graphic B. The phrase "Usage limits apply" includes an embedded hyperlink, which leads to a page titled "Usage limit best practices." *Id.* ¶ 60, Graphic G. That page includes plan-specific hyperlinks (e.g., "Free Claude," "Pro plan," "Max plan") and directs consumers to click on those links "[f]or more information on your plan's usage." *Id.* If consumers click on the "Max plan" link, they are taken to a page titled "Does the Max plan have any usage limits?" *Id.* ¶ 61, Graphic H. There, Anthropic discloses that Max plans have per-session and weekly usage limits, and that "**Max 5x** provides 5 times more usage

per session than the Pro plan," and that "**Max 20x** provides 20 times more usage per session than the Pro plan." *Id.* Given these disclosures, Anthropic maintains that reasonable consumers should understand that, when Anthropic represents that Max subscribers will have "5x or 20x more usage than Pro," Anthropic means that Max subscribers will have 5x or 20x more usage *per session*, not *per month*.

Anthropic's *per session* disclosure is located two hyperlinks away from the primary sales pages on claude.com. The disclosure is "outside the sales funnel," meaning that "consumers do not need to interact with [it] in order to subscribe to a Max plan." *Id.* ¶ 66. Plaintiffs therefore reasonably compare the *per session* disclosure to a back-label disclaimer on a tangible object for sale, like a shampoo bottle. *See, e.g.*, *McGinity v. Procter & Gamble Co.*, 69 F.4th 1093, 1099 (9th Cir. 2023). On a motion to dismiss a CLRA claim, the Court considers a back label only "when reasonable consumers would *necessarily* require more information before reasonably concluding that the [front] label is making a particular representation." *Whiteside*, 108 F.4th at 781 (emphasis added).

For example, in *McGinity*, 69 F.4th 1093, the term "Nature Fusion" on the front label of a shampoo bottle "was so devoid of any concrete meaning that there was nothing from which *any* inference could be drawn or on which *any* reasonable belief could be based about the shampoo's ingredients." *Whiteside*, 108 F.3d at 780 (citation modified). In that context, reasonable consumers would need more information before concluding that the front label was making a particular representation. The court therefore properly considered the back label on a motion to dismiss. *See McGinity*, 69 F.4th at 1099.

In contrast, in *Whiteside*, the term "plant-based" on the front label of baby wipes was not meaningless; it plausibly conveyed that the wipes were "entirely made of plant-based

ingredients." *Whiteside*, 108 F.4th at 781. Thus, because reasonable consumers wouldn't necessarily require more information, the district court erred in considering the back label on a motion to dismiss. *See id.* at 783 ("The back label may persuade the fact-finder that the Products' packaging is not misleading, but it is not a basis for dismissal under FRCP 12(b)(6)."). *Whiteside* reached this holding even though "'plant-based' could be interpreted in different ways." *Id.* at 782; *see also id.* at 781 (noting that "'plant-based wipes' could reasonably be interpreted to mean that the wipes are *either* primarily or entirely made of plant-based ingredients"). What mattered wasn't whether the front label was "susceptible to two possible meanings," but whether reasonable consumers would "necessarily require more information before reasonably concluding that the label [was] making a particular representation." *Id.* at 781; *see also id.* at 782 (explaining that the question isn't "whether a consumer 'could' look beyond the front label, but whether they *necessarily* would do so").

Claude.com's sales pages are more like the front label in *Whiteside* than in *McGinity*. They identify Claude subscription costs ($17 to $20 per month for Pro, $100 per month for Max 5x, and $200 per month for Max 20x) and explain that Max provides subscribers with "5x or 20x more usage than Pro." Compl. ¶ 35, Graphic B; *see also id.* ¶ 25, Graphic A; *id.* ¶ 37, Graphic C; *id.* ¶ 39, Graphic D. Given the monthly billing cycle and the "more usage" representation, consumers can reasonably draw the inference that Anthropic is promising Max subscribers "5x or 20x more usage than Pro" *per month*. In *McGinity*, by contrast, the front label "was so devoid of any concrete meaning that there was nothing from which *any* inference could be drawn or on which *any* reasonable belief could be based about the shampoo's ingredients." *Whiteside*, 108 F.3d at 780 (citation modified). That's not the case here.

Moreover, like the "plant-based" marketing term in *Whiteside*, even if Anthropic's "5x or 20x more usage" representation is susceptible to more than one meaning, reasonable consumers "would not necessarily require more information before concluding" that Anthropic is offering Max users "5x or 20x more usage" *per month*. *Whiteside*, 108 F.3d at 781. This isn't a case, then, in which the Court can consider the "back label" at the pleading stage. Anthropic's two-hyperlink-deep disclaimer that "more usage" means *per session*, not *per month*, "may persuade the fact-finder that [Anthropic's advertising] is not misleading, but it is not a basis for dismissal under FRCP 12(b)(6)." *Id.* at 783.

Anthropic proposes another reason why a reasonable consumer wouldn't interpret "5x or 20x more usage" as offering "more usage" *per month*. As noted above, on one of the main sales pages, the phrase "more usage" is followed by an asterisk and the disclaimer that "Usage limits apply. Prices and plans are subject to change at Anthropic's discretion." Compl. ¶ 35, Graphic B. Anthropic maintains that this disclaimer "ameliorates any tendency of the label to mislead." *Whiteside*, 108 F.4th at 784 (citation modified). It doesn't.

The disclaimer says nothing about usage limits *per session*. A reasonable consumer could thus read the disclaimer and still conclude that Anthropic is offering "5x or 20x more usage" *per month*. This isn't one of those cases in which an asterisk disclaimer "makes it impossible for the plaintiff to prove that a reasonable consumer was likely to be deceived." *Id.* at 785 (quoting *Williams v. Gerber Prods. Co.*, 552 F.3d 934, 939 (9th Cir. 2008)); *cf. id.* (concluding that the asterisk disclaimer "70%+ by weight" on the front label of "plant-based wipes" made "it unreasonable to assume that the Products were 100% plant-based").

Plaintiffs have plausibly alleged that a reasonable consumer is likely to be deceived by Anthropic's "5x or 20x more usage than Pro" representations. Having so concluded, the

Court won't separately evaluate whether other Anthropic representations (e.g., a "50% savings" representation, Compl. ¶¶ 10, 155(c)), also pass the reasonable consumer test. *See BBL, Inc. v. City of Angola*, 809 F.3d 317, 325 (7th Cir. 2015) ("A motion to dismiss under Rule 12(b)(6) doesn't permit piecemeal dismissals of *parts* of claims; the question . . . is simply whether the complaint . . . state[s] a plausible claim for relief.").

**b. "Goods" or "Services"**

The CLRA applies only to the "sale or lease of goods or services to any consumer." Cal. Civ. Code § 1770(a). Anthropic contends that Claude is neither a "good" nor a "service," whereas Plaintiffs maintain that Claude is both.

The CLRA defines "services" as "work, labor, and services for other than a commercial or business use, including services furnished in connection with the sale or repair of goods." Cal. Civ. Code § 1761(b). Claude Code, an "agentic coding system" that comes with a Claude Max subscription, and which is "capable of reading a codebase, modifying multiple files, running tests, and delivering committed code," Compl. ¶ 30, is plausibly a "service" under the CLRA when not used for a commercial or business use.

In arguing that Claude Code isn't a "service," Anthropic relies on cases holding that antivirus software isn't a "service," *Williamson v. McAfee, Inc.*, No. 14-cv-00158-EJD, 2014 WL 4220824, at *1, *7 (N.D. Cal. Aug. 22, 2014); *Ferrington v. McAfee, Inc.*, No. 10-cv-01455-LHK, 2010 WL 3910169, at *1, *19 (N.D. Cal. Oct. 5, 2010), and on a case holding that Google's reCAPTCHA software isn't a "service," *Rojas-Lozano v. Google, Inc.*, 159 F. Supp. 3d 1101, 1116 (N.D. Cal. 2016). Claude Code is materially different from antivirus software and reCAPTCHA. Antivirus software runs in the background on a computer, and reCAPTCHA is a "one-time use software program used as a gate-keeper to Internet sites."

*Rojas-Lozano*, 159 F. Supp. 3d at 1116. Claude Code isn't a one-time use program; it offers users ongoing coding help. Users regularly engage with Claude Code, asking it to handle complex and customized coding tasks. *See* Compl. ¶¶ 99, 108, 112–13. Claude Code's performance of those tasks is a service.

Anthropic also proposes a distinction between the sale of a "service" and the sale of "mere access to that service." Reply, Dkt. 47 at 16. Anthropic contends that its sale of Claude is the sale of "mere access to [a] service" and isn't covered by the CLRA. *Id.* In arguing for this distinction, Anthropic relies only on *Marks v. United Parks*, No. 24-cv-1992-MMA, 2025 WL 2767941, *1 (S.D. Cal. Sept. 26, 2025), a decision holding that the sale of amusement-park tickets isn't a "service" because the tickets only allow "access or admission to . . . services" at the amusement park. *Id.* at *7. The facts of *Marks* are far afield from those here. A subscription to Claude is more analogous to a subscription to an email service, which the court in *In re: Yahoo! Inc. Customer Data Sec. Breach Litig.*, 313 F. Supp. 3d 1113, 1120, 1142 (N.D. Cal. 2018), held was a "service" under the CLRA. Also, to the extent that *Marks* can be read as adopting a more expansive distinction between the sale of "services" and the sale of "mere access to a service," the Court declines to follow it. The CLRA itself, which "shall be liberally construed . . . to protect consumers against unfair and deceptive business practices," Cal. Civ. Code § 1760, doesn't draw such a distinction.

Claude Code is plausibly a "service" under the CLRA. Having reached this conclusion, the Court won't also consider whether Claude Code is a "good" under the CLRA.

**c. "Consumers"**

The CLRA applies only to the sale or lease of goods or services to a "consumer." Cal. Civ. Code § 1770(a). A "consumer" is "an individual who seeks or acquires, by purchase

or lease, any goods or services for personal, family, or household purposes." *Id.* § 1761(d). A commercial user of goods or services is not a consumer under the CLRA. *See Ting v. AT&T*, 319 F.3d 1126, 1148 (9th Cir. 2003). Anthropic contends that neither Plaintiff has plausibly alleged that he is a "consumer" of Claude, as opposed to a commercial user. The Court agrees with Anthropic as to Plaintiff Kahn, but not as to Plaintiff Smith.

Smith is a computer-science college student who uses Claude for "coursework, coding projects, and hackathon work." Compl. ¶ 108. He used Claude to develop a tool for "an IBM hackathon." *Id.* Anthropic contends that Smith's use of words like "work" and "projects," plus his use of Claude for an IBM-sponsored hackathon, describe software development, which is "professional work." Dkt. 39 at 25. The Court disagrees. "Educational use is plainly not commercial use," as Plaintiffs note. Dkt. 43 at 22. Smith is a student, not a professional software engineer or employee of IBM. He plausibly used Claude as a "consumer."

As for Plaintiff Kahn, he doesn't explain in any detail what he uses Claude to do. He says he uses Claude Code "to accomplish computer programming tasks," Compl. ¶ 96, but he doesn't specify what those tasks are. And although he signed up for an individual, not an enterprise-level, Claude Max plan, *id.* ¶ 26, that allegation doesn't establish that he uses Claude for "personal, family, or household purposes." Cal. Civ. Code § 1761(d). He could be an entrepreneur who uses Claude Code to develop software for sale. Lastly, Plaintiffs point to an allegation that Kahn uses Claude "for personal, family or household purposes," Compl. ¶ 95, but this is a legal conclusion that parrots the CLRA. The Court isn't bound to accept it as true. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

Plaintiff Khan hasn't plausibly alleged that he uses Claude as a "consumer" as necessary to sue Anthropic under the CLRA.

### d. CLRA Conclusion

Plaintiffs have plausibly alleged that a reasonable consumer is likely to be deceived by Anthropic's "5x or 20x more usage than Pro" representations, that Claude Code is a "service," and that Plaintiff Smith is a "consumer." The Court therefore denies Anthropic's motion to dismiss Plaintiff Smith's CLRA claim. Plaintiffs have *not* alleged sufficient facts to support that Plaintiff Khan is a "consumer." The Court thus grants Anthropic's motion to dismiss Plaintiff Khan's CLRA claim, with leave to amend.

## 2. UCL and FAL Claims

Like the CLRA, California's UCL and FAL prohibit deceptive advertising and are governed by the reasonable consumer standard. *Whiteside*, 108 F.4th at 777. As discussed above, Plaintiffs have satisfied that standard at the pleading stage.

Anthropic doesn't otherwise attack the merits of Plaintiffs' UCL and FAL claims. But Anthropic maintains that (a) Plaintiffs lack Article III standing to sue for injunctive relief under the UCL and FAL, and (b) that Plaintiffs haven't plausibly alleged that they lack an adequate remedy at law as necessary to pursue restitution under the UCL and FAL.

Both of Anthropic's arguments have merit.

### a. Injunctive Relief

"[A] previously deceived consumer may have standing to seek an injunction against false advertising or labeling, even though the consumer now knows or suspects that the advertising was false at the time of the original purchase," by alleging either (1) that he "will be unable to rely on the product's advertising or labeling in the future, and so will not purchase the product although [he] would like to," or (2) that he "might purchase the product in the future, despite the fact it was once marred by false advertising or labeling, as [he] may

reasonably, but incorrectly, assume the product was improved." *Davidson v. Kimberly-Clark Corp.*, 889 F.3d 956, 969–70 (9th Cir. 2018).

Plaintiffs' allegations don't satisfy either criterion. First, Plaintiffs haven't alleged that, because of Anthropic's advertising, they "will not purchase [a Claude Max plan] although [they] would like to." *Id.* at 970. Plaintiffs remain Max subscribers. Compl. ¶¶ 18–19. Their ongoing use of Max means they are not experiencing harm predicated on not being able to purchase a product or service although they would like to.

Second, and again because Plaintiffs remain Max subscribers, they haven't plausibly alleged that they "might purchase [Max] in the future" based on a belief that "the product was improved." *Davidson*, 889 F.3d at 970. Plaintiffs know Max hasn't been "improved"—Max users still don't receive "5x or 20x more usage than Pro" *per month*. Compl. ¶ 35; *see also id.* ¶¶ 46–47. And yet Plaintiffs continue to pay for Max and use it. *See id.* ¶¶ 18–19, 93, 99, 108, 111. It is not plausible, then, that Plaintiffs' future renewal of their Max subscriptions will hinge on their belief that the product has been improved. *See Bargetto v. Walgreen*, No. 22-cv-02639-TLT, 2024 WL 3493260, at *5 (N.D. Cal. June 14, 2024) (holding that a plaintiff lacked standing to pursue injunctive relief because she purchased, or believed she had purchased, a plastic bag after learning about the alleged misrepresentations and indicated that "regardless of whether the plastic bags were to be improved upon in the future, she would still purchase [them]").

Plaintiffs currently lack standing to pursue UCL and FAL claims for injunctive relief.

**b. Restitution**

Plaintiffs seek restitution under the UCL and FAL. *See* Compl. ¶¶ 158, 185, 193. "A federal court cannot award equitable restitution under state law if an adequate legal remedy

exists.” *Bluemel v. Conduent State & Loc. Sols., Inc.*, 834 F. Supp. 3d 863, 867 (N.D. Cal. 2026) (citing *Sonner v. Premier Nutrition Corp.*, 971 F.3d 834, 842 (9th Cir. 2020)).

Because Plaintiffs are also pursuing damages, under the CLRA, they must explain why damages may not be an adequate legal remedy. *See, e.g.*, *Murphy v. Olly Pub. Benefit Corp.*, 651 F. Supp. 3d 1111, 1129 (N.D. Cal. 2023) (holding that plaintiffs satisfied *Sonner* at the pleading stage by alleging that “for a full refund, [they] would have to show that the product has no market value, while that showing is not required for restitution”).

Plaintiffs haven’t done so. They allege only that they “have no adequate remedy at law,” without explaining why. Compl. ¶ 193. The Court isn’t bound to accept Plaintiffs’ legal conclusion as true, *Twombly*, 550 U.S. at 555, and so concludes that they haven’t plausibly alleged the lack of an adequate remedy at law.

**c. UCL and FAL Conclusion**

Plaintiffs haven’t established Article III standing to pursue injunctive relief or plausibly alleged entitlement to restitution. Because neither form of relief is currently available, and because “claims for relief under the FAL and the UCL are limited to restitution and injunctive relief,” *Castillo v. Prime Hydration*, 748 F. Supp. 3d 757, 773 (N.D. Cal. 2024) (quoting another source), the Court dismisses the UCL and FAL claims, with leave to amend.

**3. Negligent Misrepresentation Claim**

Plaintiffs allege that Anthropic’s “5x or 20x more usage” representations were misleading and negligently made. *See* Compl. ¶¶ 164–67. Anthropic contends that Plaintiffs haven’t plausibly alleged a misrepresentation, but Anthropic’s reasoning largely tracks its CLRA-related arguments. Having rejected those arguments in the CLRA context, the Court does so here, too. Like their CLRA claim, Plaintiffs’ negligent misrepresentation claim

"hinges on the reasonable consumer standard," *Girard v. Toyota Motor Sales, U.S.A., Inc.*, 316 Fed. App'x 561, 562 (9th Cir. 2008), which Plaintiffs have satisfied.

Anthropic also argues that Plaintiffs' negligent misrepresentation claim is barred by the economic-loss rule, which "limits a party to a contract to recovering in contract for purely economic loss . . . rather than in tort." *Rattagan v. Uber Techs., Inc.*, 19 F.4th 1188, 1191 (9th Cir. 2021) (citation modified). On this disputed point, the Court adopts the "majority view," *Phillips v. Brooklyn Bedding LLC*, No. 23-cv-03781-RFL, 2024 WL 2830663, at *7 (N.D. Cal. Mar. 28, 2024), which is that "California law classifies negligent misrepresentation as a species of fraud for which economic loss is recoverable." *Kalitta Air, L.L.C. v. Cent. Texas Airborne Sys., Inc.*, 315 F. App'x 603, 607 (9th Cir. 2008) (citing *Bily v. Arthur Young & Co.*, 834 P.2d 745, 768 (Cal. 1992); *Robinson Helicopter Co., Inc. v. Dana Corp.*, 102 P.3d 268, 275 & n.7 (Cal. 2004)). Plaintiffs allege that Anthropic negligently misrepresented details concerning Claude Max subscriptions. Because "[t]he duty to avoid negligently misrepresenting information that will be relied upon by another is a subspecies of fraud[,] . . . the economic loss rule does not apply." *Phillips*, 2024 WL 2830663, at *7.

Plaintiffs have stated a plausible negligent misrepresentation claim.

**4. Breach of Contract Claim**

Plaintiffs allege that they have "valid contracts with Anthropic for the acquisition of Claude via monthly subscriptions to the Max 5x and 20x plans," that they have "complied with the terms of the contract[s] by paying $100 or $200 per month in exchange for access to Claude [Max]," and that Anthropic has breached the contracts "by failing to provide Max subscribers with five and twenty times more usage than it provides to its Pro subscribers per month (or per week, in the alternative), as advertised." Compl. ¶¶ 173–75.

Plaintiffs have stated a plausible breach of contract claim. Anthropic's Terms of Service are the governing contract. *See* Compl. ¶ 34 (alleging that Anthropic requires Claude users to accept the Terms of Service). The Terms offer no details about the cost of a Max subscription or the services included. For those details, the Terms incorporate "the order process." *See* Dkt. 40-2, Consumer Terms of Service § 6(1) (effective Oct. 8, 2025) ("The content, features, and other services provided as part of your Subscription, and the duration of your Subscription, will be described in the order process.").[1]

The "order process" plausibly included webpages on claude.com that Plaintiffs were required to click through to sign up for Claude Max. Those pages explained that Max 5x cost $100 per month and provided "5x more usage than Pro," and that Max 20x cost $200 per month and provided "20x more usage than Pro." Compl. ¶ 37, Graphic C; *id.* ¶ 39, Graphic D; *see also id.* ¶ 35, Graphic B. As held above, reasonable consumers could interpret those promises to mean that if they paid a premium for Max, they would receive 5x or 20x more usage than Pro subscribers *per month*. But Anthropic didn't provide Plaintiffs with 5x or 20x more usage *per month*, so Anthropic plausibly breached the parties' agreement.[2]

Anthropic disputes that the Terms of Service expressly incorporated the "5x or 20x more usage" representations. But the Terms are quite clear on this point. As noted above, they include almost no detail on Max subscription costs and services and instead point to the

[1] Because the Terms of Service "form[] the basis of plaintiff's claim," they are incorporated by reference into the complaint. *Khoja v. Orexigent Therapeutics, Inc.*, 899 F.3d 988, 1002 (9th Cir. 2018) (quoting another source).

[2] On a motion to dismiss, if the plaintiff offers a reasonable interpretation of a contract, the Court accepts it. *See Sisley v. Sprint Commc'ns Co.*, 284 F. App'x 463, 466 (9th Cir. 2008) (reversing Rule 12(b)(6) dismissal when plaintiff "based her allegation that [defendant] breached the contract on a reasonable interpretation of the contract").

"order process" as the source of that information. Dkt. 40-2 § 6(1). The Terms plausibly incorporated Anthropic's "more usage" statements during the order process.

Anthropic alternatively asserts that if its "more usage" statements are incorporated, then its statements clarifying that "more usage" refers to "more usage" *per session* should be incorporated, too. *See* Reply, Dkt. 47 at 17–18 (citing Compl. ¶ 61, Graphic H). As alleged, however, Anthropic included its "more usage" *per session* disclaimer on a webpage that was "outside the sales funnel," and Plaintiffs did "not need to interact with [that page] in order to subscribe to a Max plan." Compl. ¶ 66. Plausibly, then, the *per session* disclaimer wasn't incorporated into the Terms as part of the order process.

Finally, Anthropic contends that Plaintiffs cannot "plausibly plead that Anthropic failed to abide by a contractual promise to provide subscribers with a fixed amount of total usage or features because the Terms expressly reserve Anthropic's right to 'add or remove features, *increase or decrease capacity limits*, offer new Services, or stop offering certain Services." Mot., Dkt. 39 at 29 (quoting Dkt. 40-2 § 12 (emphasis added)). Plaintiffs, however, are not alleging that Anthropic promised to provide them with "a fixed amount of total usage;" they allege that Anthropic promised to provide them with "5x or 20x more usage than Pro." Compl. ¶ 35, Graphic B. Anthropic hasn't suggested that it has increased or decreased those multipliers. Nor, if Anthropic had increased or decreased them, would Anthropic be able to offer evidence of such at the pleading stage.

Plaintiffs have stated a plausible breach of contract claim.

**5. Breach of Implied Covenant of Good Faith and Fair Dealing Claim**

Plaintiffs' final claim is based on different conduct than their other claims. The other claims all center around the allegations that Anthropic misled Plaintiffs into believing that,

as Claude Max subscribers, they would receive "5x or 20x more usage than Pro" subscribers *per month*. *See* Compl. ¶¶ 46–47 53, 104. Plaintiffs' implied covenant claim, in contrast, focuses on changes that Anthropic made to Max subscriptions "during billing cycles," which "reduc[ed] or accelerat[ed] depletion of usage based on undisclosed capacity conditions" and "migrat[ed] premium features to lower-priced or free tiers." *Id.* ¶ 190; *see also id.* ¶¶ 83–87. Plaintiffs assert that "[t]hose practices were inconsistent with [their] objectively reasonable expectations," and that by adopting them, Anthropic breached the implied covenant of good faith and fair dealing. *Id.* ¶ 191; *see also id.* ¶ 189.

Because Plaintiffs' implied covenant claim is based upon changes to Claude services that Anthropic made, the claim runs into Anthropic's reservation of rights. In the Terms of Service, Anthropic made clear that it reserved the right "add or remove features," "increase or decrease capacity limits," and to "modify" the "Services" "in whole or in part" at "any time." Dkt. 40-2 § 12. Anthropic, then, didn't breach the Terms by making changes to Max subscriptions during billing cycles; Anthropic exercised its contractual rights.

Ordinarily, the implied covenant of good faith and fair dealing "will not be read into a contract to prohibit a party from doing that which is expressly permitted by the agreement itself." *Wolf v. Walt Disney Pics. & Tel.*, 162 Cal. App. 4th 1107, 1120 (2008). However, the implied covenant *can* be applied "to contradict an express contractual grant of discretion when necessary to protect an agreement which otherwise would be rendered illusory and unenforceable." *W. Nat'l Mut. Ins. Co. v. Extreme Design Builders, Inc.*, No. 23-cv-02727-EMC, 2026 WL 1133692, at *6 (N.D. Cal. Apr. 27, 2026) (quoting *Third Story Music, Inc. v. Waits*, 41 Cal. App. 4th 798, 806 (1995)). Plaintiffs invoke this exception, but it doesn't apply. Anthropic hasn't rendered the parties' contract illusory.

Despite changes Anthropic has made to Claude, Plaintiffs, as Max subscribers, can still use Claude for more hours per week than Pro and free users can, *see* Compl. ¶¶ 73–78, Table 1, and they still have access to Claude Code, which is the service that attracted them to Claude's paid plans in the first place, *see id.* ¶¶ 96, 108–09. Anthropic's changes did not "completely deprive[]" Plaintiffs "of the premium usage promised to them by their Max plans," as Plaintiffs suggest. Opp'n, Dkt. 43 at 30. The parties' agreement wasn't illusory.

Nor have Plaintiffs plausibly alleged that Anthropic acted in bad faith. *Cf. Convergent Media IV LLC v. Aperture Media Partners LLC*, No. 24-cv-07402-MWF, 2025 WL 2019813, at *5 (C.D. Cal. June 10, 2025) (explaining that the implied covenant "acts as a limitation" on contractual clauses that give one party discretion when necessary "to enforce good faith dealing between contracting parties"). Plaintiffs allege that Anthropic tightened usage limits because surging demand for Claude "strained Anthropic's output capacity capabilities." Compl. ¶ 22. As alleged, then, Anthropic was trying to balance its supply of Claude with consumers' demand. Anthropic didn't tighten usage limits as a bait-and-switch.

The Court dismisses Plaintiffs' implied covenant claim, with leave to amend.

## B. CONCLUSION

The Court grants in part and denies in part Anthropic's motion to dismiss.

The motion is <u>granted</u> as to the following claims:

- Plaintiff Kahn's CLRA claim;
- the UCL and FAL claims; and
- the breach of the implied covenant of good faith and fair dealing claim.

The motion is <u>denied</u> as to the following claims:

- Plaintiff Smith's CLRA claim;

- the negligent misrepresentation claim; and
- the breach of contract claim.

The Court gives Plaintiffs leave to amend their complaint. Their amended complaint is due on December 2, 2026. If Plaintiffs don't amend their complaint, Anthropic shall answer the operative complaint by December 16, 2026.

**IT IS SO ORDERED.**

Dated: November 6, 2026



Alex G. Tse
United States Magistrate Judge